UNITED STATES DISTRICT COURT
IN AND FOR THE STATE OF COLORADO

Case No. 1:17-CV-01500-RPM

SHERROL HALL, PERSONALLY, AND AS PERSONAL
REPRESENTATIVE FOR THE ESTATE OF TERRENCE
JOSEPH EDWARD HUNT, AND ON BEHALF OF THE
WRONGFUL DEATH BENEFICIARIES FOR TERRENCE
JOSEPH EDWARD HUNT

       Plaintiffs,

v.

JASON LENGERICH, IN HIS INDIVIDUAL CAPACITY,
ROBERT TUCKER, IN HIS INDIVIDUAL CAPACITY,
DANA JOHNSON, IN HER INDIVIDUAL CAPACITY,
RENEE JORDAN, IN HER INDIVIDUAL CAPACITY,
PATSY HARTLEY, IN HER INDIVIDUAL CAPACITY,
JOHN HENDRYX, IN HIS INDIVIDUAL CAPACITY,
SANDY JONES, IN HER INDIVIDUAL CAPACITY,
KERRI BARONI, IN HER INDIVIDUAL CAPACITY,
JANE DOES 1-10, AND JOHN DOES 1-10

       Defendants.

_____

## FIRST AMENDED COMPLAINT AND JURY DEMAND
_____

COME NOW, Plaintiffs, Sherrol Hall, Personally, and as Personal Representative

for the Estate of Terrence Joseph Edward Hunt, and on Behalf of the Wrongful Death

Beneficiaries for Terrence Joseph Edward Hunt, by and through her counsel, Finger &

Thigpen, P.C., and bring this amended action against the Defendants, Jason Lengerich,

in his Individual Capacity, Robert Tucker, in his Individual Capacity, Dana Johnson, in her

Individual Capacity, Renee Jordan, in her Individual Capacity, Patsy Hartley, in her Individual Capacity, John Hendryx, in his Individual Capacity, Sandy Jones, in her Individual Capacity, Kerri Baroni, in her Individual Capacity, Jane Does 1-10, and John Does 1-10, pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, and allege, the following:

## I.  INTRODUCTION

1.      This is an action by the Plaintiff, Sherrol Hall, Personally, and as Personal Representative for the Estate of Terrence Joseph Edward Hunt, and on Behalf of the Wrongful Death Beneficiaries for Terrence Joseph Edward Hunt, for wrongful death and violation of civil rights, for the failure to provide necessary and proper medical care and treatment, as well as deliberate indifference causing a deprivation of life.   Plaintiff brings this action for violation of rights under the Eighth Amendment and Fourteenth Amendment of the United States Constitution.   Plaintiff also asserts violations of rights under the State Constitution that caused the death of her son, Terrence Joseph Edward Hunt. Mr. Hunt at all times relevant to events described herein was entitled to constitutional protection relating to his life under the Fourteenth Amendment to the United States Constitution.   The Colorado Department of Corrections and its employees owed to Mr. Hunt a duty to protect him from death and self-harm.   Mr. Hunt maintained similar rights under the State Constitution, including protections under Article II, Section 3 of the State Constitution; Article II, Section 20 of the State Constitution; and Article II, Section 25 of the State Constitution.

2.      The individually named Defendants by failing to properly train, supervise, and act, shockingly and outrageously allowed Mr. Hunt to hang himself, causing his death after Mr. Hunt in a letter that was known and received by the Colorado Department of Corrections, expressed his intent to commit suicide.   A warning was also provided in a phone call from the Plaintiff, Mr. Hunt's mother, that the Colorado Department of Corrections should take the threat seriously.   Defendants failed to follow or order subordinates to follow their own Administrative Regulations and checks put in place to prevent this very type of incident.

3.      Sherrol Hall, as Personal Representative for the Estate of Terrence Joseph Edward Hunt and on behalf of the Wrongful Death Beneficiaries for Terrence Joseph Edward Hunt, provided Defendant, State of Colorado, Colorado Department of Corrections, with a Notice of Claim on July 14, 2015, which was within one hundred eighty day (180) statutory deadline from the date of Mr. Hunt's death on June 20, 2015, as provided under C.R.S. §24-10-101, *et seq.*   See, Governmental Immunity Notice, attached as **Exhibit A**.   Moreover, this action was brought within two (2) years from the date of Mr. Hunt's death on June 20, 2015.

## II.   JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws for the United States of America, and is brought pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

5.      The Court also has supplemental jurisdiction under 28 U.S.C. §1367.

6.      Venue is proper in the District of Colorado, pursuant to 28 U.S.C. §1391(b).

All of the events alleged herein occurred within the State of Colorado, and all of the parties herein were residents of the State of Colorado at the time of the events giving rise to this litigation.

## III.   PARTIES

7.      At all times relevant to the subject matter of this civil action, Decedent, Terrence Joseph Edward Hunt, was a citizen of the United States of America and a resident of the State of Colorado.   Mr. Hunt was an inmate at Buena Vista Correctional Facility (hereafter "BVCF") located in Buena Vista, Colorado, which facility was operated by the Colorado Department of Corrections.   As an inmate under the control of the Department of Corrections, Mr. Hunt was entitled to be free of cruel and unusual punishment under the Eighth Amendment to the United States Constitution, including the right to necessary to necessary and proper medical and psychological treatment.   Mr. Hunt was also entitled to protections under the 14th Amendment of the United States Constitution.

8.      Plaintiff, Sherrol Hall, is the mother of Terrence Joseph Edward Hunt.   She is the Court appointed Personal Representative for the Estate of Terrence Joseph Edward Hunt.   Ms. Hall resides at 1811 South Quebec Way, #183, Denver, Colorado 80231.   She is mother of decedent, Terrence Joseph Edward Hunt.   Ms. Hall brings this action on behalf of the Wrongful Death Beneficiaries of her son, including his daughter, who is a minor child.

9.      Defendant, Jason Lengerich, is sued in his individual capacity.   Defendant

Lengerich at the time of Plaintiff's death was the Warden and Chief Administrative Officer at the Buena Vista Correctional Facility, which is located at 5125 US-24, Buena Vista, Colorado 81211, and may be served with process there.   Defendant Lengerich was the ultimate authority at the facility, who was in charge of creating procedures and supervision of staff for facility security and the safety of inmates.

10.     Defendant, Robert Tucker, is sued in his individual capacity.   Defendant Tucker at the time of Mr. Hunt's death was the supervisor of the Mental Health Services Department at the Buena Vista Correctional Facility, which is located at 5125 US-24, Buena Vista, Colorado 81211, and may be served with process there.

11.     Defendant, Dana Johnson, is sued in her individual capacity.   Defendant Johnson at the time of Mr. Hunt's death was the Health Services Administrator and had responsibility for overseeing all health operations and orders at BVCF.

12.     Defendant, Kerri Baroni, is sued in her individual capacity.   Defendant Baroni at the time of Mr. Hunt's death was the Regional Health Services Administrator, who had responsibility for overseeing health services practices at BVCF.   Prior to this position, she was the Health Services Administrator at BVCF and has responsibilities for establishing procedures for clinical services at the facility and training staff.

13.     Defendant, Renee Jordan, is sued in her individual capacity. Defendant Jordan at the time of Mr. Hunt's death was the Clinical Services Director for the Colorado Department of Corrections and had general oversight for the Colorado Department of Corrections clinical services operations.   Ms. Jordan had responsibilities for establishing

procedures for provision of clinical services, including mental health services and implementing training for clinical staff personnel.

14.   Defendant, Patsy Hartley, is sued in her individual capacity.   Defendant Hartley at the time of Mr. Hunt's death was the Major supervising Custody & Control at BVCF.   Her duties and responsibilities included proper supervision and planning for inmate and safety, and staff training.

15.   Defendant, John Hendryx, is sued in his individual capacity.   Defendant Hendryx at the time of Mr. Hunt's death was a Correctional Officer at the BVCF. Defendant Hendryx at the time of Mr. Hunt's death was assigned to oversee and check on inmates to see that inmates didn't harm themselves, including Mr. Hunt.

16.   Defendant, Sandy Jones, is sued in her individual capacity.   Defendant Jones at the time of Mr. Hunt's death worked in Clinical Health Services at BVCF and was contacted by Sherrol Hall about the suicide threat of her son.   Defendant Jones failed to appropriately respond to this information and obtain mental health assistance for Mr. Hunt.

17.   At this time, the Jane Doe and John Doe Defendants have not been identified.   As soon as they have been identified through the production of Rule 26(a)(1) disclosures and/or the discovery process, the actual individuals will be joined in the civil action.

IV.   FACTUAL ALLEGATIONS

18.   The facts and allegations set forth in all other sections of this Amended

Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

19.     Terrence Joseph Edward Hunt was born on September 1, 1982.

20.     Sherrol Sue Ann Hall is T.J. Hunt's mother.

21.     T.J. Hunt's father, Terry Hunt, walked out of his life when T.J. was two (2) years old, refusing to acknowledge that he was the father.

22.     The highest educational grade that T.J. Hunt completed was ninth grade.

23.     T.J. Hunt acquired his GED in 1999 from Jefferson County Public Schools.

24.     The State of Colorado took possession of T.J. Hunt when he was fifteen (15) years old.

25.     He spent substantial time incarcerated in the Correctional Facilities operated by the Colorado Department of Corrections from 2007 to the date of his death on June 20, 2015.

26.     With regard to his most recent incarceration, T.J. Hunt was at first incarcerated in the Denver Reception and Diagnostic Center (hereafter "DRDC") for classification purposes from January 7, 2015 until January 14, 2015.

27.     On January 14, 2015, Mr. Hunt was transferred to the Limon Correctional Facility, where he remained incarcerated until March 25, 2015.

28.     On March 25, 2015, Mr. Hunt was transferred to the Buena Vista Correctional Facility.

29.     On April 22, 2015, correctional officers found tattoo paraphernalia in T.J.

Hunt cell. As a result, T.J. Hunt was charged and ordered to be placed in punitive Segregation.

30.     On June 11, 2015, T.J. Hunt wrote a letter to his mother, Sherrol Hall.

31.     In his June 11th letter, T.J. Hunt expressed his intent either to injure himself or others, including correctional officers.   Further, he stated,

> I sent a note to Mental Health about a hardship move … I've received absolutely no answer.   Surprise, surprise … We aren't even human, so why even acknowledge my existence?   I don't have much left though.   I refuse to tolerate this shithole. Every fucking aspect of this place is COMPLETELY miserable.   I go back and forth between thoughts of killing myself and killing one of these pieces of shit that think their job is to make my time hard and make sure I c/o every possible day of my sentence.   Stomping one of them to death would at least give me some temporary joy.

32.     All outgoing letters, including the June 11, 2015 letter by T.J. Hunt, are read by Buena Vista Correctional security staff prior to it being mailed to the recipient, according to the Colorado Department of Corrections Administrative Regulations 300-26 and 300-38.   So, Mr. Hunt's letter was read by BVCF such that the contents were known. The content of letters where threats are made are required to be reported up the chain of command to the top level of management in the facility for security reasons.

33.     Defendants, Hartley and Lengerich, knew or should have known of the threats made by Mr. Hunt.

34.     Defendants, Hartley, Legenrich, and others in security were responsible for notifying mental health personnel of the threat by Mr. Hunt to kill himself.

35.     Nevertheless, employees of the Department also knew that T.J. Hunt

intended either to kill himself or kill correctional officers, or was seriously considering taking such action.

36.     Some or all of the Defendants also knew or should have known that T.J. Hunt had made numerous efforts to contact Mental Health staff at BVCF.

37.     Pursuant to the Colorado Department of Corrections regulations, the threat to kill one's self or staff required a comprehensive mental health assessment; yet, there was no record that such a mental health assessment was done.

38.     As such, Defendants failed to comply or failed to see that Administrative Regulation 700-29, which provided that "It is the policy of the Colorado Department of Corrections to provide assistive and supportive mental health interventions for offenders who may be at risk for harm to self or others, emotional dysregulation, and/or acute psychiatric symptoms and to immediately intervene to prevent injury by offenders whenever possible."

39.     No mental health watch was ordered for T.J. Hunt.

40.     No mental health assistive or supportive interventions were ordered for T.J. Hunt.

41.     No interventions with T.J. Hunt, who clearly expressed his intent either to harm himself or others, were ordered in order to prevent injury.

42.     In direct violation of Administrative Regulation 700-29, there was no immediate response to the clear threat of self-injurious behavior or injury to DOC employees by T.J. Hunt's June 11, 2015 letter that was read and reviewed for content in

accordance with Administrative Regulations 300-26 and 300-38.

43. DOC Administrative Regulation 700-23, provides that "It is the policy of the Department of Corrections to administer psychotropic medication to offenders on an emergency basis without consent in order to avoid imminent danger to self or others." See, AR 700-23, attached hereto as **Exhibit B**. It was clear from the June 11, 2015 letter, that T.J. Hunt spelled out his intent to injure either himself or DOC employees. This policy and regulation was not adhered to by all or some of the Defendants.

44. It is also clear from Administrative Regulation 300-38 as well as Administrative Regulation 300-26 that all outgoing mail, including T.J. Hunt's June 11, 2015 letter, would be read for content. See, AR 300-38, attached hereto as **Exhibit C**; see also, AR 300-26, attached hereto as **Exhibit D**. Thus, Department of Corrections officers and staff knew that T.J. Hunt had a clear intent to injure either himself or DOC employees.

45. No psychotropic medications were ordered for T.J. Hunt despite the imminent danger to T.J. Hunt himself or others, as stated in his June 11, 2015 letter.

46. All or some of the Defendants failed to comply with Administrative Regulation 700-03. See, AR 700-03, attached hereto as **Exhibit E**.

47. No mental health services oriented towards improvement, maintenance or stabilization of T.J. Hunt's mental health were provided.

48. No mental health services oriented towards the maintenance of an environment that preserves T.J. Hunt's basic human rights and dignity were provided.

49.     T.J. Hunt's mother received his letter of June 11, 2015.

50.     Upon her receipt of the letter, Sherrol Hall immediately became alarmed and perceived it to be a real life threatening situation.   She contacted Buena Vista Correctional Facility in order to alert them that T.J. Hunt intended to injure or kill himself, or harm or kill correctional officers.

51.     In her first few attempts to contact the mental health staff and/or correctional officers at the prison and alert them to her son's intent to injure himself or others, the Colorado Department of Corrections refused to take her outcry as serious.

52.     After Sherrol Hall's numerous attempts to contact prison officials, regarding T.J. Hunt's June 11th letter, which they had already seen, she finally got in touch with Sandy Jones, who was a mental health worker at Buena Vista Correctional Facility.

53.     Sherrol Hall told Sandy Jones about T.J. Hunt's June 11th letter, including T.J. Hunt's intent to injure himself, commit suicide, or injure others, including correctional officers.   She read some of the letter's content to Ms. Jones.

54.     According to the Colorado Department of Correction's records, Defendant Jones failed to have Mr. Hunt examined by a competent mental health treater, psychologist, psychiatrist, or medical doctor, and treated for his mental condition and threats.   She also failed to report the information she received from Mrs. Hall and the threats.

55.     It is clear from Administrative Regulation 700-29, that "Each facility will provide low level interventions and immediately identify, respond to, treat, and attempt to

prevent offenders from self-injurious and/or suicidal behaviors . . . At any time an offender verbalizes an intent to harm self or others or engages in these behaviors, mental health interventions will be implemented."   See, AR 700-29, attached hereto as **Exhibit F**.

56.   The Colorado Department of Corrections has required protocols, procedures, and regulations concerning inmates who have expressed an intent to injure themselves or others, as T.J. Hunt had done in his June 11, 2015 letter, which had to have been reviewed for content in accordance with Administrative Regulations 300-26 and 300-38, and those protocols, procedures, and regulations were not followed.   See, Exhibits C and D.

57.   Administrative Regulation 700-29(IV)(C), states, "Mental health interventions are indicated when an offender is identified to be at risk because of self-injurious and/or suicidal behavior, or who are disruptive or dangerous due to mental health problems."   See, Exhibit F.   Here, T.J. Hunt should have been identified to be at risk because of the clear intent for self-injurious and/or suicidal behavior, as well as his intent to injure DOC employees, as expressed in his June 11, 2015 letter that had to be reviewed for content by DOC employees, when it was mailed out to his mother. Furthermore, T.J. Hunt would have been identified to be at risk because of the phone call from his mother to the facility, stating that T.J. Hunt intended to commit suicide or harm DOC employees.

58.   At the very least Emergency Medication Procedures should have been implemented in accordance with Administrative Regulation 700-23(IV)(B)(1)(a), which

provided that "A psychiatric emergency exists when a mentally ill offender is determined to be in imminent danger of hurting himself/herself or others, as evidenced by a recent overt act, including, but not limited to, self-destructive behavior, a credible threat of bodily harm to self or others, or an assault upon another person."   See, Exhibit B.   Here, there was a credible threat of bodily harm to himself and others in his June 11, 2015 letter as well as confirmation by his mother, who called the facility about it and spoke with Sandy Jones.

59.   Defendant Jones failed to create any paperwork that memorialized any interactions with T.J. Hunt.   See, Exhibit F.

60.   Defendant Jones failed to implement any of the policies and procedures that were in place for this very type of situation.   See, Exhibits B through F.

61.   Defendant Jones failed to institute a mental health watch for T.J. Hunt. See, Exhibit F.

62.   Defendant Jones failed to institute any protections for T.J. Hunt in his fragile and self-injurious mental state.   See, Exhibits B through F.

63.   Defendant Jones failed to notify the on-duty shift commander, regarding T.J. Hunt's clear intent to injure himself and/or a DOC employee.   See, Exhibit F.

64.   Defendant Jones failed to maintain continuous supervision of T.J. Hunt despite knowing his clear intent to injure himself and/or a DOC employee.   See, Exhibit F.

65.   Defendant Jones failed to provide written directives to the on-duty shift

commander, regarding T.J. Hunt's clear intent to injure himself and/or a DOC employee. See, Exhibit F.

66.     There was no documentation of any request for a DOC employee, including, but not limited to Defendant Jones, to monitor T.J. Hunt.   See, Exhibit F.

67.     Defendant Jones failed to perform and document an assessment to determine the necessity for a mental health watch.   See, Exhibit F.

68.     No nursing protocol for mental health crisis was completed by the nursing staff.   See, Exhibit F.

69.     No on-site, face-to-face clinical interview was performed and/or documented by Defendant Jones.   See, Exhibit F.

70.     Defendant Jones did not review T.J. Hunt's mental health record, as required for a mental health assessment.   See, Exhibit F.

71.     Defendant Jones failed to have any discussions with DOC employees and/or contract workers regarding T.J. Hunt's recent behavior and management needs. See, Exhibit F.

72.     Defendant Jones failed to perform and/or document an assessment of T.J. Hunt's current suicide plan, intent, means, and other indicators of risk of self-injurious behavior, that was clearly stated by T.J. Hunt in his June 11, 2015 letter to his mother as well as communicated by T.J. Hunt's mother to Defendant Jones directly over the phone prior to his suicide.   See, Exhibit F.

73.     Pursuant to Administrative Regulation 700-29(IV)(D)(4)(b)(3), "The

completed assessment is then entered into the electronic health record."   See, Exhibit F. This was not done.   No such assessment for T.J. Hunt was performed and no such assessment was recorded in the electronic medical record.   This was a violation of the Administrative Regulation.

74.   Defendant Jones failed to protect T.J. Hunt's life.   See, Exhibits B through F.

75.   Defendant Hendryx was a correctional officer on duty on June 20, 2015. He was one of the correctional officers in charge of making rounds with the inmates in Segregation, including T.J. Hunt.

76.   On information and belief Defendant Hendryx knew of or was made aware of Mr. Hunt's statements about killing himself or killing staff; yet, despite such knowledge Defendant Hendryx failed to place T.J. Hunt on a suicidal watch or mental health watch or see that he was properly supervised.   See, Exhibits B through F.

77.   Defendant Hendryx failed to contact the mental health unit regarding T.J. Hunt's known intent to injure himself or others, including correctional officers.   See, Exhibits B through F.

78.   Defendant Hendryx failed to prevent T.J. Hunt from injuring himself and/or committing suicide.   See, Exhibits B through F.

79.   Defendant Hendryx allowed T.J. Hunt the time to make a ligature from his bed sheet, attach it to something, hang himself, and die without once coming by his cell to check on him.

80.     Defendant Hendryx failed to protect T.J. Hunt's life.   See, Exhibits B through F.

81.     On June 20, 2015, at approximately 2:39 p.m., Defendant Hendryx found T.J. Hunt dead, hanging by a ligature from his bookcase.

82.     On June 20, 2015, at approximately 6:15 p.m., Maureen Sheridan, who was an investigator with the Colorado Department of Corrections Inspector General Office, arrived at Buena Vista Correctional Facility allegedly in order to conduct an investigation into the hanging death of inmate, T.J. Hunt.

83.     Investigator Sheridan made a list of twelve alleged witnesses to the incident without taking a single statement from a one of them.

84.     Defendant Jones was not listed as a witness, nor was any detailed statement of Ms. Jones taken.   Further, this investigation failed to ascertain what steps Defendant Jones and her supervisors took to protect the life of Mr. Hunt.

85.     There is no mention in the investigation as to why Defendant Jones failed to perform a mental health assessment of T.J. Hunt, whom clearly stated an intent to injure himself or DOC employees, which was further confirmed by T.J. Hunt's mom, who called the facility and spoke with Defendant Jones.

86.     There is no mention in the investigation as to why Defendant Jones and others at the facility failed to perform the requisite assessments, documentation, and monitor T.J. Hunt, following his clear intent to injure himself and/or DOC employees.

87.     Investigator Sheridan claimed that she watched a SPRITE video of inmate

T.J. Hunt's cell leading up to his hanging death, but it was not a part of her investigation file. This video has been withheld from the Plaintiff, who made an Open Records Request of the Department of Corrections, pursuant to state statute.

88. No pictures were a part of the Inspector General's investigation file.

89. No audio from any interviews with Defendant Jones and Defendant Hendryx were part of the I.G.'s investigation file that was provided.

90. Warden Lengerich received the investigation report and did not question the fact that the report was incomplete and there were no statements, video, or photos.

91. Defendant Lengerich did not question the fact that Defendant Jones failed to follow required procedures contained in Administrative Regulations 700-03, 700-23, and/or 700-29, nor did he refer the matter to Clinical Services for review and disciplinary action consideration.

92. Neither Investigator Sheridan nor Defendant Lengerich or any of the other high ranking DOC officers or any Defendants made any mention of the fact that the facility was well aware of inmate T.J. Hunt's June 11, 2015 letter and the clear intent by inmate T.J. Hunt to injure or kill himself, or kill others, including correctional officers.

93. Neither Investigator Sheridan nor Defendant Lengerich or any of the other Defendants made any mention of the fact that the facility apparently had no mental health records showing diagnosis or treatment for inmate T.J. Hunt during his time at Buena Vista Correctional Facility in 2015.

94. Sherrol Hall was not contacted on June 20, 2015, regarding the hanging

death of her son, T.J. Hunt.

95.     On July 14, 2015, the Plaintiffs provided the State of Colorado, Colorado Department of Corrections with a Notice of Claim.   See **Exhibit A**.

96.     On February 23, 2017, an Open Records Request was made upon the State of Colorado and only limited records were provided in response by the State of Colorado.

97.     The Department of Corrections by and through the Defendants or some of them engaged in a cover-up concerning the death of T.J. Hunt.

98.     As a direct and/or proximate result of Defendants' actions and/or omissions, Plaintiffs, including the wrongful death beneficiaries, who suffered and continue to suffer damages, including, but not limited to: (a) Pain and Suffering; (b) Strangulation; (c) Diminishment of Health; (d) Delays in treatment; (e) Inaccurate assessments; (f) Inadequate and/or non-existent mental health treatment; (g) Careless and reckless monitoring; (h) Psychological and emotional trauma, distress, worry, anxiety, and mental suffering; (i) Loss of enjoyment of life; (j) Fear; (k) Mistreatment; (l) Abuse; (m) Neglect; (n) Death; (o) Grief to wrongful death beneficiaries; (p) Loss of companionship to wrongful death beneficiaries; (q) Pain and suffering to wrongful death beneficiaries; (r) Emotional stress to wrongful death beneficiaries; and (s) Funeral and burial expenses.

99.     In addition to compensatory and non-compensatory damages, Plaintiffs are additionally entitled to an award of attorney's fees and costs as permitted by statute.

100.     Plaintiffs are entitled to pre-judgment and post-judgment interest at the rate

provided by statute and seeks pre-judgment interest from the earliest possible date.

101.    Finally, Plaintiffs seek an award of punitive damages, relating to the federal claims, based upon the intentionally reckless and outrageous conduct by Defendants, as outlined herein.   Plaintiffs reserve the right to seek amendment and request punitive damages for any state claims.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Wrongful Death Violation of State Law by Defendant,*
*John Hendryx, In his Individual Capacity*

102.    The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

103.    Defendant Hendryx, in his individual capacity, owed a duty to Plaintiff-decedent to render care, treatment, and services, in accordance with the applicable standards of care, constitutional rights and privileges, administrative regulations, state regulations, and federal regulations ordinarily possessed and exercised by members of the corrections community under the same or similar circumstances.

104.    Defendant Hendryx, in his individual capacity, owed Plaintiff-decedent a duty to protect and promote the public welfare by providing for the development, establishment and enforcement of certain standards in the maintenance and operation of their corrections facility, along with its employees and/or agents', which would have insured safe and injury-free incarceration for Plaintiff-decedent in and/or by such

institution, corrections facility, or correctional officers.

105.    Defendant Hendryx, in his individual capacity, owed Plaintiff-decedent a duty to adhere to the recognized standards of acceptable professional practice, as provided under applicable policies and procedures, applicable standards of care for correctional facilities and/or health facilities in the same or similarly situated circumstances as were present here,

106.    Defendant Hendryx, in his individual capacity, recklessly, willfully, intentionally, and deliberate indifference deviated from the recognized standards of care, breached the recognized standards of care, and violated their duty of care to Plaintiff-decedent through mistreatment, abuse, and neglect.    More specifically, Defendant Hendryx, in his individual capacity, was the correctional officer responsible for T.J. Hunt, his condition, and his cell prior to, during, and after T.J. Hunt hung himself. Defendant Hendryx knew or should have known about T.J. Hunt's June 11, 2015 letter, wherein T.J. Hunt admits that he will be killing himself and/or injuring correctional officers or staff.    Despite this knowledge, Defendant Hendryx's actions and omissions were reckless, willful, intentional, and with deliberate indifference, disregarding T.J. Hunt's safety and causing his death.

107.    At all times relevant hereto, Defendant Hendryx, in his individual capacity, knew or should have known that he had breached the direct and non-delegable duties owed to Plaintiff-decedent to use reasonable care in maintaining safe and adequate facilities free from self-injurious behavior, to select and retain competent correctional officers, to select and retain

competent custody and control personnel, and to formulate and enforce adequate rules and policies to ensure quality care for inmates, such as Mr. Hunt.  As a direct and/or proximate result of said actions or omissions which were intentional, willful, reckless, and with deliberate indifference for T.J. Hunt's life, causing his wrongful death, Plaintiff-decedent suffered damages and/or harm, as set forth herein.

108.   At all times relevant hereto, Defendant Hendryx, in his individual capacity, was on constructive and actual notice that Plaintiff-decedent's suicidal, self-injurious condition involved a heightened risk, and despite being on notice of his condition, the Defendant Hendryx did nothing to deter or prevent Plaintiff-decedent from injury and/or damage from such conditions. As a direct and/or proximate result of said actions or omissions which were intentional, willful, reckless, and with deliberate indifference, causing T.J. Hunt's wrongful death, Plaintiffs', including the wrongful death beneficiaries, suffered damages and/or harm and continue to suffer damages, including, but not limited to: (a) Pain and Suffering; (b) Strangulation; (c) Diminishment of Health; (d) Delays in treatment; (e) Inaccurate assessments; (f) Inadequate and/or non-existent mental health treatment; (g) Careless and reckless monitoring; (h) Psychological and emotional trauma, distress, worry, anxiety, and mental suffering; (i) Loss of enjoyment of life; (j) Fear; (k) Mistreatment; (l) Abuse; (m) Neglect; (n) Death; (o) Grief to wrongful death beneficiaries; (p) Loss of companionship to wrongful death beneficiaries; (q) Pain and suffering to wrongful death beneficiaries; (r) Emotional stress to wrongful death beneficiaries; and (s) Funeral and burial expenses.

109.   Defendant Hendryx, in his individual capacity is responsible for the acts and

omissions, including the actions or omissions which were intentional, willful, reckless, and with deliberate indifference, causing T.J. Hunt's wrongful death, under the theory of respondeat superior.

110.   Defendant Hendryx, in his individual capacity feloniously killed Plaintiff-decedent through the reckless care or lack thereof for Plaintiff-decedent, warranting a claim for felonious killing.

## SECOND CAUSE OF ACTION
*Wrongful Death Violation of State Law by Defendant,*
*Sandy Jones, in her Individual Capacity*

111.   The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

112.   Defendant Jones, in her individual capacity, owed a duty to Plaintiff-decedent to render care, treatment, and services, in accordance with the applicable standards of care, constitutional rights and privileges, administrative regulations, state regulations, and federal regulations ordinarily possessed and exercised by members of the corrections community under the same or similar circumstances.

113.   Defendant Jones, in her individual capacity, owed Plaintiff-decedent a duty to protect and promote the public welfare by providing for the development, establishment and enforcement of certain standards in the maintenance and operation of the corrections facility, along with its employees and/or agents', which would have insured safe and injury-free incarceration for Plaintiff-decedent in and/or by such institution or mental

health professionals.

114.    Defendant Jones, in her individual capacity, owed Plaintiff-decedent a duty to adhere to the recognized standards of acceptable professional practice, as provided under applicable policies and procedures, applicable standards of care for health facilities in the same or similarly situated circumstances as were present here,

115.    Defendant Jones, in her individual capacity, intentionally, recklessly, willfully, and with deliberate indifference deviated from the recognized standards of care, breached the recognized standards of care, and violated their duty of care to Plaintiff-decedent through mistreatment, abuse, and neglect.    More specifically, Defendant Jones, in her individual capacity, was the mental health officer specifically responsible for evaluating T.J. Hunt's mental condition, reporting on his mental condition, referring T.J. Hunt for a mental health watch, documenting T.J. Hunt's need for a mental health watch, prior to, during, and after T.J. Hunt hung himself. Defendant Jones knew about T.J. Hunt's June 11, 2015 letter.    Moreover, she had spoken with Mrs. Hall, wherein Mrs. Hall told her that T.J. Hunt would be killing himself and/or injuring correctional officers or staff.    Despite this knowledge, Defendant Jones' actions and omissions were reckless, willful, intentional, and with deliberate indifference, disregarding T.J. Hunt's safety and causing his death.

116.    At all times relevant hereto, Defendant Jones, in her individual capacity, knew or should have known that she had breached the direct and non-delegable duties owed to Plaintiff-decedent to use reasonable care in maintaining safe and adequate facilities free from

self-injurious behavior, to select and retain competent mental health workers, and to formulate and enforce adequate rules and policies to ensure quality care for inmates such as Mr. Hunt. As a direct and/or proximate result of said actions or omissions which were intentional, reckless, willful, and with deliberate indifference, causing T.J. Hunt's wrongful death, Plaintiff-decedent suffered damages and/or harm, as set forth herein.

117. At all times relevant hereto, Defendant Jones, in her individual capacity, was on constructive and actual notice that Plaintiff-decedent's suicidal, self-injurious condition involved a heightened risk, and despite being on notice of his condition, the Defendant Jones did nothing to deter or prevent Plaintiff-decedent from injury and/or damage from such conditions. As a direct and/or proximate result of said actions or omissions which were intentional, reckless, willful, and with deliberate indifference, causing T.J. Hunt's wrongful death, Plaintiffs', including the wrongful death beneficiaries, suffered damages and/or harm, including, but not limited to: (a) Pain and Suffering; (b) Strangulation; (c) Diminishment of Health; (d) Delays in treatment; (e) Inaccurate assessments; (f) Inadequate and/or non-existent mental health treatment; (g) Careless and reckless monitoring; (h) Psychological and emotional trauma, distress, worry, anxiety, and mental suffering; (i) Loss of enjoyment of life; (j) Fear; (k) Mistreatment; (l) Abuse; (m) Neglect; (n) Death; (o) Grief to wrongful death beneficiaries; (p) Loss of companionship to wrongful death beneficiaries; (q) Pain and suffering to wrongful death beneficiaries; (r) Emotional stress to wrongful death beneficiaries; and (s) Funeral and burial expenses.

118. Defendant Jones, in her individual capacity, is responsible for the acts and omissions, including those which were intentional, reckless, willful, and with deliberate

indifference, causing T.J. Hunt's wrongful death under the theory of respondeat superior.

119.    Defendant Jones, in her individual capacity, feloniously killed Plaintiff-decedent through the reckless care or lack thereof for Plaintiff-decedent, warranting a claim for felonious killing.

THIRD CAUSE OF ACTION
*Violation of 42 U.S.C. ' 1983*
*- Eighth Amendment & Fourteenth Amendment Violations –*
*- Failure to Provide Medical Care & Treatment –*
*- Action with Deliberate Indifference & Taking of a Life -*
*By Defendant, John Hendryx, In His Individual Capacity*

120.    The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

121.    At all times relevant to the allegations in this Amended Complaint, Defendant Hendryx acted or failed to act under color of state and/or federal law, statutes, and regulations, including but not limited to 42 U.S.C. §1983 as well as the Eighth Amendment to the United States Constitution.

122.    Defendant Hendryx is a person under 42 U.S.C. §1983.

123.    Defendant Hendryx was the Correctional Officer responsible for making rounds to inmates cells, including Mr. Hunt's cell, on or about June 20, 2015.

124.    Defendant Hendryx was aware or should have been aware that Mr. Hunt was suicidal and/or intent on injuring himself.

125.    Defendant Hendryx was aware or should have been aware that Mr. Hunt

had written a letter to his mother, making it known that he intended to kill or injure himself.

126.   Nevertheless, with deliberate indifference to Mr. Hunt's constitutional right not to be denied life, liberty, or necessary medical or mental care, protected by the Fourteenth Amendment to the United States Constitution, Defendant Hendryx failed to examine and care for Mr. Hunt's worsening suicidal and self-injurious condition and failed to send Mr. Hunt for treatment.   Defendant Hendryx did so despite its knowledge of Mr. Hunt's serious suicidal and self-injurious needs, placing him at risk of substantial physical and mental harm.

127.   When Mr. Hunt was obviously planning to commit suicide and/or injure himself, as reflected both by: (a) his June 11, 2015 letter to his mother, which was reviewed by the Colorado Department of Corrections security staff at the Buena Vista Correctional Facility prior to sending it out of the facility to his mother; and (b) Mr. Hunt's mother, Sherrol Hall, openly and obviously warning Defendants through multiple phone calls and messages left for Defendants, regarding his desire to commit suicide or injure himself, Defendants acted with deliberate indifference to Mr. Hunt's known serious medical need and constitutional rights in failing to obtain and provide medical treatment, mental health care, and/or mental health watch for him in a timely and appropriate fashion.

128.   Mr. Hunt's serious medical need was so obvious that even a lay person would easily recognize the necessity for a doctor's attention, as he was clearly stating his desire either to commit suicide or seriously harm correctional officers.

129.   The acts or omissions of Defendant Hendryx was conducted in his individual capacity.

130.   The acts or omissions of Defendant Hendryx was the legal and proximate cause of Mr. Hunt's injuries and death.

131.   The acts or omissions of Defendant Hendryx caused Mr. Hunt damages in that he suffered extreme physical and mental pain during the hours leading up to his death, and ultimately caused Mr. Hunt's death.

132.   The actions or omissions of Defendant Hendryx, as described herein, intentionally deprived Mr. Hunt of his right to be free of cruel and unusual punishment and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

133.   Further, Defendant Hendryx acted or failed to act under color of state and/or federal law, statutes, and regulations, including but not limited to 42 U.S.C. §1983 as well as the Eighth Amendment to the United States Constitution.

FOURTH CAUSE OF ACTION
*Violation of 42 U.S.C. ' 1983*
*- Eighth Amendment & Fourteenth Amendment Violations –*
*- Failure to Provide Medical Care & Treatment –*
*- Action with Deliberate Indifference & Taking of a Life -*
*By Defendant, Sandy Jones, In Her Individual Capacity*

134.   The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

135.    At all times relevant to the allegations in this Amended Complaint, Defendant Jones acted or failed to act under color of state and/or federal law, statutes, and regulations, including but not limited to 42 U.S.C. §1983 as well as the Eighth Amendment to the United States Constitution.

136.    Defendant Jones is a person under 42 U.S.C. §1983.

137.    Defendant Jones admits that Mr. Hunt's mother, Sherrol Hall, contacted her by phone multiple times and warned her that Mr. Hunt would try to harm himself prior to him being found dead in his cell.

138.    Defendant Jones was the mental health staff responsible for documenting mental health needs from inmates, such as T.J. Hunt, as well as documenting and recommending a mental health watch to inmates, including T.J. Hunt, on or about June 20, 2015.

139.    Defendant Jones was aware that Mr. Hunt was suicidal and/or intent on injuring himself.

140.    Defendant Jones was aware that Mr. Hunt had written a letter to his mother, making it known that he intended to kill or injure himself.

141.    At all times relevant to the allegations in this Amended Complaint, Defendant Jones knew or should have known of Mr. Hunt's life-threatening, self-injurious mental condition.

142.    Nevertheless, with deliberate indifference to Mr. Hunt's constitutional right not to be denied life, liberty, or necessary medical or mental care, protected by the

Fourteenth Amendment to the United States Constitution, Defendant Jones failed to examine, treat, and care for Mr. Hunt's worsening suicidal and self-injurious condition and failed to send Mr. Hunt for treatment.   Defendant Jones did so despite her knowledge of Mr. Hunt's serious medical, suicidal, and self-injurious needs, placing him at risk of substantial physical and mental harm.

143.   When Mr. Hunt was obviously planning to commit suicide and/or injure himself, as reflected both by: (a) his June 11, 2015 letter to his mother, which was reviewed by the Colorado Department of Corrections security staff at the Buena Vista Correctional Facility prior to sending it out of the facility to his mother; and (b) Mr. Hunt's mother, Sherrol Hall, openly and obviously warning Defendants through multiple phone calls and messages left for Defendants, regarding his desire to commit suicide or injure himself, Defendant Jones acted with deliberate indifference to Mr. Hunt's known serious medical need and constitutional rights in failing to obtain and provide medical treatment, mental health care, and/or mental health watch for him in a timely and appropriate fashion.

144.   Mr. Hunt's serious medical need was so obvious that even a lay person would easily recognize the necessity for a doctor's attention, as he was clearly stating his desire either to commit suicide or seriously harm correctional officers.

145.   The acts or omissions of Defendant Jones was conducted in her individual capacity.

146.   The acts or omissions of Defendant Jones was the legal and proximate

cause of Mr. Hunt's injuries and death.

147.    The acts or omissions of Defendant Jones caused Mr. Hunt damages in that he suffered extreme physical and mental pain during the hours leading up to his death, and ultimately caused Mr. Hunt's death.

148.    The actions or omissions of Defendant Jones, as described herein, intentionally deprived Mr. Hunt of his right to be free of cruel and unusual punishment and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

149.    Further, Defendant Jones acted or failed to act under color of state and/or federal law, statutes, and regulations, including but not limited to 42 U.S.C. §1983 as well as the Eighth Amendment to the United States Constitution.

FIFTH CAUSE OF ACTION
*Violation of 42 U.S.C. §1983*
*- Eighth Amendment & Fourteenth Amendment Violations -*
*- Liability for Failure to Train, Supervise, & Take Corrective or Disciplinary Action -*
*By Defendants, Tucker, Johnson, Jordan,*
*Hartley, Baroni, and Lengerich, In Their Individual Capacities*

150.    The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

151.    Defendants, Lengerich, Hartley, Jordan, Johnson, Tucker, and Baroni, are persons, as defined under 42 U.S.C. §1983.

152.    Further, Defendants, Lengerich, Hartley, Jordan, Johnson, Tucker, and

Baroni, acted or failed to act under color of state and/or federal law, statutes, and regulations, including but not limited to 42 U.S.C. §1983 as well as the Eighth Amendment to the United States Constitution.

153. Defendant Lengerich was the Warden at Buena Vista Correctional Facility in June of 2015.

154. Defendant Lengerich, as Warden of the facility, was responsible for ensuring that all staff, including Defendants, Hendryx and Hartley, were properly trained to perform their job duties for which they were hired and employed, including training concerning Administrative Regulations, including, but not limited to Administrative Regulations 300-26, 300-38, 700-03, 700-23, and 700-29, as well as facility security, offender mail, publications, inmate safety, and freedom from self-injurious behavior.

155. Defendant Jordan, as head of Clinical Services for the Colorado Department of Corrections in June of 2015, was responsible for ensuring that regulations, concerning mental health, mental health interventions, mental health scope of service, emergency mental health and medication administration, facility security, inmate safety, and freedom from self-injurious behavior, were proper and carried out by his staff, including Defendants, Tucker, Johnson, and Jones.

156. Defendant Tucker was the head of Mental Health at Buena Vista Correctional Facility in June of 2015 and under the direction and control of Defendant Jordan.

157. Defendant Tucker, as head of Mental Health at the facility, was responsible

for ensuring that all mental health staff were properly trained to perform their job duties for which they were hired and employed in mental health, including Defendant Jones.

158.   Defendant Tucker, as head of Mental Health at the facility, was responsible for ensuring that regulations, concerning mental health, were proper and carried out by his staff, including Defendant Jones.

159.   Defendant Johnson was the Health Services Administrator for the Department of Corrections in June of 2015 under the direction and control of Defendant Jordan.

160.   Defendant Johnson, as Health Services Administrator over all facilities, was responsible for ensuring that all health services staff, including Defendant Jones, were properly trained to perform their job duties for which they were hired and employed in health services.

161.   Defendant Johnson, as Health Services Administrator over all facilities, was responsible for ensuring that regulations, concerning health services, were proper and carried out by her staff, including Defendant Jones.

162.   Defendant Jordan, was the head of Clinical Services for the Department of Corrections in June of 2015.

163.   Defendant Jordan, as head of Clinical Services over all facilities, was responsible for ensuring that all staff were properly trained to perform their job duties for which they were hired and employed in Clinical Services, including Defendant Jones.

164.   Defendant Jordan, as head of Clinical Services over all facilities, was

responsible for ensuring that regulations, concerning Clinical Services, were proper and carried out by her staff, including Defendant Jones.

165.   Defendant Hartley, was the head of Custody & Control at Buena Vista Correctional Facility in June of 2015 under the guidance and direction of Defendant Lengerich.

166.   Defendant Hartley, as head of Custody & Control at the facility, was responsible for ensuring that all staff, including Defendant Hendryx, were properly trained to perform their job duties for which they were hired and employed as correctional officers.

167.   Defendant Hartley, as head of Custody & Control at the facility, was responsible for ensuring that regulations, concerning correctional officers carrying out their duties with regard to self-injurious and suicidal inmates, were proper and carried out by her staff, including Defendant Hendryx.

168.   Defendant Lengerich had a duty to train, supervise, and take corrective or disciplinary action with correctional officers, including Defendants, Hartley and Hendryx, in order to ensure both their compliance with Administrative Regulations, statutes, and federal regulations, as well as the safety and well-being of prisoners confined at Buena Vista Correctional Facility.

169.   Defendant Lengerich took no corrective or disciplinary action against Defendants, Hartley or Hendryx, for their intentional, willful, reckless, and with deliberate indifference failure to comply with applicable Administrative Regulations, statutes, and

federal regulations, as outlined herein, causing the death of T.J. Hunt.

170.   Defendant Jordan had a duty to train, supervise, and take corrective or disciplinary action with medical staff and mental health staff, including Defendants, Tucker, Johnson, Baroni, and Jones, in order to ensure both their compliance with Administrative Regulations, statutes, and federal regulations, as well as the safety and well-being of prisoners confined at Buena Vista Correctional Facility.

171.   Defendant Jordan took no corrective or disciplinary action against Defendants, Tucker, Johnson, Baroni, or Jones, for their intentional, willful, reckless, and with deliberate indifference failure to comply with applicable Administrative Regulations, statutes, and federal regulations, as outlined herein, causing the death of T.J. Hunt.

172.   Defendants, Lengerich, Tucker, Johnson, Jordan, Hartley, and Baroni, failed to discharge these duties with regard to Defendants, Hendryx and Jones.

173.   Defendants, Lengerich, Tucker, Johnson, Jordan, Hartley, and Baroni, acted intentionally in failing to adequately train, supervise, and take corrective or disciplinary action with correctional officers, facility security staff, medical staff, and mental health staff, including Defendants, Jones and Hendryx.

174.   Defendants, Lengerich and Hartley, were responsible for the creation of Administrative Regulations and policy concerning Staff Interventions, pertaining to prisoners at-risk for self-harm, injuring others, engaging in behaviors evidencing self-harm or injuring others, disruptive due to mental health issues, dangerous due to mental health issues, as well as suicide.

175.   Defendants, Tucker, Johnson, Jordan, and Baroni, were responsible for the creation of Administrative Regulations and policy concerning Offender Health Services, Mental Health Interventions, and Assessment for Mental Health Watch, pertaining to prisoners at-risk for self-harm, injuring others, engaging in behaviors evidencing self-harm or injuring others, disruptive due to mental health issues, dangerous due to mental health issues, as well as suicide.

176.   At all times relevant to the subject matter of this civil action, individuals who worked for the Colorado Department of Corrections were required to follow Administrative Regulation 700-03, which provided, "it is the policy of the Colorado Department of Corrections to provide mental health services that were oriented towards improvement, maintenance or stabilization of offenders' mental health, contribute to their satisfactory prison adjustment, diminish public risk presented by offenders upon release, and aid the Colorado Department of Corrections in the maintenance of an environment that preserves the basic human rights and dignity of offenders, employees, and contract workers."   See, Exhibit E.

177.   At all times relevant to the subject matter of this civil action, individuals who worked for the Colorado Department of Corrections were required to follow Administrative Regulation 700-29, which provided, "it is the policy of the Colorado Department of Corrections to provide assistive and supportive mental health interventions for offenders, who may have been at risk for harm to self or others, emotional dysregulation, and/or acute psychiatric symptoms and to immediately intervene to prevent injury by offenders

whenever possible."   See, Exhibit F.

178.   At all times relevant to the subject matter of this civil action, it was the policy of the Colorado Department of Corrections to have a professional mental health clinician develop a treatment plan focused on preventing further self-injury and implement it whenever an offender has engaged in self-injurious behavior.   See, Exhibit E at 6.

179.   At all times relevant to the subject matter of this civil action, individuals who worked for the Colorado Department of Corrections were required to follow Administrative Regulation 700-23, which provided, "it is the policy of the Colorado Department of Corrections to administer psychotropic medication to offenders on an emergency basis without consent in order to avoid imminent danger to self or others."   See, Exhibit B.

180.   Defendants, Lengerich, Tucker, Johnson, Jordan, Hartley, and Baroni's, failure to properly train, supervise, and take corrective or disciplinary action against employees/staff, including Defendants, Hendryx and Jones, with regard to the Administrative Regulations as well as inmates' constitutional rights was a moving force and proximate cause of the actions or omissions with intentional, willful, reckless, and deliberate indifference towards Mr. Hunt's constitutional rights.

181.   Defendants, Tucker, Johnson, Jordan, and Baroni's, failure to implement the Offender Health Services and Mental Health Interventions policies, despite seeing correspondence from Mr. Hunt stating that he was suicidal as well as being told on multiple occasions by Mr. Hunt's mother, that he was a threat to injure himself, was a moving force and proximate cause of the intentional, willful, reckless, and with deliberate

indifference violation of Mr. Hunt's constitutional rights.

182.    The actions or omissions of Defendants, Lengerich, Tucker, Johnson, Jordan, Hartley, and Baroni, intentionally, willfully, recklessly, and with deliberate indifference caused Mr. Hunt's damages in that he suffered from extreme physical and mental pain during the hours leading up to his death and ultimately caused his death.

183.    The actions or omissions of Defendants, Lengerich, Tucker, Johnson, Jordan, Hartley, and Baroni, as described herein, intentionally, willfully, recklessly, and with deliberate indifference deprived Mr. Hunt of the rights, privileges, liberties, mental health services, and immunities secured by the Constitution of the United States of America, and caused him other damages.

SIXTH CAUSE OF ACTION
*Outrageous Conduct by all Defendants,*
*Lengerich, Tucker, Johnson, Jordan, Hartley, Hendryx, Jones, Baroni,*
*Jane Does 1-10, and John Does 1-10, In Their Individual Capacity*

184.    The facts and allegations set forth in all other sections of this Amended Complaint and Jury Demand are incorporated herein by reference, as if set forth in specificity.

185.    The facts asserted in this Amended Complaint are shocking to the conscious on an objective basis and will cause the fact finder to assert that what occurred in this matter was highly outrageous conduct, which is intolerable in a civilized society.

186.    Defendants' actions and omissions, as set forth above, were extreme and demonstrated an utter disregard for the safety and the well-being of Mr. Hunt.

187. The environment created by Defendants, as set forth in this Amended Complaint, was completely unsafe for a person in a similar mental state to that of the plaintiff-decedent. The environment that existed and the careless, reckless, and intentional actions of Defendants failed to safeguard the Plaintiff-decedent and provide him protection, even after Defendants were put on notice multiple times, regarding Plaintiff-decedent's mental state and desire to commit suicide.

188. Defendants made no effort to see that Plaintiff-decedent had medical, mental, and/or psychological assistance. Defendants further intentionally, willfully, recklessly, and with deliberate indifference failed to take proper steps, as explicitly outlined within the Administrative Regulations, and immediately notify mental health, perform a mental health assessment, review Mr. Hunt's past medical and mental history, discuss with DOC employees Mr. Hunt's recent behavior and management needs, and safeguard both the Plaintiff-decedent and other inmates and staff.

189. Defendants took no steps to immediately notify the Plaintiff-decedent's family of his death, provide adequate supervision for the Plaintiff-decedent and to see that he received help for his struggles.

190. Defendants on all levels showed a callous and willful disregard of the safety of the Plaintiff-decedent.

191. Defendants took no action upon reviewing Mr. Hunt's letter that was sent from the facility, reviewed by security staff, and received by Mr. Hunt's mother, which prompted her calls to correctional officers and mental health staff to warn them of his

impending self-injurious and/or suicidal actions.

192. Further, Defendants took no action upon receiving direct phone calls from Plaintiff-decedent's mother, who repeatedly warned them of her son's mental state and desire to injure himself and/or commit suicide, nor did the Defendants seek to remediate and prevent the death of Plaintiff-decedent.

193. Further, Defendants took no action, failing to place Mr. Hunt on a mental health watch or any kind of watch despite the clear self-injurious and/or suicidal behavior that Mr. Hunt conveyed in his correspondence to his mother as well as his daily activities.

194. No mental health records exist for Mr. Hunt in 2015, despite his clear requests for help.

195. The Colorado Department of Corrections has historically provided deficient mental health care services.

196. Moreover, upon information and belief the named Defendants, as well as other unnamed and unknown individuals at this time, have engaged in a cover-up of the facts and circumstances surrounding Mr. Hunt's death, failing to document Mr. Hunt's known condition(s), mental health checks, if any, mental health watches, if any, mental health care, if any, as well as numerous other required written procedures, as provided within the applicable Administrative Regulations for the Colorado Department of Corrections, as outlined above.

197. In the alleged investigation by the Office of Inspector General, Investigator Maureen Sheridan, she identifies alleged witnesses to the incident, providing no

expected testimony from any of them. It is unknown whether there are any statements by any of the witnesses. Further, one of the key witnesses, Defendant Jones, who was with Mental Health, is not listed in the list of involved persons. There is no explanation as to why she failed to fill out any of the required paperwork under the Administrative Regulations or place Mr. Hunt on a mental health watch.

198. Upon information and belief, Defendant Lengerich received this alleged investigator's report by Investigator Maureen Sheridan with the Office of Inspector General's Office, and to our knowledge has not taken corrective or disciplinary action against anyone for the sub-standard and woefully deficient investigator's report or omissions by Defendants, Jones and Hendryx.

199. Finally, Plaintiffs made a Freedom of Information Act Open Records Request upon the Colorado Department of Corrections for all records pertaining to Mr. Hunt's incarceration and treatment while incarcerated. Mental health records for Mr. Hunt in 2015 were omitted from the production as well as any video of Mr. Hunt on June 20, 2015, leading up to his suicide.

200. Mr. Hunt was in segregation at the time of this death. There should have been video of Mr. Hunt in his cell at the time of his death. In fact, we know there was video, as referenced by the Inspector General's investigator, Maureen Sheridan. No such video was produced with Defendant Lengerich's June 23, 2015 letter to Sherrol Hall, regarding the alleged investigation into her son's death.

201. Investigator Maureen Sheridan mentions a SPRITE video in her CDOC

Inspector General Offense Report; yet, this video was not produced in Warden Lengerich's June 23, 2015 letter to Sherrol Hall, regarding the alleged investigation into her son's death.   Upon information and belief, the Defendants have intentionally withheld pertinent and relevant information.

202.   The level of outrageous conduct by Defendants was extremely high and conscience-shocking, and was not simply an act of negligence. The level of outrageous conduct was so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and is regarded or should be regarded as atrocious and utterly intolerable in a civilized community.

203.   Defendants at all times held the position of authority over their inmate, Mr. Hunt, with a power to affect his safety, well-being, and his interests. This was not a simple case of Defendants' behavior being one of mere insult or annoyance, but was conduct of a much higher improper nature that reaches the degree of outrageous conduct, conduct which is actionable in tort.

204.   As a direct and proximate result of Defendants' outrageous conduct, Plaintiff-decedent was injured, including, but not limited to extreme emotional distress and anxiety, and ultimately died, as set forth above in this Amended Complaint.

205.   Plaintiffs may seek punitive damages for this outrageous conduct by amending the Complaint once disclosures are made. This is consistent with Colorado statute and law.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court enter judgment for them, against the Defendants, and award Plaintiffs damages established by the trier of fact, including:

1.    Appropriate relief at law and equity;

2.    Declaratory relief and other appropriate equitable relief;

3.    Economic losses on all claims allowed by law;

4.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

5.    Punitive damages on all federal claims allowed by law and in an amount to be determined at trial;

6.    Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

7.    Pre- and post-judgment interest at the highest lawful rate;

8.    Any further relief that this Court deems just and proper, and any other relief as allowed by law.

PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DATED this the 6th day of October, 2017.

FINGER & THIGPEN, P.C.


_s/ J. Howard Thigpen, Esq._
William S. Finger, No. 7224
J. Howard Thigpen, No. 45897
Casey Leier, No. 45155

FINGER & THIGPEN, P.C.
29025-D Upper Bear Creek Road
Evergreen, Colorado 80439
Phone: (303) 674-6955
Fax: (303) 674-6684
Email: bill@fingerthigpenlaw.com
        howard@fingerthigpenlaw.com
        casey@fingerthigpenlaw.com

Plaintiff's Address:
1811 South Quebec Way, #183
Denver, Colorado 80231

# LAW OFFICES
## OF
# JORDAN & ASSOCIATES
### LLC

**Attorneys At Law**
5445 DTC Parkway, Suite 910
Greenwood Village, Colorado 80111
Phone: (303) 766-8153 ♦ Fax: (303) 766-5568

*Ross E. Herington Esq.*　　　　*Jason W. Jordan Esq.*　　　　*John D. Halepaska Esq.*

July 14, 2015

Ms. Cynthia Coffman
Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203

Mr. Rick Raemisch
Executive Director
Colorado Department of Corrections
2862 S. Circle Drive
Colorado Springs, CO 80906

<u>Sent via Certified Mail, Return Receipt Requested</u>

|  |  |  |
|---|---|---|
| Re: | **Our Client:** | **Sherrol Hall** |
|  | **Decedent Name:** | **Terrence Hunt, DOC# 134653** |
|  | **Date of Incident:** | **June 20, 2015** |

Dear Ms. Davis:

Please be advised that this Notice is being given to you pursuant to the requirements of the Colorado Governmental Immunity Act, C.R.S.§ 24-10-101, *et seq.*, and **demand for preservation of evidence** within the possession, custody or control of the State of Colorado; the Department of Corrections; and all subdivisions thereof.

### Claimants' Address:

Sherrol Hall and Alexia Ray Hunt: 1811 S. Quebec Way, #183, Denver, CO 80231 as next of kin and heir of the deceased, Terrence Hunt.

### Claimants' Attorneys:

John D. Halepaska, Esq. and Jason W. Jordan, Esq.; Law Offices of Jordan & Associates, LLC; 5445 DTC Parkway, Suite 910, Greenwood Village, CO 80111; phone number (303) 766-8153.


EXHIBIT

**Factual Basis of Claim:**

The claim arises from the death by suicide of Terrence Hunt, an incarcerated inmate at the Buena Vista Correctional Complex ("BVCC") on June 20, 2015.  Mr. Hunt's mother, Sherrol Hall received a letter from Terrence Hunt on June 15, 2015 in which Mr. Hunt stated that he was going to kill himself.  Ms. Hall immediately began telephoning officials at BVCC to inform them that she had received the letter and believed it to be a credible threat.

Ms. Hall tried repeatedly to reach Hunt's case manager, Mr. Vallario but he did not answer his phone and there is no voice messaging options for leaving a message.  Ms. Hall continued to call BVCC and was put through to "mental health."  She informed the woman that answered the phone on that day that she had received the letter and believed it to be a credible threat.  The unidentified woman indicated that she would inform the professional mental health clinician of her concerns.  Ms. Hall received a call at approximately 4:00 p.m. on June 16, 2015 from a woman identifying herself only as "Sandy" who informed Ms. Hall that Hunt was "fine" and had "been in the yard all day."  Ms. Hall begged Sandy to not leave Hunt alone and to check on Hunt because the threat of suicide was credible.

Ms. Hall received a call from Jeff Graff, the Chaffee County Coroner on Sunday, June 21, 2015.  Mr. Graff provided Ms. Hall of the first notice that her son, Terrence Hunt, had hung himself sometime between 2:00 and 2:35 p.m. on June 20, 2015.  Prison officials did not contact Ms. Hunt until after she had already received this shocking phone call from Mr. Graff.

**Public Employees Involved:**

Employees of the BVCC including but not limited to:

1.     Warden Jason Lengerich;
2.     Unidentified Health Services Administrator;
3.     Unidentified professional mental health clinicians working between June 16, 2015 and June 20, 2015, including "Sandy" discussed above;
4.     Unidentified shift commanders working between June 16, 2015 and June 20, 2015;
5.     Unidentified correctional officers working between working between June 16, 2015 and June 20, 2015;
6.     Case Manager Vallario.

**Claimants' Injury:**

Claimants have been injured by the Department of Corrections' and these individuals' deliberate indifference to Mr. Hunt's mental illness that resulted in his wrongful death.  Their individual actions constitute willful and wanton conduct that removes these individuals from the qualified immunity of the GIA.  Claimants' have been

injured by the Department of Corrections' and these individuals' violations of Hunt's constitutional rights; rights afforded Hunt by 42 U.S.C. §1983; and rights afforded Hunt by 42 U.S.C. §12101, *et seq.*

**Amount of Claim:**

Claimants are pursuing monetary damages in an amount to be determined by a jury, punitive damages as applicable and reasonable attorneys' fees and costs as allowed by statute. A precise figure cannot be calculated at this time.

## DEMAND FOR PRESERVATION OF EVIDENCE

Please be advised that you have an obligation and a duty to preserve all evidence in whatever form that in any way pertains to the incarceration, death and subsequent investigation thereof as it pertains to Mr. Hunt. Such evidence should include, but is not limited to:

1. All records, reports and communications of whatever nature generated by the Denver Reception & Diagnostic Center ("DRDC") and its officials, agents and employees thereof pertaining to Mr. Hunt;

2. All records, reports and communications of whatever nature generated by the Limon Correctional Facility, ("LCF") and its officials, agents and employees thereof pertaining to Mr. Hunt;

3. All records, reports and communications of whatever nature generated by BVCC and its officials, agents and employees thereof pertaining to Mr. Hunt;

4. All records, reports and communications of whatever nature pertaining to the transfer of Mr. Hunt from LCF to BVCC;

5. The complete files of any and all "case managers" pertaining to Mr. Hunt, without limitation;

6. All medical and mental health records pertaining to Mr. Hunt including screening forms and inter-system mental health appraisal forms;

7. All disciplinary records pertaining to Mr. Hunt;

8. All surveillance footage from BVCC from June 15, 2015 – June 21, 2015;

9. All phone records pertaining to calls received and made between BVCC and Ms. Hall between June 15, 2015 and June 22, 2015.

10. All records pertaining in any way to the investigation of Mr. Hunt's death including but not limited to reports; communications; electronic communications to or from any source; correspondence; photographs; video; statements; interviews; without limitation;

11. All records maintained by the Time Computation Office pertaining to Mr. Hunt;

12. All records maintained by the Division of Adult Parole, the Parole Board and the Office of Community Corrections pertaining to Mr. Hunt;

13. All records maintained by any other Division or Office within the Department of Corrections pertaining to Mr. Hunt, without limitation.

14. All autopsy reports, coroner's reports, and photographs pertaining thereto.

You are obliged to prevent and prohibit "spoliation of evidence." Spoliation of evidence refers to the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation. Spoliation of evidence may occur when the movement, change, or destruction of evidence or the alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence, as did the prior investigators.

Spoliation of evidence raises a presumption that the evidence would have been unfavorable to the party allegedly responsible for destruction or suppression of the evidence. Estate of Holmes v. Boyle, 56 P.2d 1333 (Colo. 1936). In the Holmes' case, the Colorado Supreme Court concluded that, "the willful spoliation or destruction of papers which might contain adverse evidence gives rise to a presumption unfavorable to the one responsible therefore, since his conduct may properly be attributed to his supposed knowledge that the truth would operate against him." Id. at 1335, citing to 10 R.C.L. p. 885; Wigmore on Evidence (2d Ed.) § 291; McCleery v. McCleery, 200 Ala. 4, 75 So. 316.

If we do not hear from you within the statutory period of time, we will assume that you are rejecting the claim, and our office will thereafter institute the necessary suit to protect our clients' interest.

Sincerely yours,

John D. Halepaska, Esq.

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 700-23 | 1  OF  11 |
| | CHAPTER:   Offender Health Services | |
| COLORADO DEPARTMENT OF CORRECTIONS | SUBJECT:   Emergency and Involuntary Psychotropic Medication Administration | |
| RELATED STANDARDS: ACA Standards - -4401 | EFFECTIVE DATE:        July 15, 2017 | |
| | SUPERSESSION:         04/01/14 | |
| OPR: OCS | REVIEW MONTH:  April | Rick Raemisch<br>Executive Director |

## I.   POLICY

*It is the policy of the Department of Corrections (DOC) to provide involuntary administration of psychotropic medications in compliance with applicable laws, [4-4401]* in order to protect offenders and treat their mental illness. The DOC administers psychotropic medication to offenders on an emergency basis without consent in order to avoid imminent danger to self or others.  Psychotropic medication may also be administered to offenders without their consent on a long-term involuntary basis when prolonged treatment is necessary due to ongoing concerns regarding dangerousness to self or others or grave disability as a result of the offender's unstable mental illness.  This policy is in accordance with relevant state and federal laws.

## II.   PURPOSE

The purpose of this administrative regulation (AR) is to outline procedures and responsibilities for administering emergency psychotropic medication and long-term involuntary psychotropic medication to offenders in the DOC.

## III.   DEFINITIONS

A.   <u>Danger to Others</u>: The condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he or she will inflict physical harm upon another person in the near future.

B.   <u>Danger to Self</u>: The condition of a person whose behavior, significant threats, or inaction supports a reasonable expectation that there is substantial risk that he or she will inflict physical harm upon his or her own person.

C.   <u>Gravely Disabled</u>: The condition of a person, as a result of serious mental illness, who is in danger of serious physical harm due to the inability to provide for his or her own basic physical needs, such as essential food, clothing, medical care, and shelter, and lacks judgment in the management of his or her resources and in the conduct of his or her social relations to the extent that his or her health or safety is significantly endangered.

D.   <u>Involuntary Medication</u>: Psychotropic medication administered to a mentally ill offender on a long-term basis without his or her consent following approval of an Involuntary Medication Hearing Committee.

E.   <u>Mental Illness</u>: A substantial disorder of the cognitive, volitional, or emotional processes that grossly impairs judgment or capacity to recognize reality or to control behavior.  Mental retardation is insufficient to either justify or exclude a finding of mental illness.



EXHIBIT

| CHAPTER | SUBJECT | AR # | Page 2 |
|---------|---------|------|--------|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

F. <u>Multi-Disciplinary Team</u>: A group of representatives from multiple disciplines that includes custody/control, mental health, medical, case management, and other disciplines as needed on a case-by-case basis, that work together to contribute to the achievement of the offender's treatment plan and program success.

G. <u>Psychotropic Medication</u>: Medication that exerts an effect on thought, mood, and/or behavior.  Psychotropic medications are used in the treatment of mentally ill individuals and include antipsychotics, antidepressants, mood-stabilizers, anxiolytics, and medications that may have other medical uses but are accepted within the medical profession for psychiatric use as well.

## IV. PROCEDURES

A. <u>General Emergency and Involuntary Medication Procedures</u>:

1. In order for psychotropic medication to be administered without an offender's consent, whether on an emergency or long-term involuntary basis, it must be demonstrated that the offender suffers from a mental illness and, as a result of the illness, constitutes a serious threat of harm to self or others or is gravely disabled, and that administration of psychotropic medication is in the offender's clinical interest.  Emergency and involuntary medication orders may be approved once less restrictive interventions have been tried and failed, or it has been determined by clinical DOC employees or contract workers that they would not be effective.

2. All psychotropic medication administered without the consent of an offender, whether on an emergency or long-term involuntary basis, will be ordered for oral administration when the offender will accept them, but oral psychotropic medication will not be administered against the offender's will under any circumstances in any DOC location.  Thus, all orders for involuntary medication, including emergency medication, must include a medication order that can be given intramuscularly when the offender refuses to take the oral psychotropic medication ordered.  All psychotropic medication ordered involuntarily, including emergency medication, must be in the DOC formulary or have been approved as a non-formulary drug for this case.

3. In circumstances where medication is to be administered intramuscularly against the will of the offender, the administrative head, or designee, will be notified through facility notifications and documentation will be completed in the electronic health record.

4. Emergency and involuntary medications will be initiated and continued by a psychiatric provider for offenders in a special mental health placement.  However, in an emergency, any duly licensed physician may implement emergency psychotropic medication orders when criteria specified in this AR are met.  A psychiatric midlevel provider working under the supervision of a psychiatrist may write initial orders for emergency medications.  A psychiatric midlevel provider may renew or adjust dosage of involuntary medication treatments under the supervision of the treating psychiatrist, or without supervision when they have assumed direct care of the offender on involuntary medication.

5. In all situations involving medication, the principle of good medical ethics will prevail.

B. <u>Emergency Medication Procedures</u>:

1. Emergency medication orders are intended to be used as a short-term treatment solution when a psychiatric provider determines that a psychiatric emergency exists and less restrictive treatment interventions have been tried and failed.  A psychiatric emergency exists when a mentally ill offender is determined to be in imminent danger of hurting himself/herself or others, as evidenced by:

   a. A recent overt act, including, but not limited to, self-destructive behavior, a credible threat of bodily harm to self or others, an assault on another person; *or*

| CHAPTER | SUBJECT | AR # | Page 3 |
|---------|---------|------|--------|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

    b.   Grave disability resulting in imminent danger to self.

2.   A psychiatric provider may give telephone orders for emergency medications when an on-site evaluation is not possible. Telephone orders for emergency medications will require the following:

    a.   An on-site evaluation will be performed by a mental health clinician, to include documentation of the offender's mental status, symptoms, and evidence of risk to self and/or others;

    b.   A registered nurse or other health care provider must provide current information on the offender's medical needs; and

    c.   The psychiatric provider will determine if emergency medication is warranted based on current mental health and medical information.

3.   Emergency medication orders must be reviewed and reordered every 24 hours by a psychiatric provider either in person or by telephone until such time when the emergency is resolved and/or the offender accepts psychiatric medication voluntarily.

4.   Emergency medications may be given up to a maximum of 10 consecutive calendar days. In no case shall a person receive emergency psychiatric medication for a period exceeding 10 days without the approval of the chief of psychiatry or designee. Emergency medication orders may be extended beyond 10 days in certain circumstances, such as when an offender on emergency medication is awaiting an involuntary medication hearing outside of the 10 day period and the psychiatric provider is of the opinion that emergency medication is necessary to keep the emergency situation in abeyance.

5.   A reasonable attempt to obtain voluntary acceptance of psychotropic medication shall be made prior to each use of emergency medication. If a patient consents and the psychiatric provider determines that he or she will likely continue to accept medications voluntarily, this should be documented in the electronic health record and the emergency medication procedure will have ended. If the psychiatric emergency has abated because of the effect of the emergency medication and the psychiatric provider is of the opinion that emergency medication order is necessary to keep the emergency in abeyance, emergency medications may be continued, though only for a maximum of 10 days.

6.   Use of emergency medication orders more than twice for a specific offender within a three month period will require approval by the chief of psychiatry, or designee, if an involuntary medication hearing has not been initiated.

7.   Long-acting (e.g., decanoate) psychotropic medication may not be used as emergency medication.

8.   The health services administrator must be informed immediately when emergency medication has been ordered.

9.   The psychiatric provider shall document in the electronic health record the specific facts outlining behaviors supporting the finding of the emergency situation and need for emergency medication. Elements of the documented record should include, but are not limited to:

    a.   The current Diagnostic and Statistical Manual of Mental Disorders (DSM) diagnosis;

    b.   Documentation of the symptoms and behaviors exhibited by the offender demonstrating that he or she presents an imminent threat of harm to self or others, or is gravely disabled;

    c.   Methods used to motivate the offender to accept medication voluntarily, and the offender's response to those efforts.

| CHAPTER | SUBJECT | AR # | Page 4 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

11. If the psychiatric provider prescribing emergency medication to an offender believes the offender will likely require long-term involuntary medication, the provider, in collaboration with the mental health clinician, will make appropriate arrangements for immediate transfer of the offender. Male offenders will be transferred to the San Carlos Correctional Facility (SCCF) and female offenders will be transferred to the Denver Women's Correctional Facility (DWCF) where an involuntary medication hearing may be convened. The psychiatric provider and mental health clinician involved in the emergency treatment of the offender, in this instance, will provide the required involuntary medication reports, as outlined below, for the Involuntary Medication Hearing Committee to review.

12. Emergency medications may be used at any facility in an emergency situation in order to protect the safety of the offender and DOC employees and contract workers, and to facilitate safe transfer of an offender who meets criteria specified in this AR.

13. Requests for review of emergency medication orders will be submitted to the chief of psychiatry.

C. Involuntary Medication Procedures:

1. Offenders faced with the possibility of involuntary medication have a right to a hearing on the issue; the right to notice of the hearing; the right to attend the hearing, present evidence, and cross-examine witnesses; the right to representation by a lay advisor; the right to appeal the decision; and the right to periodic review of ongoing administration of involuntary medication.

2. Involuntary Medication Hearing Committee:

   a. The Involuntary Medication Hearing Committee will be composed of the following: a hearing officer, a psychiatrist, a psychologist, and one other mental health clinician.

   b. The chairperson of the Involuntary Medication Hearing Committee is the hearing officer who chairs the Involuntary Medication Hearing as the administrative head's designee. It is the responsibility of the chairperson, or designee, to gather completed reports and serve the offender with written notice of the scheduled Involuntary Medication Hearing at least 24 hours prior to the hearing. The chairperson, who serves as a non-voting member of the Involuntary Medication Hearing Committee, is responsible for audio-taping the hearing and ensuring that all forms are completed and signed as required in this AR.

   c. The Involuntary Medication Hearing Committee may approve the order for involuntary medication for a period of 180 days if they determine that the offender is suffering from a mental illness and, as a result of the illness, presents a serious threat of harm to self or others, or is gravely disabled, and the use of involuntary medication is in the offender's best clinical interest.

   d. The Involuntary Medication Hearing Committee will make its decision based on both verbal and written reports submitted by the treating psychiatric provider and mental health clinician, review of the electronic health record, and a face-to-face interview and evaluation of the offender. Each committee member will briefly write a summary of their findings and conclusions, and copies of the written committee member findings will be kept with the minutes of the hearing.

   e. The decision of the Involuntary Medication Hearing Committee will be by majority vote. However, the psychiatrist must have voted with the majority in favor of involuntary medication before it can be approved.

   f. No psychotropic medication shall be administered without the offender's consent until approval from the initial Involuntary Medication Hearing Committee is obtained, except under emergency conditions documented in Section B.

| CHAPTER | SUBJECT | AR # | Page 5 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

3. <u>Hearing Procedures</u>:

    a. <u>Offender Procedural Rights</u>:

        1) The offender must receive written notification that involuntary medication is being requested at least 24 hours prior to the scheduled hearing.

        2) This written notification must include the date and time of the hearing, the provisional diagnosis, and copies of the psychiatric provider's report, and the mental health clinician's report which reflect the factual basis for the diagnosis and why they believe involuntary medication is clinically necessary.

        3) The offender may refuse any psychotropic medication order, including existing emergency or involuntary medication orders, for 24 hours prior to a hearing. The exception is long-acting (e.g., decanoate) psychotropic medication which may be active within the offender's body at the time of the hearing. The offender may refuse a long-acting decanoate injection if it is scheduled to be given within 24 hours of the scheduled hearing.

        4) The offender has an opportunity to be present and to be heard in person at the hearing.

        5) The offender is allowed to present evidence, including witnesses, at the hearing.

        6) The offender is allowed to cross-examine DOC employee or contract workers witnesses who are called by the facility. When facility DOC employees or contract workers are witnesses against the offender, every effort will be made to have such witnesses present to testify at the hearing, provided that the written statements of such DOC employees or contract workers may be considered in their absence upon showing of good cause.

        7) The offender has the right to be silent.

        8) The offender will have a competent offender's representative designated by the administrative head, or designee, to advise him/her during the hearing process. The offender's representative will be a DOC employee or contract worker who is not involved in the offender's current treatment. The offender representative will provide ample time to review the case and discuss it with the offender prior to the hearing.

        9) The offender may appeal, in writing, the decision of all initial and 180-day Involuntary Medication Hearings. The appeal, which is to be sent to the assigned facility administrative head, or designee, must be submitted within 24 hours from the time the offender receives a written decision and minutes of the Involuntary Medication Hearing.

        10) When the decision is appealed, medication will not be administered until the administrative head, or designee, has acted on the appeal, except where it is established by the Involuntary Medication Hearing Committee that serious physical harm is likely to the offender or others if treatment is not immediately imposed or continued.

    b. <u>Limitations on Offender's Procedural Rights</u>:

        1) The offender's rights should be limited only where there is a finding of "good cause" for not permitting presentations or cross examination.

        2) Reasons for disallowing an offender to present witnesses or to cross-examine witnesses include, but are not limited to: irrelevant, unnecessary, or redundant information; potential reprisals; or other reasons related to facility interests of security and order.

| CHAPTER | SUBJECT | AR # | Page 6 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

    3)   The chair of the Involuntary Medication Hearing will document, in writing, as part of the final decision, reasons for disallowing an offender to present or cross-examine a witness orally at the hearing.

  c.   The treating psychiatric provider will prepare a report for the Involuntary Medication Hearing Committee which documents the offender's mental condition. This is to include, but is not limited to:

    1)   The current DSM diagnosis.

    2)   A documented description of how the offender presents a serious threat of harm to self or others, or is gravely disabled.

    3)   Methods used to motivate the offender to accept medication voluntarily and the offender's response to those efforts.

    4)   The offender's expected behavior and prognosis on and off medications.

    5)   The report shall specify what types of psychiatric medication are being recommended as potentially beneficial to the offender. The specific name or dose of medication need not be determined at the time of the hearing.

  d.   The mental health clinician or designee will also complete an involuntary medication report. This report is to include, but is not limited to:

    1)   Social, criminal, and treatment history;

    2)   Disturbed behaviors observed and mental condition;

    3)   Voluntary medication history;

    4)   History of involuntary medication.

  e.   All hearings are recorded on audiotapes, which are maintained at the facility where the hearing occurred.

  f.   Minutes of the hearing will be kept and a copy will be provided to the offender with the written decision after it has been reviewed by the assigned facility administrative head.

  g.   If the Involuntary Medication Hearing Committee has made a decision to authorize involuntary treatment with psychotropic medications, the treating psychiatric provider will have the responsibility to:

    1)   Order medications according to the accepted medical standard of care in the community;

    2)   Order blood collection (involuntarily, if necessary) to monitor therapeutic levels, when needed. This information will be used to guard against toxic side effects of these medications. Blood chemistries and other lab testing may be done (involuntarily, if necessary) if a particular medication needs to be monitored for potentially severe effects to the patient. Tests for various medical conditions, such as hepatitis and HIV, will be conducted (involuntarily, if necessary) if it is believed that these medical conditions may prevent or interfere with the recommended psychotropic medication treatment.

    3)   Observe the offender off medications temporarily, without affecting the involuntary status of the offender, when:

| CHAPTER | SUBJECT | AR # | Page 7 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

    a) Excessive side effects are suspected to be due to the medications

    b) Toxic levels of the medications are in the blood

    c) There is evidence, via blood tests, that indicates damage, or potential damage, to organs such as the liver, kidneys, or other vital organs due to the use of the medication.

  h. The chairperson of the Involuntary Medication Hearing may postpone a hearing for good cause up to 14 days. The chairperson will document the reasons for the postponement in the electronic health record. Continuances must be approved by the administrative head, or designee, within 24 hours.

4. 180-day Hearings:

  a. Involuntary medication may continue for a period not to exceed 180 days from the date of the initial hearing. Another hearing may be held to consider continuation of involuntary medication for an additional 180-day period. Consecutive 180-day hearings may continue indefinitely as long as the offender remains resistant to consenting to take medication on a voluntary basis and, as a result of a mental illness, would present a danger to self or others or would become gravely disabled if he/she were to stop taking medications, and it remains in the offender's medical interest to continue the prescribed psychotropic medication. If an offender on involuntary medication has accepted voluntary treatment but reasonable grounds exist to believe the person wouldn't continue treatment without the involuntary medication order, then the psychiatric provider must document this fact and may request continuation of involuntary medications for an additional 180 days.

  b. If the treating psychiatric provider recommends that involuntary medication continue for an additional 180-day period, then the Involuntary Medication Hearing Committee will meet for a 180-day hearing, following the hearing procedures described above.

  c. The committee will make a decision at that time whether to approve or disapprove of continuing involuntary medications for an additional 180 days, based upon the procedures detailed above.

  d. Whenever the chairperson postpones the 180-day hearing beyond the 180th day, the existing involuntary medication order may be renewed by the psychiatric provider until the hearing is rescheduled, not to exceed 14 additional days.

5. The administration of involuntary psychotropic medication is restricted to SCCF, the Residential Treatment Program (RTP) units of DWCF and Centennial Correctional Facility (CCF), DOC infirmaries, and/or other similar special need units or facilities approved by the deputy executive director.

6. DOC Employee or Contract Worker Responsibilities in Involuntary Medication Process:

  a. Psychiatric Provider:

    1) May refer an offender to the Involuntary Medication Hearing Committee at any time for involuntary medication if he/she finds the offender meets the criteria laid forth in this AR.

    2) Evaluates the offender and prepares an initial or 180-day involuntary medication report for the Involuntary Medication Hearing Committee recommending involuntary medication.

    3) Attends Involuntary Medication Hearing to present oral arguments and respond to questions about the involuntary medication report. If unable to attend for good cause, he/she will arrange for another psychiatric provider to attend the hearing and brief them on the offender.

| CHAPTER | SUBJECT | AR # | Page 8 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

4) If the offender is approved for involuntary medication, the treating psychiatric provider will see the offender at least once during the initial 14 day period to monitor response to the medication and make appropriate adjustments or changes, as indicated. Further follow-up shall be determined based upon the needs and stability of the offender. If the offender is psychiatrically stable, a psychiatric midlevel provider will monitor psychotropic medication response and adjust psychotropic medication dosages. All decisions regarding termination or requests for continuation of involuntary medication on cases being followed by psychiatric midlevel providers must be in consultation with a psychiatrist.

5) Re-evaluates the need for continuation of involuntary medications for an additional 180-day period, and submits an updated involuntary medication report for the 180-day Involuntary Medication Hearing.

6) When the offender becomes compliant with his/her medication, the offender's willingness to voluntarily take the medication is to be fully documented in the electronic health record by the psychiatric provider.

7) The involuntary medication treatment may be discontinued when the treating psychiatric provider, after discussion with the treatment team, determines that the offender has insight into his/her mental illness and is able to continue taking medications on a voluntary basis, or is no longer in need of medication.

8) If, at a later date, the offender again refuses to take medication voluntarily and the conditions outlined above are applicable, the offender may again be referred for a new involuntary medication hearing in accordance with these procedures.

b. Mental Health Clinician:

1) Refers the offender to the psychiatric provider for evaluation.

2) Meets with the psychiatric provider to determine if a referral for involuntary medications should be made.

3) Once the decision is made for involuntary medications, the mental health clinician completes an involuntary medication report, documenting the offender's behavior, evidence of mental illness, and possible grounds for involuntary treatment, and gives it to the health services administrator for review.

4) Attends the Involuntary Medication Hearing to present oral arguments and respond to questions about the involuntary medication report. If unable to attend for good cause, he/she will arrange for another mental health clinician to attend the hearing and brief them on the offender.

5) Ensures that a treatment plan is established for less restrictive treatment alternatives as soon as possible.

c. Health Services Administrator:

1) Reviews the recommendation and accompanying documentation to determine whether the offender meets the requirements laid out by this AR for the administration of involuntary medications.

2) Notifies the administrative head that an Involuntary Medication Hearing is being scheduled for a particular offender.

3) Coordinates the initial Involuntary Medication Hearing as soon as possible, with the assistance of the hearing officer.

| CHAPTER | SUBJECT | AR # | Page 9 |
|---------|---------|------|--------|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

       4) Coordinates the 180-day Involuntary Medication Hearing, if requested, prior to termination of the previous 180-day treatment authorization

   d. Involuntary Medication Hearing Committee:

       1) Approves or denies the request for involuntary medication administration, pending any appeal decision by the administrative head.

       2) Approval to administer involuntary medication during initial and 180-day hearings occurs with a majority vote, which must include approval of the psychiatrist on the committee.

   e. Hearing Officer:

       1) Inquires if the offender wishes to appeal the Involuntary Medication Hearing Committee's decision to authorize the administration of involuntary medications.

       2) Ensures that the offender signs the Involuntary Medication Hearing Committee decision.

       3) Provides the offender with a copy of the decision made by the Involuntary Medication Hearing Committee.

       4) Ensures that all members of the Involuntary Medication Hearing Committee review and sign their findings and conclusions and includes them in the final copy of the minutes of the hearing.

       5) Reviews the reports written by the members of the Involuntary Medication Hearing Committee for summation in the minutes.

       6) Has minutes of the hearing typed.

       7) Sends the minutes of the Involuntary Medication Hearing to the administrative head, or designee, for review.

       8) Ensures delivery of the reviewed minutes and reports of the Involuntary Medication Hearing to the offender, and ensures that the offender signs the receipt of minutes.

   f. Offender: Has 24 hours from the time the minutes of the Involuntary Medication Hearing are received to appeal the decision of the Involuntary Medication Hearing Committee to the administrative head.

   g. Administrative Head:

       1) The administrative head, or designee, will personally review the minutes of the Involuntary Medication Hearing to ensure that all procedural requirements were followed.

       2) Personally, or through a designee, reviews all appeals made regarding involuntary medications. The administrative head, or designee, has 24 hours to respond to the offender's appeal, excluding holidays and weekends.

D. Use of Involuntary Medications at CCF:

   1. Offenders may be continued on involuntary medication orders at CCF only under the following circumstances:

| CHAPTER | SUBJECT | AR # | Page 10 |
|---------|---------|------|---------|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

    a. This may occur only for male offenders who have been placed at SCCF and who have been approved for involuntary medications at SCCF, as described in the administrative regulation. After a trial of at least six months on involuntary medications at SCCF, the SCCF Treatment Team responsible for the offender's treatment may recommend that the offender be considered for a continuation of involuntary medication orders and placed at CCF.

    b. The SCCF Treatment Team must document that:

        1) The offender has an active order for involuntary medication and has benefited from this treatment, and

        2) Evidence that despite benefit from prescribed medication, the offender is currently too dangerous or disruptive to be effectively managed outside of SCCF, or

        3) Evidence that the offender is not currently willing or able to benefit from other treatments offered at SCCF, and

        4) The offender is not likely to take prescribed medications voluntarily.

2. Recommendations that an offender be placed at CCF will be reviewed by the SCCF administrative head and health services administrator, the CCF administrative head and health services administrator, and the mental health program administrator. All reviewers must approve this placement.

3. If the CCF placement is approved by all reviewers, the SCCF treatment team, responsible for the offender's treatment, will initiate a 180-day Involuntary Medication Hearing and be responsible for preparation of required documentation and presentation of evidence, as described in this AR. If the Involuntary Medication Hearing Committee approves the continuation of the involuntary medication order, the offender may be placed at CCF.

4. Offenders at CCF with active involuntary medication orders will be offered oral medications according to facility medication administration procedures. If the offender refuses oral medications, CCF DOC employees or contract workers will administer involuntary medications intramuscularly per the involuntary medication order.

5. Subsequent involuntary medication hearings will occur at the offender's facility (CCF) every 180 days, as described in this AR. For this hearing, the psychiatric provider and mental health clinician at CCF will be responsible for the required documentation and presentation of evidence for the hearing. These hearings may be conducted by televideo when it is not possible to assemble a committee on-site at CCF. The offender may also be returned to SCCF for subsequent 180-day hearings if circumstances prevent hearings from being able to be conducted at the offender's facility either in person or by televideo.

6. Involuntary medication orders may be discontinued by the treatment team at SCCF when it is determined that the offender no longer meets criteria.

E. Additional Procedures:

1. Involuntary medication orders under this AR terminate once the offender is transferred from SCCF, CCF, DWCF, the DOC infirmary, or another special needs unit approved by the deputy executive director, to another DOC facility, community corrections placement, or is paroled or discharged. If the offender is moved temporarily to another DOC infirmary, a hospital, a county jail, or other temporary placement, the involuntary medication order will still be deemed in effect when the offender returns to SCCF, CCF, DWCF, the DOC infirmary, or other special needs unit approved by the deputy executive director if the order has not expired and the treating psychiatrist so agrees. If that temporary move is to a DOC infirmary, the involuntary medication order will be implemented in that infirmary as long as the order has not expired. If the offender is moved permanently to a DOC infirmary or other special needs facility or unit approved by the deputy executive

| CHAPTER | SUBJECT | AR # | Page 11 |
|---|---|---|---|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | EFFECTIVE 07/15/17 |

director, the involuntary medication order will still be deemed in effect and implemented as long as the order has not expired.

2.  <u>Civil Commitment of a DOC Offender</u>: If an offender who is paroling or discharging from the DOC meets the 27-65 commitment criteria (C.R.S. 27-65-105 et. seq.: mental illness with imminent danger to self and/or others or is gravely disabled), the offender will be referred to the forensic division of the Colorado Mental Health Institute at Pueblo within two months prior to release into the community.

3.  Youthful Offender System residents who are placed at SCCF will be subject to the provisions of this administrative regulation.


V. <u>RESPONSIBILITY</u>

A.  The administrative head of SCCF, DWCF, CCF, any facility with a DOC infirmary, or any other special needs facility or unit designated by the deputy executive director will assure that all assigned DOC employees or contract workers involved in managing these offenders are aware of this administrative regulation and comply with all provisions in coordinating and conducting involuntary medication hearings.

B.  The chief of behavioral health services, in coordination with the chief of psychiatry, will review and update this administrative regulation at least annually.

C.  The treating psychiatric provider will ensure that all involuntary medication prescriptions are consistent with sound medical practice.


VI. <u>AUTHORITY</u>

A.  Colorado State Rules regarding Care and Treatment of the Mentally Ill: 2 CCR 502-1, Section 19.421
B.  C.R.S. 27-65, Care & Treatment for Persons with Mental Illness
C.  *Washington v Harper*, 494 U.S. 210 (1990).


VII. <u>HISTORY</u>

April 1, 2014
January 1, 2012
December 15, 2010
November 1, 2009
November 1, 2008
November 1, 2007
November 1, 2006
November 1, 2005
March 15, 2005


ATTACHMENTS:

A.  AR Form 100-01A, Administrative Regulation Implementation/Adjustments

ADMINISTRATIVE REGULATION
IMPLEMENTATION/ADJUSTMENTS

AR Form 100-01A (04/15/08)

| CHAPTER | SUBJECT | AR # | EFFECTIVE |
|---------|---------|------|-----------|
| Offender Health Services | Emergency and Involuntary Psychotropic Medication Administration | 700-23 | 07/15/17 |

FACILITY/WORK UNIT NAME)_____

WILL ACCEPT AND IMPLEMENT THE PROVISIONS OF THE ABOVE ADMINISTRATIVE REGULATION:

[ ] AS WRITTEN   [ ] NOT APPLICABLE   [ ] WITH THE FOLLOWING PROCEDURES TO ACCOMPLISH THE
INTENT OF THE AR

(SIGNED) _____   (DATE) _____
                   Administrative Head

Attachment A
Page 1 of 1

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 300-38 | 1 OF 11 |
| COLORADO DEPARTMENT OF CORRECTIONS | CHAPTER:   Facility Security | |
| | SUBJECT:   Offender Mail | |
| RELATED STANDARDS: ACA Standards 2-CO-5D-01, 4-4047, 4-4266, 4-4275, 4-4487, 4-4488, 4-4489, and 4-4491 through 4-4496 | EFFECTIVE DATE:   August 1, 2017 | |
| | SUPERSESSION:   05/15/17 | |
| OPR: DOP | REVIEW MONTH: May | *Rick Raemisch* (signature)  Rick Raemisch  Executive Director |

## I. POLICY

It is the policy of the Colorado Department of Corrections (DOC) to allow offenders under its jurisdiction to correspond with family, friends, courts, legal counsel, and other public/private entities, as appropriate.

## II. PURPOSE

The purpose of this administrative regulation (AR) is to establish *guidelines governing offender correspondence. [4-4487] These guidelines will include instructions concerning mail inspection. [2-CO-5D-01]*

## III. DEFINITIONS

A. Approved Source of Supply: Publisher, retail/wholesale dealer of mail order products for books (used books will not be accepted from any approved source of supply), magazines, hobby craft, faith items, and health care items, or other items determined by the administrative head, with an address or post office box and phone number, verifiable with a commercial directory service.

B. Book: is a set of written, printed, or illustrated continuous sheets of paper, usually fastened together to hinge at one side (i.e. bound in some manner). A set of text-filled or illustrated pages produced in electronic format is known as an electronic book, or e-book.

C. Censored: The removal of any part of incoming or outgoing mail.

D. Contraband: Any item that a DOC employee, contract worker, volunteer, visitor, or offender is not specifically authorized to have in their possession; any item that has been altered and/or is being used for other than its intended purpose; any publication deemed as contraband pursuant to AR 300-26, Publications; any item(s) over the three cubic foot allowable personal property limit; any item listed in the Offender Visitor Consent to Search Authorization (AR Form 300-01B); any item listed in the Code of Penal Discipline; any item listed on the administrative head's "Declaration of Contraband"; and any item that may threaten or could potentially threaten the safety and security of a DOC facility, DOC employees, contract workers, volunteers, offenders, or visitors or any item listed as contraband in an administrative regulation.

E. Coded Language: A system used for brevity or secrecy of communication in which arbitrarily chosen words, letters, or symbols are assigned definite meanings.

F. E-Book: An electronic version of a book-length publication or printed book, consisting of text, images, or both that can


EXHIBIT
C

| CHAPTER | SUBJECT | AR # | Page  2 |
|---------|---------|------|---------|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

be accessed, read and printed by using a personal computer or other electronic device capable of visually displaying and printing digital information. Note: For the intent and purposes of this policy, a printed e-book of ten or more continuous pages, will be considered a book.

G.  Immediate Family Member - Offender: Grandparents, parents, step-parents, adoptive parents, legal guardian, brother, step or half-brother, sister, step or half-sister, spouse, son, daughter, step/foster/adopted children, and grandchildren.

H.  Indigent Offender: An offender with no funds or source of income

I.  Junk Mail: Unsolicited mail advertising goods or services (e.g. pamphlets, ad, leaflets).

J.  Non-Restricted Mail: All incoming and outgoing offender mail, including but not limited to correspondence defined as reading materials, received via U.S. Postal Service, inter-facility mail, or private carrier, not to or from a specified class of persons or organizations, thereby subject to full contraband inspection.

K.  Publication: Any information or material in the form of a book, booklet, pamphlet, magazine, periodical, newsletter, photograph or other pictorial depiction of similar document, including stationery and greeting cards, writing, drawing, or cartoon created by any individual, organization, company or corporation which is distributed or made available through any means or media

L.  Victim: As defined in CRS 24-4.1-302(5), "any natural person against whom any crime (as defined in 24-4.1-302, CRS) has been perpetrated or attempted, UNLESS THE PERSON IS ACCOUNTABLE FOR THE CRIME OR A CRIME ARISING FROM THE SAME CONDUCT, CRIMINAL EPISODE, OR PLAN as crime is defined under the laws of this state or of the United States, OR, IF SUCH PERSON IS DECEASED OR INCAPACITATED, THE PERSON'S SPOUSE, PARENT, CHILD, SIBLING, GRANDPARENT, GRANDCHILD, SIGNIFICANT OTHER, OR OTHER LAWFUL REPRESENTATIVE."

IV.  PROCEDURES

A.  General Guidelines

1.  Administrative heads will permit offenders to send and receive mail, unless it can be determined that such mail may present a threat to the safety and security of the public, DOC employees, contract workers, volunteers, offenders, and agency/facility, pursuant to the review criteria established in AR 300-26, *Publications*.

2.  *Offender mail, both incoming and outgoing, may be opened and inspected for contraband. Mail is read, censored, or rejected based on legitimate institutional interests of order and security. [4-4491]*

3.  Disposition of contraband contained in offender mail will be in accordance with AR 300-06, *Searches and Contraband Control. [4-4494]*

4.  *To maintain community ties, indigent offenders will be allowed to mail one personal letter, per week, with postage paid by the facility/office [4-4489], contingent upon funding. Postage assistance will be limited to a total not exceeding $2.00 per month.*

5.  *When the offender bears the mailing cost, there is no limit on the volume of letters the offender can send or receive or on the length, language, content, or source of mail or publications except when there is reasonable belief that limitation is necessary to protect public safety or institutional order and security. [4-4488]* Allowable offender property limitations are defined in AR 850-06, *Offender Property.*

| CHAPTER | SUBJECT | AR # | Page 3 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

6. Mail may be in a foreign language but will not be in coded language, symbols or obscure in meaning.

7. Mail addressed to the ADA inmate coordinator and the Step III grievance officer at Headquarters will be sent inter-facility mail at no cost to the offender; this is considered restricted inspection mail. All other mail addressed to DOC employees, contract workers, and volunteers located outside of the facility where the offender is housed will be addressed, stamped, and sent through the U.S. Postal Service.

8. *Offenders in restrictive housing can write and receive letters on the same basis as offenders in the general population [4-4266].*

9. *Excluding weekends, holidays, and/or emergency situations, incoming and outgoing mail is held for no more than 48 hours and packages are held for no more than 72 hours. An emergency situation is interpreted as any significant disruption of normal facility or agency procedure, policy, or activity caused by riot, escape, fire, natural disaster, employee action, or other serious incident. [4-4495]* Exceptions to this are cases where the legitimate penological interests of safety and security dictate otherwise, or as provided for in AR 300-26, *Publications.*

10. Any victim of the offender who wishes to correspond with the offender must submit such request, in writing, to the administrative head seeking authorization to correspond. The administrative head will consult with mental health DOC employees and/or contract workers and the Victim Services Unit and respond to the victim indicating the decision within 30 days from the receipt of such letter. If approved, the facility mailroom will be notified.

11. The DOC may use another state agency, Department of Personnel and Administration (DPA), to provide assistance with the picking up and delivery of mail to correctional facilities from the post office and to provide logistics help with the delivery of inter-facility mail between correctional facilities and state agencies. The help from DPA will include but not be limited to transportation of mail, scanning, and the applying of postage for both DOC employees and offender mail.

12. An offender can receive **addressed** "Postage Metered" envelopes from an outside legal source for legal purpose/response.

B. Incoming and Outgoing Restricted Inspection Mail: *Offenders are permitted to send sealed letters to a specified class of persons and organizations, including but not limited to the following: courts, counsel, officials of the confining authority, state and local chief executive officers, administrators of grievance systems, and members of the paroling authority. DOC employees, in the presence of the offender, may be allowed to inspect outgoing privileged mail for contraband before it is sealed. Mail to offenders from this specified class of persons and organizations may be opened only to inspect for contraband and only in the presence of the offender, unless waived in writing or in circumstances which may indicate contamination. [4-4492]* Suspicious circumstances may include, but are not limited to: packages or letters of unusual appearance or different from mail normally received or sent by the offender; inconsistent postmark and return address; inconsistent title/organization and address or which cannot otherwise be verified; packages and letters which are stained, leaking or emitting odors, substances, or residues.

1. Restricted inspection mail only applies to these persons and organizations corresponding in their official capacity. For purposes of this regulation, the specified class of persons and organizations are defined as follows:

   a. Courts: to include mail from Lexis-Nexis.

   b. Official of the confining authority: DOC executive director.

   c. State chief executive officer: governor of Colorado.

   d. Local chief executive officer: county sheriffs from any county within the state of Colorado.

| CHAPTER | SUBJECT | AR # | Page 4 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

    e.   Administrator of grievance system: grievance officer.

    f.   Paroling authority: chairperson of the parole board.

    g.   Counsel: Attorneys and their authorized representatives.

    h.   Legal Aid Organizations: refer to DOCNET-Legal Services page for list of verified organizations

    i.   AIC: ADA inmate coordinator.

    j.   Any elected member of a legislative body; state, local or federal.

    k.   Inspector general.

    l.   Legitimate health care providers: DOC clinical employees/contract workers; Non-DOC physicians, hospitals, clinics.

    m.   DOC PREA administrator.

    n.   Department of Justice Certified PREA Auditors.

    o.   Outside PREA Reporting Agency.

2.   Incoming and outgoing mailing envelopes to/from this class of persons and organizations must include an accurate and verifiable mailing and return address, including department, organization, or official title for identification purposes. Outgoing mail addressed to the PREA Reporting Agency at P.O. Box 41118, Olympia, WA 98504-1118 is not required to have a return address. **(115.51(b))**

3.   The DOC will *ensure and facilitate offender access to counsel and assist offenders in making confidential contact with attorneys and their authorized representatives; such contact includes, but is not limited to uncensored correspondence. [4-4275]* To be considered a confidential contact from an attorney, their authorized representative, or legal aid organization, the incoming mailing envelope must include the following:

    a.   Attorney's first and last name;

    b.   Attorney's registration, bar, or license number (exception will be made for attorneys practicing in states that do not issue such numbers, e.g., Mississippi);

    c.   Attorney's complete business address;

    d.   Mailing envelope must be clearly marked "PRIVILEGED" or "CONFIDENTIAL."

4.   In order to protect confidentiality, if the incoming mailing envelope from an attorney, their authorized representative, or legal aid organization fails to meet these requirements, the offender to whom the incoming mail was directed will be notified and may elect to either have the mail rejected and returned with a note on the envelope directing the sender to review this policy at: www.doc.state.co.us. OR to waive confidentiality and have the mail processed as non-restricted mail. This designation will be made using AR Form 300-38 Attachment D, Notice of Rejection/Disposition of Mail. The offenders must make an election either to have the mail returned to sender or to waive confidentiality and have the mail processed as non-restricted mail within ten (10) days of receiving notice. If the mailroom does not receive the offender's written election within ten (10) days, the mail will be returned to sender.

| CHAPTER | SUBJECT | AR # | Page  5 |
|---------|---------|------|---------|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

5.  Outgoing mail to attorneys, their authorized representatives, and legal aid organizations, require a legitimate and identifiable attorney, law office/firm or legal organization name and verifiable business mailing address and must be marked "PRIVILEGED" or "CONFIDENTIAL."

6.  Facility DOC employees will refer to DOCNET-Legal Services "Attorney/Legal Aid Organization" page for attorney identification, legal aid organization and address verification.

7.  These mailing requirements, in and of themselves, do not create or establish an attorney-client privilege or any other type of protected relationship or communication.

8.  For the purpose of providing postage, legal mail is that addressed to a court, Office of the Attorney General, the offender's attorney of record, Office of the District Attorney, opposing parties, co-defendants, and co-plaintiffs only. Offenders will be charged for postage, even if it results in a negative balance on the offender's account. If necessary, legal mail will be sent at the DOC's expense to avoid delay; however, postage will not exceed the current first class minimum rate.

    a.  Offenders are not entitled to unlimited postage. Offenders whose accounts have had overages, for postage charges only, of $300.00 or greater, within the last three years, may have postage privileges restricted.

    b.  Postage restrictions are subject to facility review and discretion. Once an offender's account is $300.00 or more in arrears, for postage charges only, facilities may limit the offender's outgoing restricted inspection mail to a maximum of $2.00, per month. .

9.  Outgoing restricted inspection mail will be stamped on the back of the envelope with the AR Form 300-38C, Restricted Inspection Mail Stamp.  The requested information will be filled in by the DOC employee who completes the mail log.

10. Due to various security threats, offenders will give outgoing unsealed restricted inspection mail to designated DOC employees. In the presence of the offender, DOC employees will remove the contents from the envelope to inspect both the envelope and the contents for contraband and scan the material to ensure it is restricted inspection mail. Staff will seal the envelope prior to stamping it with the Restricted Inspection Mail stamp over the seal on the back of the envelope, fill in the information required by the stamp, and have the offender initial the envelope.

11. All outgoing restricted mail, except for outgoing mail to the PREA Reporting Agency at P.O. Box 41118 Olympia, WA 98504-1118, will be logged utilizing AR Form 300-38 A, Outgoing Restricted Inspection Mail Log.

12. All incoming restricted inspection mail will be logged utilizing AR Form 300-38B, Incoming Restricted Inspection Mail Log.  If incoming restricted inspection mail is inadvertently opened by mailroom DOC employees, they will write "opened by mistake" on the envelope, initial and date the envelope, and tape it shut immediately.

    a.  Incoming restricted inspection mail will be opened and scanned, but not read for content, in the direct presence of the offender to ensure it is from a specified class of persons or organization, that it does not contain contraband, and that the contents are not contrary to legitimate institutional interests of order and security.

    b.  Upon delivery to the facility, mailroom DOC employees will make a copy of the sender information from the envelope/packaging of all incoming restricted mail.  This information will be provided to the offender upon delivery of the contents in lieu of the actual envelope packaging.

13. Restricted mail that has been previously delivered to and opened by an offender may be searched when the offender is not present based upon legitimate facility security interests of order and security.

| CHAPTER | SUBJECT | AR # | Page 6 |
|---------|---------|------|--------|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

14. If an offender does not wish to have his/her outgoing mail logged as Restricted Inspection Mail, such mail will be treated as non-restricted mail and be subject to full inspection.

15. All incoming and outgoing restricted inspection mail must adhere to all other requirements contained in this AR.

16. Mail received from a public information office associated with any of the protected organizations listed in this AR is not considered privileged or confidential and will be processed as non-restricted mail.

C. Incoming and Outgoing Non-restricted Mail: All other incoming and outgoing mail is considered non-restricted and may be read for content.

1. All incoming mail will include the following information:

   a. Offender name (commitment name); (Offenders may receive mail that identifies them by a legally changed name IF the offender's commitment name is listed first followed by the legally changed name.)

   b. Offender number;

   c. Facility and/or P.O. Box Number;

   d. Return address; or

   e. JPay letter ID for offender e-messaging.

   If all of these requirements are not met, the offender cannot be properly identified; therefore, the mail will be rejected and returned to sender. If an offender has been moved to another facility, the receiving mailroom will forward his/her mail to the current facility.

2. Adhesive labels, stickers and stamps will be removed from the offender's mail. The information that is on the label will be provided to the offender.

3. Mail that is not first class mail and is commonly considered "junk mail" will automatically be returned to sender or destroyed by DOC mailroom employees.

4. *Offender letters and packages* will *be inspected to intercept cash, checks, and money orders. [4-4493]*

   a. Cash, personal checks, and paper money orders will not be accepted through offender mail. Cash, personal checks or money orders will be returned to the sender, at the offender's expense utilizing AR Form 300-38G, Mail Office Withdrawal Slip.

   b. Deposits to an offender's account from an offender's family or friends must be made by electronic fund transfer (EFT) in accordance with AR 200-02, *Inmate Banking.*

   c. All other authorized checks or money orders (e.g., vendor refund and government payments in the form of a check) to offenders will be removed from incoming mail by the DOC mailroom employees and will be forwarded to Inmate Accounts at Colorado Territorial Correctional Facility to be credited to the offender's account in accordance with AR 200-02, *Inmate Banking.*

   d. Authorized checks or money orders received through incoming mail will be logged by DOC mailroom employees with the following information:

      1) Sender name and address;

| CHAPTER | SUBJECT | AR # | Page 7 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

    2) Offender name;
    3) DOC #;
    4) Type;
    5) Amount.

The envelope in which the check was received will be stamped and initialed by the mailroom employee, indicating the date received and the amount of the authorized check or money order. The envelope will serve as notice to the offender and as a receipt that the check or money order was removed from the offender's incoming mail and was forwarded to the Business Office to be credited to the offender's account.

e. Offenders may send money orders through offender mail in accordance with AR 200-02, *Offender Debt Collection (Inmate Banking)*. *Any financial transactions permitted between offenders must be approved by the appointing authority. [4-4047]* Offenders will not be permitted to receive funds from another currently incarcerated offender's relative or visitor, or any individual who is a current or former employee, or volunteer with the DOC. Exceptions may be made by the appointing authority for offenders with common immediate family members

f. Offenders are permitted to send stamps in order to obtain membership in and receive newsletters from certain offender organizations such as:

    1) Colorado CURE
    2) Advocates for Change
    3) Coalition for Sexual Offense Restoration (CSOR)

g. Offenders are permitted to send self addressed stamped envelopes. This is not a third party/three way mail issue as the self addressed envelope can only be sent back in to the original offender.

h. Offenders are allowed to receive self-addressed, stamped/postage metered envelopes from the specified organizations listed in this AR, authorized offender aid organizations, and from correspondence courses.

5. All outgoing offender mail will be enclosed and sealed in an envelope and stamped with the official DOC return address of the facility.

6. Receipt of Merchandise:

a. Receipt and delivery of items of value/packages will be documented utilizing AR Form 300-38H, Mail Office Package Slip.

b. All items of value ordered or received through the mail must be paid in full, purchased, and shipped by an approved source of supply, in accordance with AR 850-06, *Offender Property* and AR 800-01, *Religious Programs, Services, Clergy, Faith Group Representatives, and Practices*.

    1) Barring content and property restrictions, offenders may receive books which are fastened, hinged, or otherwise bound which come from an approved source of supply. Bindings which have a wire component are not allowed (example wire spiral). The offender may choose to provide disposition instructions or choose to have the wire binding removed.

    2) Barring content and property restrictions, offenders may receive loose-leaf (unbound) pages printed from the internet, including but not limited to e-books, pamphlets, newspaper articles, and legal materials. These unbound internet materials will be deemed to have come from an original, approved source of supply.

| CHAPTER | SUBJECT | AR # | Page 8 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

> 3) The contents of these items will be inspected and reviewed by mailroom DOC employees to ensure that the contents are in compliance with property restrictions outlined in AR 850-06, *Offender Property*, as well as content restrictions outlined in AR 300-26, *Publications*.
>
> 4) If the mailroom determines that any item should be censored, the mailroom DOC employees should submit their decision for review by the facility publication review committee in accordance with AR 300-26, *Publications*.

    c. Hobby craft items sent out through the mail will not be permitted to be returned to the offender in any form e.g., copied, enlarged, etc.

    d. New books or literature offered by legitimate, verifiable faith based organizations at no cost to the recipient may be received and processed consistent with this administrative regulation and in accordance with AR 850-06, *Offender Property*. Literature must be limited to the individual recipient only; multiple copies are not permitted.

7. Forwarding Mail:

    a. ***Forwarding of first-class letters and packages will be provided after an offender's transfer or release. [4-4496]*** Offenders who are paroled or discharged will be asked to provide a forwarding address to their last facility's mailroom to ensure the forwarding of mail for a period of 30 days. This is to be accomplished by the offender completing AR Form 300-38E, Offender Mail Forwarding Request. Offenders may ask for additional copies of this form, if necessary, from housing officers or case managers.

    b. If the offender does not provide a forwarding address, letters and packages will be returned to the sender.

    c. The following classes of mail will be forwarded:

> 1) First class (including zone rated priority) mail.
>
> 2) All other mail for which the sender or addressee has guaranteed to pay the forwarding postage.
>
> 3) When an item not endorsed by return postage guarantee is determined to be of obvious value and cannot be forwarded, it will be held for 30 days and then processed in accordance with AR300-06, *Searches and Contraband Control*.
>
> 4) Offender restricted inspection mail will be forwarded for offender's who have been transferred to another DOC facility. Mailrooms will keep a log of all mail that was received and forwarded. Offenders that have paroled will have their restricted inspection mail forwarded for 30 days; after 30 days the restricted inspection mail will be returned to sender.
>
> 5) Magazines will be forwarded via inter-facility mail or DPA.

    d. Offender e-messaging letters will be returned to sender if the offender has been placed in community corrections, paroled, or discharged.

8. Rejection of Mail:

    a. ***Offenders are notified when incoming or outgoing letters are withheld in part or in full [4-4491].*** This includes withholding of packages and merchandise, cash, checks, and money orders and all other incoming mail addressed to an offender. All censorable or rejected publications will be forwarded to the facility reading committee for evaluation and disposition pursuant to AR 300-26, *Publications*.

| CHAPTER | SUBJECT | AR # | Page 9 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

b. All mail rejected, consistent with this administrative regulation, may be returned to the sender at the offender's expense utilizing AR Form 300-38G, Mail Office Withdrawal Slip, or redirected for purposes pending disposition at the discretion of DOC employees. The offender will receive a written notification of the rejection utilizing AR Form 300-38D, Notice of Rejection/Disposition of Mail within ten days of receipt of the item by DOC mailroom employees. Where applicable, the sender will also receive a copy of AR Form 300-38D, Notice of Rejection/Disposition of Mail along with any returned mail item.  When the offender is permitted to designate disposition of the item but fails to complete and return the form within ten days, DOC employees will retain the item for a minimum of thirty (30) days from the date of confiscation before disposing of the item in order to allow for the offender to grieve the confiscation. In all cases, DOC employees will note the final disposition on AR Form 300-38D, Notice of Rejection/Disposition of Mail.

c. Disposition of contraband items, to include censorable publication, will be in accordance with AR 300-06, *Searches and Contraband Control*.

d. Mail may be rejected if it meets one or more of the following criteria:

1) Concerns and/or attempts to send contraband into or out of any DOC operated or contract facility. See AR 300-06, *Searches and Contraband Control* for information regarding contraband.

2) Sends, receives, solicits, or contains money orders or any other items of value from other currently incarcerated DOC offenders, or the relatives or visitors of other offenders in the custody of the DOC. Exceptions may be made for offenders with common immediate family members.

3) Contains cash, unauthorized personal checks, or paper money orders.

4) Creates a substantial danger to the emotional or mental health of an offender. The decision to reject the mail will be made by the administrative head, or designee, in conjunction with a qualified mental health practitioner.

5) There is a written request from a citizen or agency that mail from an offender be discontinued. Such written requests will be kept on file in the facility mailroom and chroned within the offender's electronic working file.

6) Indicates an offender is entering into a contract or engaging in business without the written approval of the administrative head of the facility where the offender is incarcerated.

7) Envelopes that are padded, cloth, plastic, cardboard, or which contain decorative stamps or stickers or has contents that cannot easily be removed and searched.

8) Contains postage stamps (unless stamps are specifically in accordance with IV.C.4.f. in this AR.), stamped, blank envelopes (unless envelopes are specifically in accordance with IV.C.4.g and h in this AR), blank stationery, blank writing paper, blank cards, blank postcards or blank personal journals.

9) Contains Polaroid photos.

10) Contains photos from another DOC offender.

11) Facility mailroom DOC employees will have the authority to reject mail containing any foreign, unknown, or unauthorized (liquid, powder, greasy, glued, or painted) substances that may pose a justifiable security risk to the facility. In such cases that mail and substance will be turned over to the facility OIG investigator for testing, investigation, and proper disposition.

| CHAPTER | SUBJECT | AR # | Page  10 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

12) Three-way/third party mail.

13) Once a property item (excluding written documentation) has been taken out of or sent outside of the DOC, re-entry will not be allowed, unless the item was sent out of the facility for approved repair or written approval was given by the administrative head.

14) Greeting cards with a musical component will have the musical device removed.

15) Greeting cards larger than 8½ inches wide and 11 inches long (legal size), folded.

16) Game boards, trading cards, and game accessories.

e.  Any incoming mail items that contain information or documents that are not being rejected, yet contain sensitive information or documents that may be inappropriate for an offender to have in his/her immediate possession (e.g., birth certificate, social security card), will be sent to the offender's case manager.  The case manager will forward the document(s) to the Offender ID Bank.

f.  Additional review may be conducted based on specific offender behavior related to incoming or outgoing mail. Any additional review must be approved by the administrative head.

g.  If an offender grieves the decision to reject any form of incoming mail, in accordance with AR 850-04, *Grievance Procedures,* the item(s) in question will not be disposed of and will be maintained at the facility until all phases of the grievance are addressed and/or resolved.  In the event that mail containing materials printed from the internet is rejected, the item of mail and all rejected materials printed from the internet will be retained within the facility's mailroom for a period of 60 days *after* the completion of the grievance process.


V.  RESPONSIBILITY

A.  Administrative heads or designees of facilities will keep completed AR Form 300-38A, Outgoing Restricted Inspection Mail Logs and AR Form 300-38B, Incoming Restricted Inspection Mail Logs in a central location for a minimum of 3 years.

B.  The director of Prisons or designee will ensure that this AR is reviewed annually and updated as necessary.


VI.  AUTHORITY

A.  C.R.S. 18-8-201. Aiding Escape.
B.  C.R.S. 18-8-204. Introducing contraband in the second degree.
C.  C.R.S. 18-8-204.1. Possession of contraband in the first degree.
D.  C.R.S. 24-4.1-302.5. Rights afforded to victims.

VII.  HISTORY

May 15, 2017
March 15, 2017
August 15, 2016
September 15, 2015
April 15, 2015
January 1, 2015
March 15, 2014

| CHAPTER | SUBJECT | AR # | Page 11 |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | EFFECTIVE 08/01/17 |

September 1, 2014
April 1, 2013
November 15, 2012
June 1, 2012
January 15, 2011
October 15, 2010
September 15, 2009
October 1, 2008
September 1, 2008
September 1, 2007
June 15, 2007
June 15, 2006

ATTACHMENTS:

A.   AR Form 300-38A, Outgoing Restricted Inspection Mail Log
B.   AR Form 300-38B, Incoming Restricted Inspection Mail Log
C.   AR Form 300-38C, Restricted Inspection Mail Stamp
D.   AR Form 300-38D, Notice of Rejection/Disposition of Mail
E.   AR Form 300-38E, Offender Mail Forwarding Request
F.   AR Form 300-38G, Mail Office Withdrawal Slip
G.   AR Form 300-38H, Mail Office Package Slip
H.   AR Form 100-01A, Administrative Regulation Implementation/Adjustments

AR Form 300-38A (05/15/17)

## Outgoing Restricted Inspection Mail Log
(Month / Year)

(Facility) _____  Living Unit _____

| Offender Signature | Offender Name (Print) | DOC # | Date Received | Addressed To: | Date Mailed | DOC Employee Name | DOC Employee # |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

Attachment A
Page 1 of 1

AR Form 300-38B (05/15/17)

## Incoming Restricted Inspection Mail Log

Facility

| Date Received | Sender | Offender Name | DOC # | Offender Initial | Date Delivered | DOC Employee ID # |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Attachment B
Page 1 of 1

AR Form 300-38C (06/15/12)

Restricted Inspection Mail Stamp

| | |
|---|---|
| _____ | _____ |
| FACILITY | DATE REC'D |
| _____ | _____ _____ |
| DOC EMPLOYEE LAST NAME | ID #        INT |
| _____ | _____ _____ |
| DOC# | OFFENDER LAST NAME   INT |

Attachment C
Page 1 of 1



**COLORADO**
Department of Corrections

AR Form 300-38D (08/01/17)

## Notice of Rejection/Disposition of Mail

Facility/Unit: _____ Date: _____ Offender/DOC#: _____

Your mail to/from: _____ or Publication: _____

(include name, issue number, page(s) of offender publication and RMMS number if available) **has been rejected or declared contraband for the following reason(s):**

- ❑ Contains threats or plans of criminal activity.
- ❑ Contains threats of physical harm against any person.
- ❑ Violates or concerns plans for activities in violation of the *Code of Penal Discipline*, law, or DOC policy.
- ❑ Is in code and/or not understood by the reader.
- ❑ Contains information that constitutes a danger to a person or threat to the security and safety of the facility.
- ❑ Concerns and/or attempts to send contraband into or out of any DOC operated or contract facility.
- ❑ Concerns plans for escape.
- ❑ Sends, receives, solicits or contains money orders or any other items of value from other currently incarcerated DOC offenders, or the relatives or visitors of other offenders in the custody of the DOC. Exceptions may be made for offenders with common immediate family members.
- ❑ Creates a substantial danger to the emotional or mental health of an offender.
- ❑ Contains cash, unauthorized personal checks, or paper money orders.
- ❑ There is a written request from a citizen that mail from an offender be discontinued.
- ❑ Indicates an offender is entering into a contract or engaging in business without the written approval of the administrative head. .
- ❑ Contains decorative stamps or stickers on the envelopes or contents that cannot easily be removed and searched.
- ❑ Contains postage stamps, (unless being sent in accordance with IV.C.4.f. in this AR) stamped envelopes, blank stationery, blank writing paper, blank cards, or blank post cards.
- ❑ Contains Polaroid photos.
- ❑ Contains photos from another DOC offender.
- ❑ Contains unknown substance(s).
- ❑ Material that describes or depicts the design or manufacture of firearms, explosives, or other weapons or destructive devices, or controlled substances or intoxicants, or which provide detailed instructions regarding the illegal use of such items.
- ❑ Material that by depiction or description advocate violence, hatred or vengeance against any individual or group based upon their race, religion, nationality, sex, or ethnicity or that appears more likely than not to provoke or to precipitate a violent confrontation between the recipient and any other person.
- ❑ Material that by depiction or description support the illegal activities of a security threat group contrary to the security interests of the facility or the individual rehabilitative goals of the recipient. **Sign language or style of dress alone, in the absence of other material that supports, incites, promotes, encourages, or advocates any type of illegal gang activity, will not be the cause of rejection.**
- ❑ Sexually explicit material pursuant to AR 300-26, "Publications". **Offenders may appeal this by contacting their case manager for AR Form 300-26A.**
- ❑ Material which poses a potential threat to the safety and security of the offender population or DOC employees, contract workers, and volunteers by advocating facility disruption or noncompliance with prison rules or regulations.
- ❑ Other.

## DISPOSITION
- ❑ Sent to publication committee.
- ❑ Declared contraband, not for offender disposition.
- ❑ Declared contraband; offender must designate disposition within ten days.
- ❑ Returned to sender. (*Regarding Publications - you may submit a one page statement addressed to the facility publication committee within 28 days of the date on this notice*).
- ❑ Other

Date: _____ Mailroom DOC Employee Signature: _____

I designate the following disposition of the above items:
- ❑ I do not waive legal confidentiality. I understand this letter will be sent back to the sender for the appropriate information and thus I understand it will result in delay of delivery of restricted mail to me.
- ❑ I waive legal confidentiality and grant permission to process mail as non-restricted mail.
- ❑ Destroy
- ❑ Return to sender at my expense
- ❑ Send to the following address at my expense:

Date: _____   Offender Signature: _____

Cc:  Offender
     Facility Publication Committee
     Sender of personal letter

Attachment D
Page 1 of 1



**COLORADO**
Department of Corrections

AR Form 0300-038E (04/15/15)

## Offender Mail Forwarding Request

The facility will forward first class mail or other mail that the sender or addressee has guaranteed to pay for forwarding postage. In order to receive forwarded mail, fill out the address labels below. The forwarding request will be honored for 30 days from the date of signature. **You must print legibly.**

OFFENDER NAME: _____   DOC# _____   DATE: _____

| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |
|---|---|---|
| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |
| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |
| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |
| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |
| Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: | Forwarding Address:<br><br>Name:<br>Address: |

Attachment E
Page 1 of 1

AR Form 300-38F (05/15/17)

## Mail Office Withdrawal Slip

Name: _____

DOC # _____     Date _____

Your account has been charged   $ _____

For postage used for:

                    □      Package shipped UPS – Parcel Post

                    □      Certification/return receipt

                    □      Additional postage was needed

Mail Office Supervisor

AR Form 300-38G (05/15/17)

## Mail Office Package Slip

Name: _____

DOC # _____   Date _____

Received by: _____   Date: _____

The State of Colorado Department of Corrections, any and all of the employees of the Department of Corrections, and any and all of the facilities or departments connected with the above will not be responsible for damage to or loss and/or theft of any personal article belonging to the noted offender whose signature appears above after the delivery of the said item to the offender.

ADMINISTRATIVE REGULATION
IMPLEMENTATION/ADJUSTMENTS

AR Form 100-01A (04/15/08)

| CHAPTER | SUBJECT | AR # | EFFECTIVE |
|---|---|---|---|
| Facility Security | Offender Mail | 300-38 | 08/01/17 |

(FACILITY/WORK UNIT NAME) _____
WILL ACCEPT AND IMPLEMENT THE PROVISIONS OF THE ABOVE ADMINISTRATIVE REGULATION:

[ ] AS WRITTEN    [ ] NOT APPLICABLE    [ ] WITH THE FOLLOWING PROCEDURES TO ACCOMPLISH THE INTENT OF THE AR

(SIGNED) _____ (DATE) _____
         Administrative Head

Attachment H
Page 1 of 1

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 300-26 | 1 OF 7 |
| | CHAPTER:   Facility Security | |
| COLORADO DEPARTMENT OF CORRECTIONS | SUBJECT:   Publications | |
| RELATED STANDARDS:   ACA Standards - 4-4490 | EFFECTIVE DATE:   August 1, 2017 | |
| | SUPERSESSION:   02/01/17 | |
| OPR: DOP/OLS   REVIEW MONTH: May | Rick Raemisch Executive Director | |

## I.   POLICY

It is the policy of the Colorado Department of Corrections (DOC) to balance the offender's right to receive, read and view publications with the right of DOC employees to work in an environment free of hostility and sexual harassment.

## II.   PURPOSE

The purpose of this administrative regulation (AR) is to establish criteria for allowing publications within a correctional facility or office and to *provide guidelines governing offender access to publications.  [4-4490]*

## III.   DEFINITIONS

A.   Administrative Head: The chief executive officer for a facility, center, division, office, or unit within the DOC organization.

B.   DOCNET: An internal website (intranet) for DOC employees, contract workers, and volunteers.

C.   Facility Publication Review Committee: As established by the administrative head of each facility, this committee should consist of the facility general library technician / librarian, and at least one representative from each of the following areas: Programs, Custody/Control, Intelligence Office, Behavioral Health, and may include other persons deemed appropriate. The administrative head will designate a committee chair.

D.   Nudity: The fully exposed, or transparently covered, depiction or display of the human genitals, anus, or the female areola and/or nipple.  For purposes of this AR; pasties, blackened dots or stars and other such covering of the nipple and areola of the female breast or of the human genitalia will be considered nudity.

E.   Publication: Any information or material in the form of a book, booklet, pamphlet, flyer, magazine, periodical, newsletter, photograph or other pictorial depiction of similar document, including stationery and greeting cards, writing, drawing, or cartoon created by any individual, organization, company or corporation which is distributed or made available through any means or media.

F.   Security Threat Group: A group of three or more individuals with a common interest, bond, or activity characterized by criminal or delinquent conduct, engaged in either collectively or individually, with the potential to create a security threat to DOC facilities or offices and/or functions within DOC, as defined by C.R.S. 17-1-109.  This will include, but not be limited to gangs, disruptive, and deviant groups.



EXHIBIT

D

| CHAPTER | SUBJECT | AR # | Page 2 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

G. Sexually Explicit Conduct:  Contains any display, actual or simulated of any of the following (whether nude or clothed)

   1. Sexual intercourse or sodomy, including genital-genital, oral genital, anal-genital, and anal-oral contact, whether between persons of the same or differing gender or by animate or inanimate objects;

   2. masturbation;

   3. bestiality;

   4. necrophilia;

   5. sadistic or masochistic practices; or

   6. discharge of bodily fluids.

IV. PROCEDURES

A. General Principles

   1. All DOC and privately operated correctional facilities will coordinate publication reviews to ensure consistency of decisions regarding the censorship of publications.

   **2. Specific programs within the department may set more stringent censorship restrictions for rehabilitation purposes (e.g., Sex Offender Treatment Program, mental health, and the Youthful Offender System (YOS)). Violations of these modified restrictions should be addressed through the program process.**

   3. Publications (including incoming/outgoing mail and other materials) that are in violation of this policy and are found in an offender's cell, possession, or property will be deemed contraband and subject to disposition as defined in AR 300-06, *Searches and Contraband Control*. If the material is considered to be criminal evidence it will be handled pursuant to AR 1150-07, *Crime Scene Management and Criminal Evidence Handling*.

   4. Administrative heads will ensure that facility contraband lists are consistent with the above mandates.

   5. Facilities, other than the YOS, will not adopt any implementation adjustments (I/A) or operational memoranda (OM) that contains different criteria and/or procedures for censorship than those articulated in this AR. YOS may censor publications which have been approved for all other facilities. The director of Prisons may give recommendation to YOS regarding its censorship options.

   6. Department publication censorship decisions may not be grieved but may be appealed pursuant to the guidelines herein.

B. Mailroom Review

   1. The mailroom will make an initial censorship decision on all incoming publications, personal letters and photos, including those sent electronically to the offender.

   2. Publications meeting the following criteria will be held by the mailroom and forwarded to the facility reading committee for a final censorship decision:

| CHAPTER | SUBJECT | AR # | Page 3 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

    a. Publications that depict or describe the design or manufacture of firearms, explosives, or other weapons or destructive devices, or controlled substances or intoxicants, or which provide detailed instructions regarding the illegal use of such items.

    b. Publications that by depiction or description, advocate violence, hatred, abuse or vengeance against any individual or group based upon his/her race, religion, nationality, sex, sexual orientation, disability, age or ethnicity, or that appear more likely than not to provoke or to precipitate a violent confrontation between the recipient and any other person.

    c. Publications that by depiction or description support the illegal activities of a security threat group, contrary to the security interests of the facility. Sign language or style of dress alone, in the absence of other material that supports, incites, promotes, encourages, or advocates any type of illegal security threat group activity will not be the cause of rejection.

    d. Publications depicting nudity and/or sexually explicit conduct (as defined herein).

    e. Publications which pose a potential threat to the safety and security of the offender population or DOC employees, contract workers, or volunteers by advocating facility disruption or noncompliance with prison rules or regulations.

3. Personal letters and personal photos meeting the following criteria will be held by the mailroom and forwarded to the facility reading committee for a final censorship decision

    a. Personal letters, and photos which describe **illegal sexual conduct** (e.g., rape, child molestation) or contain photos or drawings containing nudity (as defined herein) or sexually explicit conduct.

    b. Personal letters, and photos which may present a threat to facility safety and security (e.g., security threat group, weapons, violence). These will be sent to the facility intelligence officer as well as the facility publication review committee.

4. When a publication is received in a facility mailroom that appears to be in violation of this policy:

    a. Offender(s) will be notified within 48 hours from the date the item is received in the facility mailroom, using AR Form 300-38D, Notice of Rejection/Disposition of Mail. Offenders may appeal the decision by submitting AR Form 300-26A, Appeal Statement, to their case manager within 14 days of the date of service of the notice of rejection of mail. Case managers will submit completed appeal forms to the facility reading committee.

    b. The facility mailroom will send a notice to all DOC and private prison mailrooms, facility libraries, and to the publisher. Publisher notice will be made using AR Form 300-26F, Notice to Publisher. If the notification to the publisher is returned to the facility as undeliverable, it will be documented in the offender publication database by the receiving facility, and a copy will be maintained as a part of the administrative head's record.

    c. Facility libraries may appeal the initial mailroom decision by submitting AR Form 300-26A, Appeal Statement to the facility reading committee chairperson within 14 days of the date of service of the notice of rejection of mail.

    d. Upon receipt of the notice, all DOC and private prison mailrooms will hold the publication until a final decision on censorship is made at the originating facility or by the director of Prisons.

5. When a publication is received which has already been censored by a facility reading committee or the director of Prisons or designee, as indicated by the distributed AR Form 300-26B, Facility Publication Committee Publication Censorship Decision or AR Form 300-26E, Director of Prisons Final Departmental Publication Censorship Decision:

| CHAPTER | SUBJECT | AR # | Page 4 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

    a.    All DOC and private facility mailrooms will provide AR Form 300-38D, Notice of Rejection/Disposition of Mail and AR Form 300-26B, Facility Publication Committee Publication Censorship Decision or 300-26E, Director of Prisons Final Departmental Publication Censorship Decision to any offenders who were to receive the censored publication and to the facility library.

    b.    The publication should then be considered contraband and disposed of pursuant to AR 300-06, *Searches and Contraband Control*. Library materials will be discarded or returned to the Colorado State Library (CSL), as determined by the CSL supervisor.

    c.    The publication does not need to go back through the facility publication committee process.

C.   Facility Publication Committee Review:

    1.    Excluding weekends, holidays and/or emergency situations, the facility publication review committee will meet as needed, but not less than every two weeks (14 calendar days), to review publications referred to the committee.

    2.    When evaluating the censorship decision, the committee must review the publication and any appeal statements received.

        a.    *A publication may not be rejected solely because its content is religious.*

        b.    A publication, personal letters, and/or photo may not be rejected solely because of its philosophical, political or social views, or because its content is unpopular, repugnant, or critical of the DOC or other government authority.

        c.    A publication may be allowed which would otherwise meet the definition of nudity or sexually explicit conduct if, the publication has literary, educational, scientific, artistic or historic value.

    3.    The facility publication review committee, at their discretion, may censor and remove offending pictures or articles, up to a total of five pages per publication, and allow the rest of the publication.

    4.    The facility publication review committee's decision must specify the nature of the objectionable content.

    5.    Within seven working days of the conclusion of the facility publication committee meeting, the chairperson will forward the committee's recommendations using AR Form 300-26B, Facility Publication Committee Publication Censorship Decision or AR Form 300-26C, Facility Publication Committee Personal Letter/Photo Censorship Decision, as applicable, and the original publication, personal letter or photo to the administrative head or designee.

    6.    Within 14 days of receipt of the facility publication committee's recommendation, the administrative head or designee will:

        a.    Review the censorship recommendation, the publication, and any statements received.

        b.    Determine whether to permit or censor the publication, personal letter or photo.

        c.    Determine whether to permit an appeal of the facility's publication committee decision to the director of Prisons. **Appeals will be allowed for all library materials, whenever the censored or partially censored material involves political or religious speech, and/or any time that the administrative head is uncertain whether the publication strictly meets the definitions of nudity and/or sexually explicit conduct contained herein.**

| CHAPTER | SUBJECT | AR # | Page 5 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

    d.   The administrative head/designee will indicate the decision and reasons for the decision in the space provided on AR Form 300-26B, Facility Publication Committee Publication Censorship Decision, or AR Form 300-26C, Facility Publication Committee Personal Letter/Photo Censorship Decision, as applicable.

    e.   Each administrative head or designee will log the appeals that have been submitted to the director of Prisons in the Reading Material Management System (RMMS), the central database created for tracking publications that have gone through the publication review process.

7.   The decision of the administrative head/designee completes the facility review process and is the final authority on censorship decisions related to personal letters and photos.

8.   When the facility publication review is completed, the originating facility will communicate the decision on the publication to all facility mailrooms and libraries using AR Form 300-26B, Facility Publication Committee Publication Censorship Decision.

    a.   All facilities will use the AR Form 300-26B, Facility Publication Committee Publication Censorship Decision, as prepared by the originating facility, and will forward a copy of this form to offenders and any facility libraries affected by the censorship decision.

    b.   After appropriate labeling, the publication, personal letter, or photo will be delivered to the offender(s) and to the facility library (if applicable).

    c.   If an appeal to the director of Prisons will be allowed, AR Form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision will also be provided to the offender and the facility library (if applicable).

9.   Each administrative head will ensure that signed and completed copies of AR Form 300-26B, Facility Publication Committee Publication Censorship Decision are kept together with the original publication until the review/appeal process has been exhausted. Electronic copies are acceptable. Copies of the publication will not be provided to the offender.

D.   Director of Prisons Appeal Review:

1.   If an appeal is allowed, offenders, facility libraries, and facilities may appeal the censorship decision to the director of Prisons using AR Form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision. Offenders will not be allowed to view nor receive copies of the publication in order to prepare an appeal.

2.   The director of Prisons will review the publications and any appeal statements received and will make the final publication censorship decision based on the criteria established in this AR.

    a.   AR form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision will be completed and forwarded, along with the publication in question, to the appropriate administrative head for distribution to the appropriate offender(s) or library.

    b.   AR form 300-26E, Director of Prisons Final Departmental Publication Censorship Decision will be completed documenting the department-wide censorship decision on all appealed publications

E.   Disposition of Publication:

1.   Once all appeals and time limits for appeal have been exhausted for offenders, libraries and publishers, fully censored publications, personal letters or photo(s) will be considered contraband for the purposes of disposition.

| CHAPTER | SUBJECT | AR # | Page 6 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

2. The facility will notify offenders and/or the library technician/librarian that they have ten calendar days in which to designate disposition of the publication, in accordance with AR 300-06, *Searches and Contraband Control*.

3. If library material is not censored, or is censored only in part, the library technician / librarian will affix a label (AR Form 300-26G) to the item and make it available for use.

4. If the publication, personal letter or photo(s) is not censored, or is censored only in part, the facility will affix a label (AR Form 300-26G) to the item and deliver it to the offender.

    a. If an offender removes the label, the item will be considered contraband and it will be confiscated and disposed of pursuant to AR 300-06, *Searches and Contraband Control* and

    b. The offender may be charged with a Code of Penal Discipline infraction (possession of unauthorized material).

F. Record Keeping

1. The administrative head will retain copies (electronic or otherwise) of the cover page of the publication (if applicable), AR Form 300-26B, Facility Publication Committee Publication Censorship Decision and AR Form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision for the current fiscal year and the previous four years.

2. All facilities will utilize Reading Material Management System available on DOCNET to log all required information. Facilities will have all monthly information entered in the database by the fifth working day of the following month.

3. Offenders are required to keep copies of completed and signed AR Form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision for permitted publications for as long as they maintain the publication

V. RESPONSIBILITY

A. It is the responsibility of the appropriate administrative head to ensure that DOC employees are adequately trained to meet the intent and requirements of this policy.

B. It is the responsibility of the director of Prisons and associate director of Legal Services to review this AR annually and update as necessary.

VI. AUTHORITY

A. C.R.S. 17-40-102. Program established.
B. C.R.S. 18-7-101(2). Definitions.
C. Carpenter v. South Dakota 536 F2d 759 (8th Cir 1976) [upholding prison review board's decision to ban sexually explicit material as detrimental to rehabilitation].
D. McCorkle v. Johnson 881 F2d 993 (11th Cir 1989) [Satanic Bible and Satanic ritual book barred as threat to facility security and contrary to rehabilitative goals].
E. Superintendent v. Hill 472 US 445 (1985).
F. Thornburg v. Abbott 490 US 401 (1989).
G. Turner v. Safely 482 US 78 (1987) [regulation is valid if reasonably related to valid penological objective].
H. Wolff v. McDonnell 418 US 539 (1974).
I. Sperry v. Werholtz, 2011 U.S. App. LEXIS 2925 (2011)
J. Title VII, Civil Rights Act, 1964, 42 U.S.C.S. § 2000e et seq.,
K. Jones v. Salt Lake County, 503 F.2d 1147.

| CHAPTER | SUBJECT | AR # | Page 7 |
|---|---|---|---|
| Facility Security | Publications | 300-26 | EFFECTIVE 08/01/17 |

VII. <u>HISTORY</u>

      February 1, 2017
      November 15, 2016
      February 1, 2016
      November 15, 2012
      June 15, 2012
      February 1, 2012
      October 15, 2010
      September 15, 2009
      August 15, 2008
      August 15, 2007
      May 1, 2007
      February 1, 2007

ATTACHMENTS:

    A.  AR Form 300-26A, Offender Appeal Statement
    B.  AR Form 300-26B, Facility Publication Committee Publication Censorship Decision
    C.  AR Form 300-26C, Facility Publication Committee Personal Letter/Photo Censorship Decision
    D.  AR Form 300-26D, Director of Prisons Publication Censorship Appeal Statement and Decision
    E.  AR Form 300-26E, Director of Prisons, Final Departmental Publication Censorship Decision
    F.  AR Form 300-26F, Notice to Publisher
    G.  AR Form 300-26G, Label
    H.  AR Form 100-01A, Administrative Regulation Implementation/Adjustments

AR Form 300-26A (02/01/16)

## APPEAL STATEMENT

| Offender Name and DOC# (if submitted by an offender): | Facility: | **Statement Date:** |
|---|---|---|

Material being appealed:

[ ]  Publication _____

_____
_____

Include the title and date of the publication, issue number and a brief description of why the publication has been censored.

[ ]  Personal Letter_____

_____
_____

Include sender's name, number of pages and a brief description of why the letter has been censored.

[ ]  Photos_____

_____
_____

Include sender's name, total number of photos and a brief description of why the photo(s) have been censored.

**If you wish to provide input into this appeal, you must complete this portion and return it to your case manager within 14 days of the notice date.**

What is the basis of your appeal statement (Be specific and brief):

Appellant Signature/Date:                          Receiving DOC Employee Signature/Date:

**Decision**

Original -  Facility Publication Committee
     xc:  Offender

Attachment A
Page 1 of 1



**COLORADO**
Department of Corrections

AR Form 300-26B (12/08/16)

## Facility Publication Committee Publication Censorship Decision

**PUBLICATION**
*Title or Description of Publication:* _____
Include name, issue number, page(s) of offending publication and RMMS number

Pursuant to AR 300-26, this publication contains one of the following:

[ ]  Material that describes or depicts the design or manufacture of firearms, explosives, or other weapons or destructive devices, or controlled substances or intoxicants, or which provide detailed instructions regarding the  illegal use of such items.

[ ]  Material that by depiction or description advocate violence, hatred or vengeance against any individual or group based upon their race, religion, nationality, sex, or ethnicity or that appears more likely than not to provoke or to precipitate a violent confrontation between the recipient and any other person.

[ ]  Material that by depiction or description support the illegal activities of a security threat group contrary to the security interests of the facility or the individual rehabilitative goals of the recipient. **Sign language or style of   dress alone, in the absence of other material that supports, incites, promotes, encourages, or advocates any type of illegal gang activity, will not be the  cause of rejection.**

[ ]  Material that depicts Nudity/Sexually explicit conduct

[ ]  **Material is permitted due to literary, educational, scientific, artistic or historic value.**

[ ]  Material which poses a potential threat to the safety and security of the offender population or DOC employees, contract workers, and volunteers by advocating facility disruption or noncompliance with prison rules or regulations.

Printed Name/Signature of all committee members in attendance:
_____
_____
_____
_____

DISPOSITION FOLLOWING EVALUATION OF PUBLICATION(S):
[  ]  Allowed
[  ]  Censored
[  ]  You may appeal this decision within 14 days of the date of service of this form.
[  ]  This response serves to exhaust all administrative remedies.
[  ]  Censored in part; pages censored:_____
[  ]  You may appeal this decision within 14 days of the date of service of this form.
[  ]  This response serves to exhaust all administrative remedies.

_____
Administrative Head: Printed Name/Signature                Date

Cc:     Facility Mailroom
        Facility Library

Attachment B
Page 1 of 1

AR Form 300-26C (02/01/16)

## Facility Publication Committee Personal Letter/Photo Censorship Decision

*Offender Name:*

*DOC#:*

*Material reviewed:*

*[ ] Personal Letter*

Include sender's name and number of pages

*[ ] Personal Photos*

Include sender's name and total number of photos

**Provide a detailed explanation as to what material was originally censored, why the material, or any portion thereof is being reviewed and the basis for the facility publication committee decision.**

Review    Committee    Chair:    Printed    Name    &    Signature    Date

DISPOSITION FOLLOWING EVALUATION OF MATERIALS):
[ ] Allowed
[ ] Censored.  This response serves to exhaust all administrative remedies.
[ ] Censored in part; pages and/or photos censored:_____.This response serves to exhaust all administrative remedies.
[ ] Material has been confiscated as contraband pursuant to ARs 300-06 and 300-38.  This response serves to exhaust all administrative remedies.

Administrative Head:  Printed Name/Signature            Date

Date Served to Offender            Served by: DOC Employee(s) Printed Name/Initials

Offender Signature/Printed Name

Facility publication review committee decisions may not be grieved.

Attachment C
Page 1 of 1

AR Form 300-26D (02/01/16)

## Director of Prisons Publication Censorship Appeal Statement and Decision

| Offender Name and DOC # (if submitted by an offender): | Facility: |
|---|---|
| | |

OR

Facility Appealing Censorship Decision:

Publication  Title, Issue Date and RMMS number:

What is the basis of your appeal (Be specific and brief):

Administrative head or designee Review: Initials/Signature _____

Printed Name _____ Date _____

(Attach original censored publication)

Director of Prisons'/Designee Response:
The Director of Prisons/Designee has reviewed this appeal  and determined that the publication will be:

[  ] Allowed
[  ] Censored
[  ] Censored in part; pages censored:_____

**This response serves to exhaust all administrative remedies.**

Signature: _____
Printed Name of Director of Prisons or designee: _____

Date Served: _____   Served by: DOC Employee(s) Printed Name/Initials

Appellant Signature/Printed Name

Attachment D
Page 1 of 1

AR Form 300-26E (12/08/16)

## Director of Prisons Final Departmental Censorship Decision

The publication_____was reviewed by the Director of Prisons/Designee on _____.

Pursuant to AR 300-26, this publication contains one of the following:

[ ]  Material that describes or depicts the design or manufacture of firearms, explosives, or other weapons or destructive devices, or controlled substances or intoxicants, or which provide detailed instructions regarding the illegal use of such items.

[ ]  Material that by depiction or description advocate violence, hatred or vengeance against any individual or group based upon their race, religion, nationality, sex, or ethnicity or that appears more likely than not to provoke or to precipitate a violent confrontation between the recipient and any other person.

[ ]  Material that by depiction or description support the illegal activities of a security threat group contrary to the security interests of the facility or the individual rehabilitative goals of the recipient.  **Sign language or style of dress alone, in the absence of other material that supports, incites, promotes, encourages, or advocates any type of illegal gang activity, will not be the cause of rejection.**

[ ]  Material that depicts Nudity/Sexually explicit conduct

[ ]  **Material is permitted due to literary, educational, scientific, artistic or historic value.**

[ ]  Material which poses a potential threat to the safety and security of the offender population or DOC employees, contract workers, and volunteers by advocating facility disruption or noncompliance with prison rules or regulations.

[ ]  NO CENSORABLE CONTENT

DISPOSITION FOLLOWING EVALUATION OF PUBLICATION:

[ ] CENSORED
[ ] CENSORED IN PART; PAGES CENSORED _____
[ ] ALLOWED

Director of Prisons/Designee Signature                                          Date    of Decision

Cc: Facility Administrative Head
      Facility Publication Committee Chairs
      Facility Mailrooms
      Facility Libraries

Attachment E
Page 1 of 1

AR Form 300-26F (11/15/12)

**[USE FACILITY SPECIFIC OR DOC LETTERHEAD AS APPLICABLE]**
Notice to Publisher

TO: _____
Name

_____
Address

_____
City / State / Zip Code

FROM: _____
Facility

_____
Address

_____
City / State / Zip Code

DATE: _____

Please be advised that your publication:

_____
(Name & Issue/Date of Publication)

Sent to one or more Colorado Department of Corrections offender(s) is being reviewed by the facility publication review committee and the administrative head of the facility.  (Identify the page number(s) and content on those pages which is objectionable and a brief description of why the publication has been censored)

Using the space provided below (you may attach 1 additional page), provide a response and input regarding this review the reviewing facility at the address listed above.  You have 28 days from the date listed above to

_____
_____
_____
_____
_____
_____
_____
_____
_____

Attachment F
Page 1 of 1

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of publication and RMMS# if applicable

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of publication and RMMS# if applicable.

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of PUBLICATION and RMMS# if applicable.

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of publication and RMMS# if applicable.

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of publication and RMMS# if applicable.

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

REMOVAL OF THIS LABEL
WILL RESULT IN THE LOSS
OF THE PUBLICATION
TO WHICH THIS LABEL IS
AFFIXED.

Name & Date of Publication or detailed description of publication and RMMS# if applicable.

| Facility | Offender Name & DOC Number |
|---|---|

| List any pages removed |
|---|

| Facility | Publication | Review | Date Label Affixed |
|---|---|---|---|
| Committee | | | |

Attachment G
Page 1 of 1

ADMINISTRATIVE REGULATION
IMPLEMENTATION/ADJUSTMENTS

AR Form 100-01A (04/15/08)

| CHAPTER | SUBJECT | AR # | EFFECTIVE |
|---|---|---|---|
| Facility Security | Publications | 300-26 | 08/01/17 |

(FACILITY/WORK UNIT NAME) _____
WILL ACCEPT AND IMPLEMENT THE PROVISIONS OF THE ABOVE ADMINISTRATIVE REGULATION:

[ ] AS WRITTEN   [ ] NOT APPLICABLE   [ ] WITH THE FOLLOWING PROCEDURES TO ACCOMPLISH THE INTENT
                        OF THE AR

(SIGNED)_____ (DATE) _____
        Administrative head

Attachment H
Page 1 of 1

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 700-03 | 1 OF 10 |
| COLORADO DEPARTMENT OF CORRECTIONS | CHAPTER: Offender Health Services | |
| | SUBJECT: Mental Health Scope of Service | |
| RELATED STANDARDS: ACA Standards 2-CO-4E-01, 2-CO-4F-01, 4-4281-4, 4-4281-5, 4-4368, 4-4370 through 4-4374, 4-4403-1 4-4405, and 4-4435 | EFFECTIVE DATE: March 15, 2015 | |
| | SUPERSESSION: 03/15/14 | |
| OPR: OCS   REVIEW MONTH: DECEMBER | *Rick Raemisch*  Rick Raemisch  Executive Director | |

I. POLICY

It is the policy of the Colorado Department of Corrections (DOC) to provide mental health services that are oriented towards improvement, maintenance or stabilization of offenders' mental health, contribute to their satisfactory prison adjustment, diminish public risk presented by offenders upon release, and aid the DOC in the maintenance of an environment that preserves the basic human rights and dignity of offenders, correctional DOC employees, and contract workers.

II. PURPOSE

*The purpose of this administrative regulation (AR) is to establish the general scope and limits of mental health services, as approved by the chief of Behavioral Health Services, which are provided to DOC offenders by qualified mental health DOC employees and contract workers. [2-CO-4E-01] [2-CO-4F-01] [4-4368]*

III. DEFINITIONS

A. Ambulatory Restraint: The use of mechanical devices that limit movement of extremities without preventing the offender from moving about in an area. The mechanical devices may consist of metal universal restraint system, safety harness, or cloth restraints.

B. Clinical Restraint, General: Physical restrictions on an offender's movements ordered by properly credentialed clinicians for clinical purposes. Clinical restraint includes ambulatory restraint, medical restraint, and four point restraint.

C. Contract Worker: A person other than a DOC employee who provides services to the DOC under contract, special assignment, or informal agreement (e.g. purchase order). A contract worker includes self-employed persons, sole proprietors, and persons employed by an employer in the private sector, another public entity, or by another agency of the state of Colorado.

D. DOC Employee: Someone who occupies a classified, full or part-time position in the State Personnel System (including management and at will positions) in which the Department has affect over pay, tenure, and status.

E. Health Care Practitioner: A clinician trained to diagnose and treat patients, e.g., physicians, dentists, psychologists, optometrists, nurse practitioners, and physician assistants.



EXHIBIT

E

| CHAPTER | SUBJECT | AR # | Page 2 |
|---|---|---|---|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

F.  Health Services Administrator (HSA): The DOC employee or contract worker administratively in charge of multi-disciplinary clinical services teams that provide services at the facility level or clinical unit. These clinical teams include medical, nursing, dental, mental health, drug and alcohol, sex offender, and health care support DOC employees and contract workers.

G.  Mental Health Care Professional: DOC employee or contract worker who performs clinical duties for offenders with mental illness, e.g., psychologists, nurses, social workers, and licensed professional counselors, in accordance with each health care professional's scope of training and applicable licensing, certification, and regulatory requirements.

H.  Mental Health Four Point Restraint: Any mechanical device used to restrain offenders four extremities to a fixed object. This does not include the use of the restraint chair.

I.  Professional Mental Health Clinician: Clinical Services DOC employees and contract workers trained in the provision of mental health services. These DOC employees and contract workers are licensed to provide mental health services to adults or are eligible for licensure and work under the supervision of a licensed professional mental health clinician. Such DOC employees and contract workers include those in the following DOC positions: psychologists, social workers, masters' level counselors.

J.  Psychiatric Practitioners: Clinical Services DOC employees and contract workers who are licensed as psychiatrists, psychiatric position extenders, and nurse specialists to include psychiatric physician assistants and nurse practitioners with prescriptive authority.

K.  Significant Functional Impairment:  The demonstration of difficulty functioning within the confines of the correctional environment as evidenced by engaging in deliberate self-harming behaviors, such as cutting, self-mutilation, ingestion or insertion of a foreign body, head banging, drug overdose, hanging, biting, or jumping from heights with intent to cause self-harm; demonstrating difficulty maintaining activities of daily living such as eating, maintaining personal hygiene, or participating in recreation; and/or a pervasive pattern of dysfunctional, bizarre, or disruptive social interaction as a consequence of an underlying mental disorder

L.  Serious Mental Illness:  The current diagnosis of any of the following DSM diagnoses accompanied by the P-code qualifier of M, denoting  the presence of a major mental disorder: schizophrenia, schizoaffective disorder, delusional disorder, schizophreniform disorder, brief psychotic disorder, substance-induced psychotic disorder (excluding intoxication and withdrawal), unspecified schizophrenia spectrum and other psychotic disorder (previously psychotic disorder not otherwise specified), major depressive disorders, and bipolar disorders. Offenders, regardless of diagnosis, indicating a high level of mental health needs based upon high symptom severity and/or high resource demands, which demonstrate significant impairment in their ability to function within the correctional environment.

IV.  PROCEDURES

A.  *Organization: [2-CO-4F-01]*

1.  *The chief of Behavioral Health Services is the mental health authority. The mental health program administrator and the chief of psychiatry will approve all clinical activities carried out by mental health and psychiatric DOC employees and contract workers. [2-CO-4E-01]* All mental health services provided by mental health clinician DOC employees and contract workers will be clinically directed by, or coordinated through, the mental health program administrator. All psychiatric services provided by psychiatric provider DOC employees and contract workers will be clinically directed by, or coordinated through, the chief of psychiatry. These positions will review and approve clinical mental health policies and will participate in personnel reviews and planning for mental health supervisors, oversee recruitment of mental health DOC employees and contract workers, and must be consulted regarding selection and movement of mental health DOC employees and contract workers. *The mental health program administrator, will*

| CHAPTER | SUBJECT | AR # | Page 3 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

*also annually review and approve a suicide prevention and intervention training curriculum to be provided to all line DOC employees and contract workers through the Corrections Training Academy. The suicide prevention and intervention training includes, but is not limited to:*

a. *Identifying the warning signs and symptoms of impending suicidal behavior.*

b. *Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors.*

c. *Responding to suicidal and depressed offenders.*

d. *Communication between correctional and health care personnel.*

e. *Referral procedures.*

f. *Housing observation and suicide watch level procedures.*

g. *Follow-up monitoring of offenders who make a suicide attempt. [4-4373]*

2. A mental health supervisor will oversee the clinical and operational functioning of each facility mental health service. The mental health supervisor will report to the health services administrator (HSA) regarding all day-to-day mental health services operational functions. *The mental health program administrator will provide clinical supervision of mental health services and programs, [2-CO-4E-01]* in consultation with the chief of Behavioral Health Services.

3. The chief of psychiatry is responsible for overseeing system-wide recruitment and administrative supervision of *psychiatrists. [4-4368] The chief of psychiatry will also develop system-wide procedures regarding psychiatric services, [4-4368]* in consultation with the chief of behavioral health services.

B. Types of Services: *The following mental health services/programs will be provided to offenders: [2-CO-4E-01] [2-CO-4F-01] [4-4368]*

1. Initial Evaluation and Treatment Recommendations:

a. All offenders are programmed upon entry to DOC. Programmers will review all documents relevant to the offender's criminal history and mental health needs, assign initial psychological needs levels (P-codes) and developmental disabilities needs levels (DD-codes), and based upon specific criteria, refer the offender to Mental Health, as needed.

b. *All inter-system and intra-system transfer offenders will receive an initial mental health screening at the time of admission to the facility by mental health trained or qualified mental health DOC employees and/or contract workers [4-4368] AR 700-03, "Colorado Department of Corrections Mental Health Screening Form" (Attachment A) The mental health screening includes, but is not limited to:*

*Inquiry into whether the offender: [4-4370]*

1) *Has a present suicide ideation.*
2) *Has a history of suicidal behavior.*
3) *Is presently prescribed psychotropic medication.*
4) *Has a current mental health complaint.*
5) *Is being treated for a mental health problem.*
6) *Has a history of inpatient or outpatient psychiatric treatment.*

| CHAPTER | SUBJECT | AR # | Page 4 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

7) *Has a history of treatment for substance abuse.*
8) Has a history of head injury or traumatic brain injury with loss of consciousness.

*Observation of:*

9) *General appearance and behavior.*
10) *Evidence of abuse and/or trauma.*
11) *Current symptoms of psychosis, depression, anxiety, and/or aggression.*

*Disposition of offender:*

12) *To the general population.*
13) *To the general population with appropriate referral to mental health care services.*
14) *Referral to appropriate mental health care services for emergency treatment. [4-4370]*

2. *Mental Health Appraisal: All intersystem offender transfers will undergo a mental health appraisal by a DOC mental health clinician within 14 days of admission to a facility (AR 700-03 "Inter-System Mental Health Appraisal Form (Attachment B)"). Mental health appraisals include, but are not limited to: [4-4371]*

   a. *Assessment of current mental status and condition.*

   b. *Assessment of current suicidal potential and person-specific circumstances that increase suicide potential.*

   c. *Assessment of violence potential and person-specific circumstances that increase violence potential.*

   d. *Review of available historical records of inpatient and outpatient psychiatric treatment.*

   e. *Review of history of treatment with psychotropic medication.*

   f. *Review of history of psychotherapy, psycho-educational groups, and classes or support groups.*

   g. *Review of history of drug and alcohol treatment.*

   h. *Review of educational history.*

   i. *Review of history of sexual abuse-victimization and predatory behavior. [4-4281-4] [4-4281-5]*

   j. *Assessment of drug and alcohol abuse and/or addiction.*

   k. *Use of additional assessment tools, as indicated.*

   l. *Referral to treatment, as indicated.*

   m. *Development and implementation of a treatment plan, including recommendations concerning housing, work assignment, and program participation.*

3. *Mental Health Evaluations: Any offender referred for mental health treatment will receive a comprehensive written evaluation by a professional mental health clinician. The evaluation will be completed within 14 days of the referral request, and may include, but not be limited to: [4-4372]*

   a. *A review of mental health screening and appraisal data.*

| CHAPTER | SUBJECT | AR # | Page 5 |
|---|---|---|---|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

b. *Direct observation of behavior, including assessment of current mental status to include suicidal potential and person-specific circumstances that increase suicide potential.*

c. *Collection and review of additional data from individual diagnostic interviews and/or appropriate psychological tests.*

d. *Compilation of the individual's mental health history, including review of historical psychiatric treatment, psychotropic medication, and/or psychotherapy.*

e. *Development of an overall treatment/management plan, and/or referral to an appropriate mental health facility for offenders whose psychiatric needs warrant such placement. [4-4368] [4-4372]*

4. Informal Evaluations: Mental health DOC employees and contract workers will provide informal evaluations in response to requests from case managers or other correctional DOC employees and contract workers. These evaluations may result in a written note to the offender's file and/or a verbal consultation with the requesting person.

5. Emergency Services: Twenty-four hour mental health services, with psychiatric backup, are available through an on-call, call-back system throughout the DOC major facilities and centers and the Youthful Offender System (YOS). Emergency mental health services will be provided for offenders assigned to Adult Parole through the community.. Offenders may be referred for community mental health services by the community parole officer or through the mental health coordinator assigned to the division of Adult Parole.

6. Psychiatric Treatment: *Psychiatric evaluation, treatment, and/or referral are available in all major facilities. This will include the management of acute psychiatric episodes. [2-CO-4E-01] [4-4368]* All psychotropic drugs are prescribed by licensed physicians or physician extenders based on appropriate psychiatric and/or physical evaluation of the offender's treatment needs. Psychotropic medications will be administered or dispensed by qualified persons in accordance with legal requirements and professional standards.

7. Sex Offender Treatment: Psychoeducational and psychotherapeutic services are available for offenders who have engaged in sexually deviant behaviors and/or committed sex offenses. Offenders must meet eligibility requirements for acceptance into this program.

8. Drug and Alcohol Treatment: Substance abuse monitoring, case management, drug and alcohol education and treatment, and other supportive services are also available.

9. *Services for Offenders with Serious Mental Illness: All offenders are assessed and those with mental illnesses are identified and monitored during their incarceration. [4-4374]* Special services include group and individual treatment, collaboration with correctional DOC employees and contract workers regarding special needs, specialized programs to promote medication compliance and self-management, specialized housing and management, and special assistance with transition to the community.

10. Inpatient Services: Inpatient treatment for psychiatric disorders is available through DOC infirmaries and the Colorado Mental Health Institute at Pueblo (CMHIP). DOC's Residential Treatment Programs (RTP) provide specialized housing and increased mental health services for high needs offenders. *Offenders who require inpatient services due to mental illness or developmental disabilities may be referred to a RTP or CMHIP for evaluation and treatment. [4-4374]*

11. *Psychoeducational/Skills Development Programs: These programs are designed* to assist offenders in the development of social and self-management skills *that will assist in the stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting. [4-4368]* Program topics may include medication

| CHAPTER | SUBJECT | AR # | Page 6 |
|---|---|---|---|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

management, mental illness management, anger management, stress management, cognitive skills, assertiveness, and communication skills will be offered as resources allow.

12. Services for Offenders with Developmental Disabilities: These services include identification and tracking of offenders with intellectual deficits and special services to assist these offenders in learning, adjusting to the correctional environment, developing effective independent living skills, and recommendation for housing assignments. Specialized housing for those with developmental disabilities and higher treatment and/or management needs is available for male offenders at the San Carlos Correctional Facility and for female offenders at the Denver Women's Correctional Facility in the RTP.

13. *Counseling and Crisis Intervention Services: Initial contact and counseling services will be provided by facility case management, DOC employees and contract workers and/or, on call professional mental health clinicians and may be initiated by offender self-referral, or by other facility DOC employees and contract workers referral. Offenders who require further counseling will be referred to facility mental health offices for follow-up, or placed in appropriate programs. When an offender has engaged in self-injurious behavior a treatment plan focused on preventing further self-injury will be developed by a professional mental health clinician and implemented. For those offenders who currently have an active mental health treatment plan, the current treatment plan will be updated to include interventions specifically addressing prevention of further self-injury. [2-CO-4F-01] [4-4368] [4-4435]*

14. *Outpatient Services: Outpatient services will be provided for the detection, diagnosis, and treatment of mental illness that is not available at the facilities. [4-4368]*

15. *Certain treatment services (e.g. elective therapy treatment, preventive treatment, etc.) will be provided only in specific facilities where resources permit and all professional mental health services must be ordered by a psychiatric practitioner or professional mental health clinician. [4-4368]*

16. The department will offer mental health evaluation and, as appropriate, treatment to all offenders who have been victimized by sexual abuse in any facility. The care provided will be consistent with the community level of care. The evaluation and treatment of such victims will include, as appropriate, follow-up services, treatment plans, and when necessary, referrals for continued care following their transfer to other facilities or their release from custody **(115.83(a-c))**.

C. Priority of Services: When mental health resources are limited, priority will be given to offenders who suffer from chronic or acute mental illnesses and those offenders who present a danger of injury to themselves or others due to mental health problems.

D. Clinical Use of Seclusion and Restraints: *The use of seclusion and/or restraints for medical and psychiatric purposes is a clinical judgment and may only be ordered by properly trained and credentialed medical and mental health DOC employees and contract workers. [4-4405]*

1. *Clinical multi-point restraints may only be ordered by a pychiatric provider or professional mental health clinician. This will occur in one of the DOC infirmaries, at the San Carlos Correctional Facility, or Denver Women's Residential Treatment Program.*

2. *Clinical seclusion and/or ambulatory restraints may be ordered by a professional mental health clinician as part of a mental health watch in any DOC facility.*

3. *Procedures for the use of restraints will be in accordance with DOC Mental Health Standards and Procedures and will include:*

| CHAPTER | SUBJECT | AR # | Page  7 |
|---|---|---|---|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

     a. *Conditions under which restraints may be applied.*
     b. *Types of restraints to be applied.*
     c. *Monitoring procedures used while offender is in restraints.*
     d. *Length of time restraints are to be applied.*
     e. *Documentation of efforts used for less restrictive treatment alternative. [4-4405]*

4. The transport/restraint will be used in accordance with AR 300-16**RD**, *Use of Force Options*.

5. *An after-incident review will be done after every use of restraints for medical or psychiatric purposes. [4-4405]*

E. ***Mental Health DOC Employees/Contract Workers Consultation Regarding Correctional Management***

    1. The chief of Behavioral Health Services, in coordination with the chief of psychiatry and mental health program administrator, will provide consultation to the Office of Offender Services regarding the availability of mental health services in all facilities to assure that offenders are placed at facilities where their mental health needs can be managed. The RTP Referral Committee will work with Offender Services to arrange offender movement in and out of a RTP.

    2. The mental health coordinator assigned to the Division of Adult Parole will be consulted whenever possible concerning offenders with serious mental illnesses on parole.

F. Consultative and Preventive Services: Consultation with correctional DOC employees and contract workers related to offender behavioral management, program planning and development, and mental health issues will be provided.

G. Right to Refuse Treatment: Mental health services will be offered to offenders according to DOC procedures with the offender retaining the right of refusal. *In those instances where involuntary treatment is required, a due process procedure will be followed [4-4368]* by mental health, medical, and correctional officers, in accordance with AR 700-23, *Administering Involuntary Medication,* and Colorado law.

H. ***Professional DOC Employees and Contract Workers' Qualifications***: Services will be provided by DOC employees and contract workers who are *professionally qualified by training, experience, and credentials. [4-4368]* All professional mental health DOC clinicians and contract workers will be licensed to provide mental health services to adults or will work under the supervision of licensed professional mental health clinicians and contract workers. All job duties and responsibilities of professional mental health clinicians and contract workers will be approved by the mental health program administrator, in consultation with the chief of behavioral health services, who will verify current credentials for all professional mental health clinicians and contract workers. Licensed professional mental health clinicians and contract workers function as independent providers who are authorized to provide and/or direct mental health treatment services provided to offenders.

I. Confidentiality: In a correctional setting, confidentiality exists within limits. Privileged information will not be disclosed without the offender's permission, except as required by state law and DOC administrative regulations.

J. Program Evaluation: Mental health services will participate in and support a formal system of program evaluation. Evaluations will be aimed at determining the effectiveness and efficiency of mental health services programs in meeting mental health goals and objectives as outlined in this AR.

K. ***Mandatory Disclosure: All relevant information regarding ethical and professional issues related to offenders' mental health treatment, to include information about treatment methods and duration, confidentiality, appropriate professional behavior, and the degrees, credentials, and licensure of DOC mental health care practitioners, as required and regulated by the Colorado Mental Health Practice Act, will be provided to offenders who receive mental health services.***

| CHAPTER | SUBJECT | AR # | Page 8 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

1. *An orientation program and written statement in a language understood by the offender regarding mental health treatment services will be presented to all offenders during the initial intake process. Offenders who receive mental health services in a DOC facility will be asked to sign "Mandatory Disclosure and Information for Behavioral Health Clients" (Attachment C). [4-4368] The written statement will include the following:*

   a. A statement indicating that all professional mental health clinicians are either licensed as psychologists, social workers, or professional counselors in this state, or are working under the supervision of licensed clinicians.

   b. A statement that any offender seen in mental health treatment has the right to be informed of the degrees, credentials, and licenses of the specific psychiatric practitioner, professional mental health clinician, mental health professional and treatment provider(s), as required and/or regulated by the Colorado Mental Health Practice Act, involved in his/her treatment.

   c. A statement that the practice of all psychiatric practitioners and professional mental health care clinicians are regulated by the Department of Regulatory Agencies and an address and telephone number for the grievance board.

   d. A statement indicating that:

      1) *The information provided by the client during therapy sessions is legally confidential in the case of licensed psychotherapists [4-4368].* Information provided by the client to an unlicensed psychotherapist who practices under the supervision of a licensed psychotherapist is also confidential. All DOC psychiatric practitioners or professional mental health care clinicians practice under the supervision of licensed providers.

      2) Certain situations are required to be reported to the appropriate parties as provided in Colorado Revised Statutes (C.R.S.) section 12-43-218. These situations are:

         1. Where the offender may cause harm to him or herself;

         2. Where the offender may cause harm to another offender or staff;

         3. If the offender reports any instance which may threaten the safety or security of the facility.

         4. Any instance of sexual assault must be reported using the Prison Rape Elimination Act (PREA) procedures contained in AR 100-40-*Prison Rape Elimination Act.*

      3) The client is entitled to receive information about the methods of therapy, the techniques used, the duration of therapy, if known, and any charges to be assessed. *Some behavioral health services may be delivered via teleconferencing and the client must be notified t*hat the service will *be provided in this format. The client has the right to refuse any behavioral health services at any time. [4-4368][4-4403-1]*

      4) The client may seek a second opinion, at his/her own expense, from a private mental health provider or may terminate therapy at any time.

      5) In a professional relationship, sexual intimacy is never appropriate and should be reported to the Department of Regulatory Agencies grievance board in writing and offenders may also report the sexual intimacy to DOC by using the PREA tip line; reporting to the mental health supervisor at his or her facility and to the HSA at his or her facility.

      6) A copy of the written statement, along with the names and degrees, credentials, and licensure of all facility mental health treatment providers will be posted in each mental health area.

| CHAPTER | SUBJECT | AR # | Page 9 |
|---|---|---|---|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

L.   Individualized Material Restrictions to Facilitate Offender Rehabilitative Goals: Any material including but not limited to written documents, pictures, magazines, publications, etc., may be prohibited under the following conditions:

  1.   A mental health care professional employed by the DOC will assess the offender's history and determines the type of material that would be detrimental to public safety and/or the DOC rehabilitative goals for the offender.

  2.   After the assessment is complete, the material or description of the material and recommendation will be forwarded to the facility warden for implementation of the material restriction.

  3.   The mental health care professional may recommend an individualized material restriction by completing the first part of the Rehabilitative Need Material Restriction Form (Attachment D) and forwarding it to the facility warden for further action.

  4.   When available, a copy of a representative sample of the material to be restricted will be attached to the mental health assessment and recommendations and placed in the mental health file

M.   Continuity of Care/Transition to the Community: Mental health services will ensure continuity of care to offenders throughout DOC facilities, and will arrange for appropriate referral to community services when offenders discharge or parole, as outlined in AR 700-26, *Continuity of Care Standards for Mental Health Treatment*. Offenders assigned to Adult Parole are part of the continuity of care continuum established by the DOC.

N.   Offenders assigned to the DOC Youthful Offender System (YOS): Offenders assigned to YOS will receive mental health services equivalent to those provided to adult offenders. Psychiatric practitioners, professional mental health care professionals, and contract workers who provide services to YOS offenders will be appropriately trained for this population. YOS offenders may be placed at DOC infirmaries, or DOC mental health units, as needed to meet their mental health needs, in accordance with AR 600-06, *Placement and Release from DOC Mental Health Units*.

O.   Oversight of Private Prison Mental Health Services: The Private Prisons Monitoring Unit (PPMU) will ensure that a formal quality assurance audit is conducted, at least annually, to assess the quality of clinical mental health services in private facilities and determine if the private facilities are adequately prepared to meet the mental health needs of offenders with serious mental illness. A formal recommendation will be provided to the associate director of PPMU and the mental health program administrator at least annually and/or whenever a change in resources occurs in the private facilities. The chief of Behavioral Health Services, in coordination with the mental health program administrator and the chief of psychiatry, will develop policies and procedures with the associate director of Offender Services for referral and transfer of offenders with serious mental health needs from private facilities and into DOC special placements, as needed.

V.   RESPONSIBILITY

  A.   It will be the responsibility of the chief of Behavioral Health Services and the director of Clinical and Correctional Services, to enforce and maintain this AR.
  B.   It will be the responsibility of administrative, program, and correctional DOC employees and contract workers to be knowledgeable of this AR.
  C.   It will be the responsibility of each mental health care professional to use this AR as a guide to practice.

VI.   AUTHORITY

  A.   Chapter V of the Colorado Department of Health licensure requirements for community clinic facilities.
  B.   C.R.S. 12-43-214. Mandatory disclosure of information to clients.

| CHAPTER | SUBJECT | AR # | Page  10 |
|---------|---------|------|----------|
| Offender Health Services | Mental Health Scope of Service | 700-03 | EFFECTIVE 03/15/15 |

C. C.R.S. 17-2-212. Duty of warden.

D. C.R.S. 17-23-101. Transfer of inmates who have a mental illness or a developmental disability.

E. C.R.S. 17-23-103. Transfer to department.

F. C.R.S. 17-40-103. Examination of offenders - report.

G. C.R.S.  18-1.3-407. Sentences - youthful offenders - legislative declaration - powers and duties of district court - authorization for youthful offender system – powers and duties of department of corrections.

H. C.R.S. 18-1.3-901. Short title.

I. C.R.S. 18-1.3-907. Defendant to be advised of rights.

J. C.R.S. 24-72-204. Allowance or denial of inspection - grounds - procedure – appeal – definitions.

K. C.R.S. 25-1-801. Patient records in custody of health care facility.

L. C.R.S. 27-10-101. Legislative declaration.

M. C.R.S. 27-10-105. Emergency procedure.

N. C.R.S. 27-10-106. Court-ordered evaluation for person with mental illness.

O. C.R.S. 27-10-120. Records.

VII. HISTORY

April 1, 2013
May 15, 2012
January 15, 2011
December 15, 2010
November 15, 2009
October 15, 2008
September 1, 2008
October 1, 2007
October 1, 2006
October 1, 2005

ATTACHMENTS:

A. AR Form 700-03A, Colorado Department of Corrections Mental Health Screening Form

B. AR Form 700-03B, Inter-System Mental Health Appraisal Form

C. AR Form 700-03C, Your Rights as a Client of DOC

D. AR Form 700-03D, Rehabilitative Need Material Restriction

E. AR Form 100-01A, Administrative Regulation Implementation/Adjustments



**COLORADO**
Department of Corrections

AR Form 700-03A (03/15/15)

## Mental Health Screening Form

**OFFENDER INFORMATION:**

Offender's Name: _____   Screen Date: _____ - _____ - _____
                       First                Last                MI

DOC #:_____   Gender: _____   Facility: _____

**THE PURPOSES OF THIS SCREENING** is to determine if this offender will be referred for a Mental Health appraisal/evaluation.

**QUESTIONS FOR THE OFFENDER:**   (Please indicate the offender's answers to each question; ask all questions.)

**Yes  No   MENTAL HEALTH**
O    O    1.   Have you <u>ever</u> been treated for mental health problems?

O    O    2.   Have you been treated for mental health problems in the <u>last 6 months</u>?

O    O    3.   Have you been <u>hospitalized</u> for mental health problems in the <u>last 2 years</u>?

O    O    4.   Have you <u>ever</u> been prescribed psychiatric medication?

O    O    5.   Are you taking psychiatric medication <u>now</u>?

O    O    6.   Has anyone in your family been treated for a mental health problem or attempted/committed suicide?

O    O    7.   Do you currently have a mental health problem you need to talk to someone about? (note problem on back of form – Item 1)

O    O    8.   Have you had a recent death of someone close to you, divorce, or loss of a relationship?

O    O    9.   Do you have a history of head injury or traumatic brain injury with loss of consciousness?

O    O    10.  Have you ever experienced prior sexual victimization (institution or community)?

O    O    11.  Have you ever perpetrated sexual assault/abuse (institution or community)?

**SUICIDE**
O    O    12.  Have you <u>ever</u> tried to harm or kill yourself?  _____ in last 6 mo.;  _____ in last 6 mo. to 2 yrs;  _____ over 2 years

O    O    13.  Are you thinking about harming or killing yourself <u>now</u>?

**SUBSTANCE**
O    O    14.  Have you ever been treated for alcohol/drug/other substance problems?  (List drugs used.)

**OBSERVATION OR INFORMATION FROM INTERVIEW OR OTHER RELIABLE SOURCE:**   (Please answer for each observation)

O    O    15.  Appears unusually emotionally upset, anxious or fearful.  O    O    16.  Is unable to sit still, sleep or stop talking.

O    O    17.  Appears aggressive, threatening, menacing, belligerent, won't be calmed down; has history of angry outbursts.

O    O    18.  Is unable to understand or follow directions.

O    O    19.  Appears to be distracted, is disoriented, is looking at or listening to things others don't see or hear.

O    O    20.  Has bruises, cuts, scrapes, burns on face, arms, back or other physical injuries or appears to have been traumatized in some way.

O    O    21.  Has been a victim of domestic violence or reports to having been traumatized in some way.

**DISPOSITION**
O    O    22.  Cleared to general population.
O    O    23.  Cleared to general population with appropriate referral to mental health care services.
O    O    24.  Referral to appropriate mental health care services for emergency treatment.

If an offender answers yes to questions #13 and/or #19, contact Mental Health Services **immediately.**

_____
Screeners Name/Signature
Forward completed form to Clinical Services.          Attachment "A"
Copy to MH file.                                      Page 1 of 1



**COLORADO**
Department of Corrections

AR Form 700-03B (03/15/15)

## Inter-System Mental Health Appraisal Form

*Date of Appraisal:* _____

Offender's Name: _____ DOC #_____
　　　　　　　　　　Last　　　　　　　　　　　First

Facility: _____ Gender:  M　F　　Level of Education completed: _____

| Yes No | | **MENTAL HEALTH TREATMENT HISTORY** |

(Prior P Code & date if applicable_____ )

☐　☐　1.　Are you taking psychiatric medication now? _____
　　　　　　_____

☐　☐　2.　Have you ever taken psychiatric medication? _____
　　　　　　_____

☐　☐　3.　Have you ever been hospitalized for mental health problems? _____
　　　　　　_____

☐　☐　4.　Have you ever been treated for mental health problems? _____
　　　　　　_____

☐　☐　5.　Is there a history of special placement at SCCF or admissions to CMHI-P? _____
　　　　　　_____

☐　☐　6.　Has anyone in your family ever been treated for mental health problems? _____
　　　　　　_____

☐　☐　7.　Have you had a recent death of someone close to you, divorce, or loss of a relationship? ____
　　　　　　_____

### SUICIDE & SELF-INJURY FACTORS

☐　☐　8.　Have you ever tried to kill yourself? When_____
　　　　　　Method_____

☐　☐　9.　Are you thinking about killing yourself now? _____
　　　　　　_____

☐　☐　10.　Have you ever injured yourself on purpose by burning, cutting, or scratching yourself? _____
　　　　　　When_____
　　　　　　Method_____

☐　☐　11.　Are you thinking about hurting yourself now? _____

### SUBSTANCE ABUSE FACTORS

☐　☐　12.　Have you ever been treated for alcohol/drug or other substance abuse problems? _____
　　　　　　Treatment History: _____
　　　　　　Drug(s) of choice & route of administration: _____

Attachment "B"
Page 1 of 2



**COLORADO**
Department of Corrections

AR Form 700-03B (03/15/15)

*Date of Appraisal:* _____

## VIOLENCE FACTORS

☐ ☐ 13. Have you ever been violent toward another person? _____

☐ ☐ 14. Have you ever been the victim of domestic violence? _____
_____

☐ ☐ 15. Do you have concerns for your safety? (gang affiliation, high profile, custody or vulnerability issues)_____
_____

☐ ☐ 16. Have you ever experienced prior sexual victimization or molestation (institution or community)? _____
_____

☐ ☐ 17. Have you ever perpetrated sexual assault/abuse (institution or community)? _____
_____

## CURRENT MENTAL STATUS AND CONDITION

☐ ☐ 18. Appears unusually emotionally upset, depressed, or fearful._____
Symptoms: _____

☐ ☐ 19. Appears agitated, restless, or is unable to sit still, sleep, or stop talking. _____
Symptoms: _____

☐ ☐ 20. Appears aggressive, threatening, hostile, belligerent, won't be calmed down, has a history of angry outbursts.
Symptoms: _____

☐ ☐ 21. Appears to be distracted, is disoriented, and/or unable to understand or follow directions. _____
_____

☐ ☐ 22. Has bruises, cuts, scrapes, burns, or other physical injuries or appears to have been traumatized in some
way._____

## DISPOSITION        P1_____    P2_____    P3_____    P4_____    P5_____

☐ ☐ 23. Cleared to general population.  No Mental Health or Psychiatric referrals.

☐ ☐ 24. Cleared to general population with referral(s): Mental Health Psychiatry.  Priority Code_____

☐ ☐ 25. Referral to Mental Health/Psychiatry for emergency evaluation and treatment planning.

☐ ☐ 26. Referral for Diagnostic Testing and/or Special Placement Referral
Referral/Diagnostic Question: _____

☐ ☐ 27. Cleared for housing, work assignment, and program participation.

**Mental Health Clinician/Clinician #**

Attachment "B"
Page 2 of 2

 **COLORADO**
Department of Corrections

AR Form 700-03C (05/15/16)

## Mandatory Disclosure and Information for
## Behavioral Health Clients

A. **General Information**: Colorado state law requires that you receive information about the professional degree and the license, registration or certificates that your therapist holds. This information is posted in the behavioral health office at every correctional facility and you may ask your therapist directly for this information. You may also write to headquarters and receive the information about the degree and license your therapist holds. The address for the Department of Corrections headquarters office is: Colorado Department of Corrections, Division of Clinical Services, 1250 Academy Park Loop, Colorado Springs, Colorado 80910.

B. **Therapist Credentials**: Each therapist holds a license, registration or certificate that has been issued to them from the Department of Regulatory Agencies. This agency oversees the practice of behavioral health services in Colorado. This agency also maintains a list of registered psychotherapists. In the Department of Corrections, all unlicensed psychotherapists work under the supervision of a licensed behavioral health therapist.

    1. **Levels of Licensing, Registration and Certification**: The Department hires a variety of behavioral health staff. Listed below are the education and training requirements for licensure, registration or certification in Colorado. You may ask your therapist directly what kind of license, registration or certificate he or she holds.

    2. **Therapists who hold a license are these:**
       a. Licensed Clinical Social Workers (LCSW) – A Master's degree; 2 years of post degree supervision and a license from the Department of Regulatory Agencies.
       b. Licensed Professional Counselor (LPC) – A Master's degree; 2 years of post degree supervision and a license from the Department of Regulatory Agencies.
       c. Licensed Marriage and Family Therapist (LMFT) – A Master's degree; 2 years of post degree supervision and a license from the Department of Regulatory Agencies.
       d. Licensed Psychologist – A Doctorate in Psychology; one year post degree supervision and a license.
       e. Licensed Social Workers (LSW) – A master's degree in social work and a license.
       f. Licensed Addictions Counselor (LAC) – A Master's degree in professional counseling; 2,000 hours of supervised clinical addictions experience; certification as a CACIII and a license.

    3. **Therapists who are candidates for licensure:**
       a. Psychologist Candidates – A Doctorate in Psychology and currently participating in clinical supervision required to obtain a license.
       b. Professional Counselor Candidates – A Master's degree in professional counseling and currently participating in clinical supervision to obtain a license.
       c. Marriage and Family Therapist Candidates – A Master's degree in professional counseling and currently participating in clinical supervision to obtain a license.

    4. **Therapists who hold a certificate:**
       a. Certified Addictions Counselor III (CAC III) – A Bachelor's degree in professional counseling and 2000 hours of supervised clinical experience in addiction counseling.
       b. Certified Addictions Counselor II (CAC II) – A high school graduate, and 2000 hours of supervised clinical experience in addiction counseling.

    5. **Registered Psychotherapists:**
    A registered psychotherapist is a psychotherapist listed in the State's database and is authorized by law to practice psychotherapy in Colorado but is not licensed by the state and is not required to satisfy any standardized educational or testing requirement to obtain a registration from the State.

    The Department of Regulatory Agencies has licensing boards that oversees the practice of mental health counseling. Each of the Licensing Boards can be reached at this address and telephone number: Department of Regulatory Agencies, Mental Health Boards, 1560 Broadway, Suite 1350, Denver, CO 8020, Telephone: 303-894-7800.

AR Form 700-03C (03/15/15)

C. **Sexual Contact:** A sexual relationship between you and your therapist is never appropriate and is against Colorado state law. Any sexual activity should be reported to the Department of Regulatory Agencies by writing to them at the address listed above and to the Department of Corrections. You may do this by telling your case manager; calling the PREA tip line at 1-800-DOC-TIPS-0 (1877-362-8477-0, or informing the mental health supervisor at your facility.

D. **Confidentiality:** The information you give to your therapist will be kept confidential by law. There are certain situations in the law in which a therapist must share confidential information.

    1.    Your therapist must report situations where you may cause harm to yourself or others.
    2.    Therapists are required to report knowledge of child abuse and neglect to law enforcement.
    3.    At the Department of Corrections, therapists are required to report threats to the safety and security of the institution or public.
    4.    In order to provide continuity of care services, your behavioral health record may be shared with other health care professionals who provide services to you while you are under the supervision of the Department of Corrections.
    5.    If you file a complaint against a therapist or the Department, your health records may be shared with the regulatory agency in response to the complaint.
    6.    If you sue the Department over your behavioral health treatment, your health record may be shared with the court in response to the lawsuit.

E. **Specialized Treatment:** While at the Department of Corrections, you may participate in a specialized treatment programs or be placed in special units for behavioral health treatment. Correctional staff may hear limited information concerning your behavior; your treatment needs and your medicine. Those staff have signed an agreement to keep this information confidential.

F. **Behavioral Health Services Using Tele-video:** While at the Department of Corrections, you may participate in therapy session with your counselor using tele-video services. Any behavioral health information you share during these sessions is confidential and the information will be maintained with the same confidentiality as in person sessions.

G. **Parole:** When you progress to parole, the community parole officer may receive information about your behavior; treatment needs and medicines. This information will be used to help you schedule follow up care in the community.

H. Any instance of sexual assault, sexual misconduct, or sexual abuse must be reported using the Prison Rape Elimination Act procedures contained in Administrative Regulation 100-40 – Prison Rape Elimination Act.

I. Mental health care practitioners will obtain informed consent from you before reporting prior sexual victimization that did not occur in an institutional setting, unless you are under the age of 18.

J. You may seek a second opinion, at your own expense, from a private mental health provider, utilizing AR 700-21.

Participation in behavioral health programs is voluntary. I understand I have the right to refuse treatment. If I choose to participate in treatment, I understand that I can request additional information on the intensity and duration of treatment.

I have read or have had someone read this information to me.   I understand my rights as a client of the behavioral health program at the Department of Corrections.

Offender Name: _____    DOC #: _____
        (Printed)
Offender Signature: _____    Date: _____

Staff Witness: _____    Date: _____


**COLORADO**
**Department of Corrections**

Attachment "C"
Page 2 of 2

AR Form 700-03D (03/15/15)

# REHABILATIVE NEED MATERIAL RESTRICTION

Offender: _____   DOC #: _____

DOC Mental health care professionals have assessed your history and are recommending the following restrictions in support of your rehabilitative needs and goals:

_____

_____

_____

_____

_____

_____

Mental Health Care Professional Signature _____ ID# _____ Date _____

## DIRECT ORDER

For rehabilitative purposes you are hereby directed not to have in your possession any material, including but not limited to magazines, periodicals, written documents, viewing material, publications, drawings, etc., as defined or described in the above recommendations since they have been deemed to be contrary to your individualized rehabilitative interests and goals.

Warden Signature _____ ID# _____ Date _____

## DATE DELIVERED TO OFFENDER _____

Signature of staff delivering order: _____ ID# _____

cc:  **Working file, Mental Health file, Mailroom, Reading Committee Chairperson, Central Reading Committee Chairperson**

Attachment "D"
Page 1 of 1
ADMINISTRATIVE REGULATION
IMPLEMENTATION/ADJUSTMENTS

AR Form 100-01A (04/15/08)

| CHAPTER | SUBJECT | AR # | EFFECTIVE |
|---------|---------|------|-----------|
| Offender Health Services | Mental Health Scope of Service | 700-03 | 03/15/15 |

(FACILITY/WORK UNIT NAME) _____

WILL ACCEPT AND IMPLEMENT THE PROVISIONS OF THE ABOVE ADMINISTRATIVE REGULATION:

[ ] AS WRITTEN    [ ] NOT APPLICABLE    [ ] WITH THE FOLLOWING PROCEDURES TO ACCOMPLISH THE INTENT
                                          OF THE AR

(SIGNED) _____    (DATE) _____

                Administrative Head

Attachment "E"

Page 1 of 1

| ADMINISTRATIVE REGULATION | REGULATION NUMBER | PAGE NUMBER |
|---|---|---|
| | 700-29 | 1 OF 8 |
| | **CHAPTER:** Offender Health Services | |
| COLORADO DEPARTMENT OF CORRECTIONS | **SUBJECT:** Mental Health Interventions | |
| **RELATED STANDARDS:** ACA Standards 4-4405, 4-4257, 4-4373, and 4-4416 | **EFFECTIVE DATE:** November 1, 2015 | |
| | **SUPERSESSION:** 12/15/14 | |
| **OPR:** OCS        **REVIEW MONTH:** August | Rick Raemisch<br>Executive Director | |

## I. POLICY

It is the policy of the Colorado Department of Corrections (DOC) to provide assistive and supportive mental health interventions for offenders who may be at risk for harm to self or others, emotional dysregulation, and/or acute psychiatric symptoms and to immediately intervene to prevent injury by offenders whenever possible.

## II. PURPOSE

The purpose of this administrative regulation (AR) is to establish procedures for the use of mental health interventions in facilities to identify, immediately respond to, treat and prevent harm to self or others, emotional dysregulation, and/or acute psychiatric symptoms.

## III. DEFINITIONS

A. <u>Ambulatory Restraint</u>: The use of mechanical devices that limit movement of extremities without preventing the offender from moving about in an area. The mechanical devices may consist of metal universal restraint system and safety harness or cloth restraints.

B. <u>Conditional Property</u>: Specific property allowed to an offender by a professional mental health clinician that is designed to effect the progressive treatment and management of offenders who demonstrate low risk behavior.

C. <u>Contract Worker</u>: A person other than a DOC employee who provides services to the DOC under contract, special assignment, or informal agreement (e.g. purchase order). A contract worker includes self-employed persons, sole proprietors, and persons employed by an employer in the private sector, another public entity, or by another agency of the state of Colorado.

D. <u>De-Escalation Rooms</u>: Designated therapeutic rooms for offenders to practice self-calming skills to manage their behavior and emotional state in a safe and calm environment.

E. <u>DOC Employee</u>: Someone who occupies a classified, full or part-time position in the State Personnel System (including management and at will positions) in which the Department has affect over pay, tenure, and status.

F. <u>Four Point Restraint</u>: Any mechanical device used to restrain an offender's four extremities to a fixed object.



EXHIBIT

F

| Chapter | Subject | AR # | Page 2 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

G. <u>Intensive Supervision</u>: An increased level of monitoring and management of offenders who demonstrate violent, dangerous, disruptive, defiant and / or self-injurious behaviors. There are three levels of Intensive Supervision; Continuous Supervision, 15-minute welfare checks, and 30-minute welfare checks:

   1. <u>Continuous Supervision</u>: Direct, continuous, uninterrupted and unobstructed on-site visual observation and supervision of an offender and his/her surroundings by a DOC employee. At a minimum written documentation of continuous supervision shall be made every 15 minutes.

   2. <u>15-Minute Welfare Checks</u>: Intermittent on-site direct visual observation and documentation of an offender. Welfare checks will be conducted at random intervals of at least every 15 or 30 minutes or less.

   3. <u>30-Minute Welfare Checks</u>: Intermittent on-site direct visual observation and documentation of an offender at least every 30 minutes or less.

   Video and audio recording equipment shall not replace the requirement for continuous staff observation, but should be utilized when available to support intensive supervision of offenders.

H. <u>Low Level Staff Intervention</u>: Guided by any staff person when offenders have emotional distress or mental health concerns that are not self-injurious, suicidal, or dangerous. Low level interventions may be requested by an offender.

I. <u>Mental Health Interventions</u>: Mental health watches or infirmary admissions for offenders who are high risk as determined by the mental health assessment. The interventions are specified on the mental health directives. Advanced mental health interventions are directed by clinical services professionals.

J. <u>Mental Health Watch</u>: An enhanced level of supervision ordered by a professional mental health clinician for offenders who are judged to be at high risk for self-injurious or suicidal behavior, or who are disruptive or dangerous due to a mental health problem. Mental health watches will occur in housing locations as determined by the appointing authority.

K. <u>Observation cell</u>: Housing location utilized for intensive supervision of offenders on mental health watch. Location of the observation cell will be determined by the appointing authority.

L. <u>Professional mental health clinician</u>: Clinical Services DOC employees/contract workers trained in the provision of mental health services. These DOC employees/contract workers are licensed to provide mental health services to adults or are eligible for licensure and work under the supervision of a licensed professional mental health clinician. Such DOC employees/contract workers include those in the following DOC positions: psychologists, social workers, and masters level counselors, psychiatric practitioners, and nurse specialists.

M. ***Safety Garment: A smock, wrap, and blanket made of tear resistant material that may be used as a safe alternative to clothing and provided to offenders in observation cells. This is not a restraint device. [4-4416]***

N. <u>Self-Injury</u>: An intentional act that causes or could cause harm to self, which occurs as a result of the offender's own action.

O. <u>Self-Soothing Resources</u>:   Strategies for reducing emotional distress and promoting relaxation provided for offenders who are not in crisis.  Examples include, but are not limited to: relaxation CD's, crossword puzzles, art work, etc.

P. <u>Staffing</u>: A formal comprehensive offender case planning review by a multi-disciplinary team.

Q. <u>Suicide</u>: Offender death that occurs as a result of the offender's own actions.

| Chapter | Subject | AR # | Page 3 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

R. <u>Suicide Attempt:</u> An act that causes or could cause serious harm, occurs as a result of the offender's own actions, and is judged by a mental health professional to be due to the offender's intent to cause his/her own death.

S. <u>Video Monitoring:</u>  Ability to view and/or record an offender from a remote location utilizing approved video equipment.  Video and audio recording equipment shall not replace the requirement for direct or continuous staff observation and supervision, but should be utilized when available to support mental health watches.

## IV. PROCEDURES

A. Each facility will provide low level interventions and immediately identify, respond to, treat, and attempt to prevent offenders from self-injurious and/or suicidal behaviors.

B. Low Level Staff Interventions:

   1. Low level staff interventions can be guided by any staff person when offenders have emotional distress or mental health concerns that are not self-injurious, suicidal, or dangerous.  Low level intervention may be requested by an offender and may consist of:

      a.  Self-soothing resources

      b.  De-escalation rooms

      c.  Assignments including, but not limited to, journaling and treatment assigned by mental health staff

   2. Any time an offender utilizes low level staff interventions, it will be documented in the chronological record and communicated to the facility mental health supervisor the next business day.

   3. At any time an offender verbalizes an intent to harm self or others or engages in these behaviors, mental health interventions will be implemented.

C. Mental Health Interventions:

   1. Mental health interventions include mental health watches and infirmary admissions, as directed by clinical services professionals.  Mental health interventions are indicated when an offender is identified to be at risk because of self-injurious and/or suicidal behavior, or who are disruptive or dangerous due to mental health problems.

   2. The DOC employee/contract worker observing the behavior shall immediately notify the on-duty shift commander while maintaining continuous supervision of the offender.

   3. The shift commander shall ensure that the offender is maintained under continuous supervision until the clinical services professional is contacted and determines level of risk and placement *[4-4257]*.  If any injury has occurred, the shift commander shall ensure that immediate medical attention is provided to the offender.

   4. Upon determination that a mental health watch is deemed necessary, the clinical services professional will provide written directives to the shift commander at the initiation of the mental health watch. The shift commander will ensure a PCDCIS incident report is completed reflecting the initiation or discontinuation of the mental health watch.

   5. Correctional DOC employees/contract workers will monitor offenders according to mental health watch directives and document observations on the Mental Health Watch Intensive Supervision Log, AR 700-29C.

| Chapter | Subject | AR # | Page 4 |
|---|---|---|---|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

6. The duration of the mental health watch is contingent on the offender's acuity and level of risk. For mental health watches that are less than 24 hours in duration, documentation of protective factors and consultation with the mental health supervisor is required.

D. Assessment for Mental Health Watch:

1. During regular business hours, a professional mental health clinician will provide an assessment to determine the necessity for a mental health watch within one hour of contact by the shift commander.

2. After hours, the nursing staff at facilities with 24 hour nursing will be contacted by the shift commander. Nursing staff will follow the nursing protocol for mental health crisis and document on the nursing protocol form. Facilities that do not have 24 hour nursing will contact the on-call mental health clinician. The on-call professional mental health clinician will respond on site within one hour of the phone contact if deemed necessary to evaluate the offender.

3. Upon approval from the mental health program administrator or designee, telephone directives for mental health watch may be provided in instances of imminent danger.

4. A mental health risk assessment will consist of:

   a. Completion of the nursing protocol for mental health crisis by nursing staff, or;

   b. An on-site, face-to-face clinical interview by a professional mental health clinician which will consist of:

      1) A review of the offender's health record (medical and mental health files and review of psychotropic medication compliance).

      2) Discussion with correctional DOC employees/contract workers regarding the offender's recent behavior and management needs.

      3) Assessment of the offender's current suicide plan, intent, means, and other indicators of risk of self-injurious behavior. The completed assessment is then entered into the electronic health record.

E. Mental Health Watch Directives

1. When a mental health watch is ordered, special controls are discontinued. If the offender is on a mental health watch and the offender escalates in risk to self or others, the shift commander shall implement additional safety measures only until a professional mental health clinician can re-evaluate the offender. Special controls and a mental health watch will never run concurrently.

2. If it is determined that the offender may be managed on a mental health watch in the facility, the professional mental health clinician or nurse will establish mental health watch directives utilizing AR Form 700-29A Non-Confidential Mental Health Directives to protect the offender and/or others. Mental health watch directives will be reviewed and updated at a minimum every 24 hours, or more frequently if necessary, by the professional mental health clinician. A copy of the mental health directives are provided to the shift commander.

3. Mental health watch directives will specify the therapeutic activities to be implemented during the mental health watch.

   a. In cell activities may include, but not limited to:

      1) Self-soothing resources
      2) Music (This may include placing a radio outside of offender's door)

| Chapter | Subject | AR # | Page 5 |
|---|---|---|---|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

        3) Therapeutic assignments
        4) Artwork or letter writing
        5) Reading

    b. Out of cell activities may include but not limited to:

        1) Animal assisted therapy
        2) Time out of cell
        3) Self soothing resources
        4) Music
        5) Leisure activities through consultation with mental health and correctional staff
        6) Outdoor recreation
        7) Work assignments

4. Mattresses will be provided to offenders on a mental health watch unless risk assessment determines otherwise. Approval will be indicated in the mental health watch directives.

5. *The clinical use of physical restraints will be ordered by professional mental health clinicians or nurses for the sole purpose of preventing offenders with mental health problems from harming themselves, other persons, or property. Clinical restraints may be used only if less restrictive interventions have been ineffective, or if is determined by the professional mental health clinician that less restrictive interventions would not be effective. Types of restraints, monitoring procedures and timeframes are defined in offender-specific mental health watch directives [4-4405].*

6. Four point restraints shall only be used to prevent offenders from harming themselves or others.

    a. Four point restraints shall be permissible only in DOC infirmaries, San Carlos Correctional Facility (SCCF), and Denver Women's Correctional Facility (DWCF).

    b. Initial four point restraint directives may not exceed a period of four hours. Subsequent directives may be continued for successive periods of up to 24 hours if the criteria continue to be met. Initial and extensions of four point restraints must be preceded by an on-site assessment and written directives by a professional mental health clinician. All offenders placed in four point restraints must be evaluated by the facility psychiatric provider on the next scheduled working day following the initiation of restraint.

    c. Every two hours, the offender will be offered fluids and toileting by correctional DOC employees/ contract workers. This schedule applies to waking hours; however, fluids and toileting will be offered upon awakening instead of waiting until the next two-hour increment.

    d. Every two hours, DOC employees/contract workers will permit the offender to exercise (during waking hours) while being maintained in full walking restraints unless a contrary directive is given by a professional mental health clinician. Offender shall be maintained under continuous supervision during this time frame.

    e. If more than one exercise period is missed due to offender refusal or mental health watch directive, the health services administrator (HSA) or designee will be notified.

    f. Every two hours, clinical services DOC employees/contract workers will observe active range of motion (ROM) by the offender (for example during exercise) or conduct passive ROM if needed. This will require the assistance of correctional DOC employees/contract workers by releasing each of the offender's limbs one at a time. During this time, clinical services DOC employees or contract workers will also assess for adequate circulation; evaluate the effects of medication and external controls; assess the ability to verbalize,

| Chapter | Subject | AR # | Page 6 |
|---------|---------|------|--------|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

relate to staff, recognize appropriate behavior, and to exercise appropriate self control; and assess to see if criteria for release has been met.

    1) Circulation and evaluation of medication effects by clinical services DOC employees/contract workers will be assessed every two hours regardless of offender activity, compliance, or sleep.

    2) This information will be documented in the electronic health record. If criteria for release from four point restraints have been met, the clinical services DOC employee/contract worker will notify the facility or on-call professional mental health clinician.

7. The shift commander will report self-harming and suicidal behavior to the duty officer in accordance with AR 100-07 *Reportable Incidents and Incident Management System.*

F. Mental Health Watch Rounds:

1. Professional mental health clinicians will provide two mental health assessments for each 24 hour period. These assessments are documented as mental health watch rounds. The clinician will verify implementation of the mental health watch directives.

2. The mental health watch round consists of an assessment to determine the status of the risk factors that precipitated the mental health watch. The offender's progress toward resolving the risk factors is also assessed and documented. During the mental health watch round therapeutic activities that can assist the offender's progression can be determined.

3. The mental health supervisor will be notified of all mental health watches.

4. In the event of a mental health watch, all offender self-administered medications including rescue inhalers and sublingual nitroglycerin will be removed from the offender's possession, but made available for immediate use upon offender request. Use of medication will be observed by a DOC employee/contract worker and then must be surrendered after use.

5. The facility shall implement policies and procedures that enable the offenders on mental health watches to perform bodily functions without non-medical staff of the opposite gender viewing their breast, buttocks or genitalia except in exigent circumstances **(115.15(d))**. Any opposite-gender visual observation, under exigent circumstances only, by non-medical staff will be documented in an incident report. **(115.15(c))**

G. Extension of Mental Health Watch

1. Extension of a mental health watch of more than 72 hours must be approved by the mental health program administrator or designee and documented on AR Form 700-29A.

2. A multi-disciplinary staffing will be conducted for offenders who do not progress off a watch within a 72 hour period. The staffing members will include: treating clinician, mental health supervisor, HSA or designee, psychiatric provider, custody control representative, and mental health program administrator or designee. The results of the staffing will be distributed to the H.S.A and warden/designee.

3. The mental health program administrator or designee must be informed and approve each additional 24 hours of mental health watch past 72 hours.

4. Additional multi-disciplinary staffings may be necessary to review the offender's behaviors and risk factors and to consider options to best treat and manage the offender. Members of the staffing should include at minimum, the treating clinician, the mental health supervisor, the HSA or designee, the facility warden/administrative head

| Chapter | Subject | AR # | Page 7 |
|---|---|---|---|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

or designee, and the mental health program administrator or designee. Any of these individuals may request the staffing.

H.   Removal from Mental Health Watch

1.   An offender will be removed from a mental health watch by a professional mental health clinician.  A mental health assessment will be completed by the professional mental health clinician before removing the mental health watch. This assessment will involve a face-to-face interview and will not be based on assessment at the cell door.

2.   Removal from a mental health watch (date and time) will be documented on AR Form 700-29A.

3.   The professional mental health clinician who removes an offender from a mental health watch will provide thorough documentation of factors assessed and rationale for a conclusion that the offender presents a reduced risk of self-injury.  This documentation should include a review of factors noted in the initial assessment and evidence of change in risk factors.  This documentation will be recorded on an individual contact form and retained in the offender's mental health file.

4.   The facility shift commander must be informed immediately when an offender is removed from mental health watch. The shift commander will notify the duty officer. The facility mental health supervisor will inform the offender's case manager that the offender has been removed from mental health watch on the next working day.

I.   Mental Health Watch Follow-Up

1.   Mental health watch follow up supports the offender's transition for safe and effective functioning after a mental health watch.

2.   Mental health clinicians will provide face-to-face follow up once daily for seven business days.  During this seven day period, an updated treatment plan will be completed.

J.   Administrative Review

1.   *A mental health watch administrative review will be completed by facility administration, security, and health services [4-4373]* within 10 working days after mental health watch directives are completed utilizing the Mental Health Watch Administrative Review form (AR Form 700-29B).

a.   The shift commander shall ensure the mental health watch packet and logs are forwarded to the mental health supervisor.

b.   The mental health supervisor will review the mental health watch packet.  The mental health supervisor will identify any deficiencies in clinical services, complete a plan to resolve the deficiencies and document it on the Administrative Review Form. The mental health supervisor signs the form and submits the packet to the HSA.

c.   The HSA will review the packet of information and any additional clinical information associated with the mental health watch such as nursing documentation.  The HSA will add any issues if identified to the form and a plan to correct.  The packet is then forwarded to the custody/control manager.

d.   The custody/control manager will review the administrative review packet. The custody/control manager will add issues, if identified, to the form and a plan to correct.  The packet is then forwarded to the warden/administrative head for final review.

| Chapter | Subject | AR # | Page 8 |
|---|---|---|---|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

2.  If issues related to Clinical Services are identified during the review process, a copy of the "Mental Health Watch Administrative Review" (AR Form 700-29 B), will be forwarded to the chief of clinical operations and quality management program administrator.

3.  When the mental health watch administrative review is complete, the warden/administrative head will forward the entire administrative review packet to the mental health supervisor for filing. These records will be maintained for a period of 10 years.

K.  Training

1.  *All DOC employees/contract workers will receive, at a minimum, annual training in the implementation of the suicide prevention program. The training should include, but is not limited to:*

    a.  *Identifying the warning signs and symptoms of impending suicidal behavior;*

    b.  *Understanding the demographic and cultural parameters of suicidal behavior, including incidence and variations in precipitating factors;*

    c.  *Responding to suicidal and depressed offenders;*

    d.  *Communication between correctional and health care DOC employees/contract workers;*

    e.  *Referral procedures;*

    f.  *Housing observation and suicide watch level procedures;*

    g.  *Follow-up monitoring of offenders who make suicide attempts; [4-4373]*

    h.  Documentation of mental health watches and reviews.

L.  Safety Garments and Equipment

1.  *Offenders on mental health watch will be provided a safety garment as directed by the professional mental clinician or nurse that will promote offender safety in a way that is designed to prevent humiliation and degradation. [4-4416]*

2.  Every level III and above facility will have on-site at least two approved safety smocks, two safety blankets, one set of hand tubes, and one helmet. Facilities at level I or II will have at least one helmet, one safety smock, and one safety blanket and use appropriate restraint systems.

V.  RESPONSIBILITY

A.  It is the responsibility of the administrative head to ensure that the facility is prepared to implement mental health watches, as specified in this AR.

B.  It is the responsibility of the administrative head and HSA to ensure that DOC employees/contract workers are aware of and comply with this AR.

C.  It is the responsibility of the chief of Behavioral Health Services to review and update this AR annually.

VI.  AUTHORITY

| Chapter | Subject | AR # | Page 9 |
|---|---|---|---|
| Offender Health Services | Mental Health Interventions | 700-29 | EFFECTIVE 11/01/15 |

    A.  CRS 17-1-103. Duties of the Executive Director.
    B.  CRS 24-37-303. Governor has final authority.
    C.  CRS 24-37-304. Additional budgeting responsibilities.
    D.  CRS 27-10. Care and Treatment of Persons with Mental Illness.

VII.  <u>HISTORY</u>

    December 15, 2014
    March 15, 2014
    April 15, 2013
    February 1, 2012
    January 1, 2011
    November 15, 2009
    November 15, 2008
    November 15, 2007
    November 15, 2006
    December 1, 2005
    August 15, 2005
    August 15, 2004

VIII.  <u>ATTACHMENTS</u>:

    A.  AR Form 700-29A, Non-Confidential Mental Health Directives
    B.  AR Form 700-29B, Mental Health Administrative Review Form
    C.  AR Form 700-29C, Mental Health Watch Intensive Supervision Log
    D.  AR Form 100-01A, Administrative Regulation Implementation/Adjustments

 **COLORADO**
Department of Corrections

AR Form 700-29A (11/01/15)

## Non-Confidential Mental Health Directives

Offender Name / DOC #:

Date:          Time of Directives:          Location:

Clinician Name/ Clinician #:

Type:     Begin MHW     Extend MHW     End MHW
     Infirmary Admit  Infirmary Discharge
Approved by the mental health program administrator or designee for extension of MHW for more than 72 hours     Yes / Date:

Risk Factors:
1)

2)

3)

Frequency of checks:     Direct Supervision     15 min     30 min

Conditions:

Clinical Ambulatory Restraints (full walking restraints) (initial directives must be reassessed within 4 hours) clothing consists of tee shirt and underwear. Offender must be able to drink water and use toilet unassisted or offered water and toilet every two hours. (Contact MH program administrator)

Helmet (initial directives must be reassessed within 4 hours)

Four Point Restraints (Infirmary and SCCF and DWCF RTP only)

Safety Garments:
1)
2)

Clothing:

Food / Utensils:

Shower / Hygiene: (indicate date of last shower)

Allowable Items:

Therapeutic Interventions:


RTP referral:     Pending     Not Recommended

Clinician Signature:

Distribution:
Shift Commander

Attachment A
Page 1 of 1



**COLORADO**
Department of Corrections

AR Form 700-29B (11/15/15)

## Mental Health Watch Administrative Review Form

| Offender Name (Last, First, MI) | DOC # | Facility |
|---|---|---|
| | | |

| Date Watch Started | Ordering Clinician | Date Watch Discontinued | Discontinuing Clinician |
|---|---|---|---|
| | | | |

Identified deficiencies in clinical services:



Plan to Resolve Identified deficiencies:



Responsible Party:

Identified Facility Issues:



Plan to Resolve Identified Facility Issues:



Responsible Party:

### Reviewing Signatures

| Mental Health Supervisor Signature: | Review Date: |
|---|---|
| HSA Signature: | Review Date: |
| Custody/Control Manger: | Review Date: |
| Administrative Head/Designee: | Review Date: |

### Routing of Completed Review

☐ Completed review form copy to the HSA.

☐ Quality Occurrence Report submitted

☐ If Clinical Services issues Chief of Clinical Operations and Quality Management Program Administrator

☐ Completed review packet to facility mental health supervisor for filing

Attachment B
Page 1 of 1

AR Form 700-29C (11/01/15)

 **COLORADO**
Department of Corrections

**Mental Health Watch**
**Intensive Supervision Log**

| Offender Name: | | DOC Number: |
|---|---|---|
| Facility / Location: | | |
| Today's Date: | Date & Time Watch Began: | Date & Time Watch Ended: |

### Status Assessment Codes

| | | | |
|---|---|---|---|
| 1. Appropriate Behavior | 7. Crying | 13. Restless | 19. Verbalizing Intent to Harm/ Kill Others |
| 2. Sleeping | 8. Describing Guilt, Remorse, Hopelessness | 14. Not Eating or Change in Eating Habits | 20. Doesn't Relate to DOC Employee / Others |
| 3. Verbalizing Intent to Harm / Kill Self | 9. Refusing Medications | 15. Angry | 21. Spitting |
| 4. Trying to Harm Self | 10. Rambling Speech | 16. Agitated | 22. Visit by MH Provider |
| 5. Withdrawn | 11. Rambling Speech | 17. Yelling / Screaming | 23. Cross Gender Observation – Exigent Circumstances |
| 6. Change in Hygiene | 12. Disturbed Sleep | 18. Pacing | 24. Other _____ |

### Mental Health Watch Intensive Supervision Log

| Date: | Time: | Supervision/Ordered: | Status Codes and Comments: | DOC Employee / Contract Worker Signature: |
|---|---|---|---|---|
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |
| | | ☐ Continuous<br>☐ 15 Minutes<br>☐ 30 Minutes | | |

Offender/DOC #: _____

## Mental Health Watch Intensive Supervision Log (Continued)
### PAGE _____ of _____

| Date: | Time: | Supervision/ Ordered: | Status Codes and Comments: | DOC Employee / Contract Worker Signature: |
|---|---|---|---|---|
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |
| | | □ Continuous<br>□ 15 Minutes<br>□ 30 Minutes | | |

ADMINISTRATIVE REGULATION
IMPLEMENTATION/ADJUSTMENTS

AR Form 100-01A (04/15/08)

| CHAPTER | SUBJECT | AR # | EFFECTIVE |
|---------|---------|------|-----------|
| Offender Health Services | Mental Health Watches | 700-29 | 11/01/15 |

(FACILITY/WORK UNIT NAME) _____
WILL ACCEPT AND IMPLEMENT THE PROVISIONS OF THE ABOVE ADMINISTRATIVE REGULATION:

[ ] AS WRITTEN  [ ] NOT APPLICABLE  [ ] WITH THE FOLLOWING PROCEDURES TO ACCOMPLISH THE INTENT
OF THE AR

(SIGNED) _____   (DATE) _____
              Administrative Head

Attachment E
Page 1 of 1